Erin Bolan Hines (*Pro Hac Vice Pending*)
Email:  EBolanHines@cozen.com
Melissa Siebert (*Pro Hac Vice Pending*)
Email:  MSiebert@cozen.com
COZEN O'CONNOR
123 North Wacker Drive, Suite 1800
Chicago, IL 60606
Telephone: 312.474.4490
Facsimile: 312.300.5645

Rebekah R. Shapiro (SBN 262834)
Email:  rrshapiro@cozen.com
COZEN O'CONNOR
101 Montgomery Street, Suite 1400
San Francisco, CA 94104
Telephone: 415.644.0914
Facsimile: 415.644.0978

Attorneys for Defendant
UKG INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AEGIS SENIOR COMMUNITIES LLC, <br><br> Plaintiff, <br><br> vs. <br><br> UKG, INC., and DOES 1 through 20 inclusive, <br><br> Defendants. | CASE NO. <br><br> **DECLARATION OF REBEKAH R. SHAPIRO IN SUPPORT OF DEFENDANT UKG INC.'S NOTICE OF REMOVAL** <br><br> Action Filed:      1/25/2023 |

I, Rebekah R. Shapiro, declare and state as follows:

1.      I am an attorney licensed to practice before all of the courts of the State of California, an associate attorney with the law firm of Cozen O'Connor, and counsel of record for Defendant UKG Inc. ("UKG"), in the above-entitled action. This declaration is based upon my personal knowledge, except as to those matters stated on information and belief and, as to those matters, I believe them to be true. If called upon as a witness, I could and would competently testify as to the facts set forth therein.

///

2.      Plaintiff Aegis Senior Communities LLC filed this civil action against UKG in the Superior Court of California, County of Alameda, on January 25, 2023.

3.      Attached as **Exhibit A** is a true and correct copy Plaintiff's Summons and Complaint, filed in the Alameda County Superior Court.

4.      Plaintiff's Complaint was served on and received by UKG on February 7, 2023.

5.      UKG files this Notice of Removal on March 9, 2023, or "within 30 days after receipt by the defendant, through service or otherwise, of a copy of the initial pleading." *See* 28 U.S.C. §1446(b)(1).

6.      UKG is a Delaware corporation with dual corporate headquarters in Weston, Florida and Lowell, Massachusetts. *See* Ex. A ¶ 13.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 9th day of March, 2023 in Redwood City, California.

_____
Rebekah R. Shapiro

DECLARATION OF REBEKAH R. SHAPIRO IN SUPPORT OF UKG INC.'S NOTICE OF REMOVAL

# EXHIBIT A

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
UKG, INC.; and DOES 1 through 20, Inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
AEGIS SENIOR COMMUNITIES LLC

**ELECTRONICALLY FILED**
Superior Court of California
County of Alameda
01/25/2023
Chad Finke, Executive Officer / Clerk of the Court
By: _____ A. Linhares _____ Deputy

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
SUPERIOR COURT OF CALIFORNIA, COUNTY OF ALAMEDA
Hayward Hall of Justice
24405 Amador Street
Hayward, CA 94544
Tel. 510-690-2700

CASE NUMBER:
*(Número del Caso):*
23CV026235

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Shareef Farag (251650); Alex Spjute (SBN 229796); Ava Claypool (327059) Tel: (310) 820-8800  Fax: (310) 820-8859
BAKER & HOSTETLER LLP
11601 Wilshire Boulevard, Suite 1400, Los Angeles, CA 90025-0509

DATE: 01/25/2023  Chad Finke, Executive Officer / Clerk of the Court  Clerk, by ___ A. Linhares ___, Deputy
*(Fecha)*  *(Secretario)*  *(Adjunto)*

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*


[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*
   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)   ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courtinfo.ca.gov*

Shareef Farag (251650)
Alex Spjute (SBN 229796)
Ava Claypool (327059)
**BAKER & HOSTETLER LLP**
11601 Wilshire Boulevard
Suite 1400
Los Angeles, CA  90025-0509
Telephone:      310.820.8800
Facsimile:      310.820.8859
Email:          sfarag@bakerlaw.com
                aspjute@bakerlaw.com
                aclaypool@bakerlaw.com

Attorneys for Plaintiff
AEGIS SENIOR COMMUNITIES LLC

**ELECTRONICALLY FILED**
Superior Court of California,
County of Alameda
**01/25/2023 at 11:45:06 AM**
By: Angela Linhares,
Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF ALAMEDA

AEGIS SENIOR COMMUNITIES LLC,

Plaintiff,

v.

UKG, INC.; and DOES 1 through 20, inclusive,

Defendants.

Case No.:   **23CV026235**

**COMPLAINT FOR**

1.  **Negligence**
2.  **Gross Negligence**
3.  **Violations of the California Unfair Competition Law**
4.  **Equitable Indemnity**
5.  **Breach of Contract**
6.  **Breach of Covenant of Good Faith and Fair Dealing**

Plaintiff AEGIS SENIOR COMMUNITIES, LLC hereby complains and alleges as follows:

## INTRODUCTION

1.      Plaintiff, Aegis Senior Communities, LLC ("Aegis" or "Plaintiff"), brings this action against United Kronos Group, Inc. ("UKG" or "Defendant") for its failure to implement and maintain reasonable security procedures and practices, including with respect to the sensitive and confidential personal information UKG obtains from its customers' employees; the consequent data breach of its systems that began in December of 2021; its failure to implement and maintain reasonable backup or contingency procedures and practices to prevent or minimize

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

- 1 -

disruption of services; and the resultant shut down of payroll services for approximately five weeks.

2.     UKG is one of the world's biggest workforce management software companies. The company collects, stores, and processes data for thousands of companies and millions of workers.

3.     As a result of UKG's grossly inadequate security measures, UKG was subject to a ransomware attack on its timekeeping system, Kronos Private Cloud, on or around December 11, 2021.

4.     The data breach exposed millions of workers' sensitive and confidential personal identifying information ("PII") to cybercriminals.

5.     Additionally, because of its extraordinary failure and refusal to create a safeguard or any backup plan for the event of a data breach, both UKG and its thousands of customers were unable to access any of UKG's timekeeping and payroll systems, resulting in extreme difficulties for Plaintiff attempting to correctly calculate and pay its employees.

6.     Many of the affected organizations included hospitals and healthcare systems, including Plaintiff, an Assisted Living and Memory Care Provider serving seniors in California, Nevada, and Washington.

7.     Plaintiff provides a continuum of care to elder residents suffering from physical and cognitive impairments. The care includes but is not limited to living arrangements, memory care, laundry, cleaning and dining services, and health and wellness activities.

8.     Plaintiff employs thousands of employees with a variety of responsibilities to help the elderly residents.

9.     As a result of UKG's payroll services going offline, it became very difficult for Plaintiff to correctly calculate and pay its employees, resulting in disruption of and harm to Plaintiff's business and other damages, as described below.

10.     On March 18, 2022, due to the failure of UKG's services and the subsequent difficulties by Plaintiff to compensate for that failure, Daniela Melgoza, an employee of Aegis,

COMPLAINT

filed a putative class action in the Superior Court of California against Plaintiff on behalf of herself and other employees.

11.     On May 5, 2022, due to the failure of UKG's services and the subsequent difficulties faced by Aegis to compensate for that failure, Daniela Melgoza, filed a Labor Code Private Attorneys General Act ("PAGA") enforcement action on behalf of herself and other employees against Plaintiff in the Northern District of California.

## PARTIES

12.     Plaintiff Aegis Senior Communities LLC, doing business as Aegis Living, is a Washington limited liability company with its principal place of business located in Bellevue, Washington. Plaintiff is registered to do business in the State of California and does business in the State of California.

13.     Defendant UKG, Inc. is a corporation formed under the laws of the State of Delaware, with dual corporate headquarters in Weston, Florida and Lowell, Massachusetts. UKG is the result of a merger between Ultimate Software and Kronos Incorporated. The merger was complete as of April 1, 2020.

## JURISDICTION AND VENUE

14.     UKG is registered to do business in California with the California Secretary of State under entity number C2111426. UKG regularly contracts with a multitude of businesses and organizations in California to provide continuous and ongoing human resource services, including timekeeping and payroll services.

15.      This Court has specific personal jurisdiction over UKG because Plaintiff's claims arise from UKG's specific contacts with the State of California – namely, UKG's provision of payroll and other human resource services to Plaintiff's assisted living communities  throughout California, UKG's failure to implement and maintain reasonable security procedures and practices with respect to those services, and the consequent interruption of and failure to timely restore or replace such services to Plaintiff's assisted living communities throughout California.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

16.     Venue is proper in this judicial district because some of the parties reside Alameda County, and a substantial part of the events giving rise to this action occurred in Alameda County.

**FACTUAL ALLEGATIONS**

17.     UKG is a multinational technology company that provides workforce and human resources management services, including timekeeping and payroll services, to many large businesses including Marriott International, MGM Resorts, PepsiCo, Tesla, Inc. and others.

18.     UKG was established in April 2020 as a result of a merger between Ultimate Software and Kronos Incorporated. UKG is one of the largest HR technology companies in the world, valued at $22 billion.

19.     Kronos Incorporated was an American multinational workforce management and human capital management cloud provider which provided cloud applications for workforce management and human capital management, as well as consulting, education, and support services to its customers.

20.     UKG currently provides its timekeeping services to many companies and organizations in California including PepsiCo, Tesla, GameStop, the University of California system, the County of Santa Clara, and many private and public hospital and healthcare organizations, including Aegis. UKG provides timekeeping and payroll services to thousands of employers.

21.     UKG's website indicates that its payroll services and solutions will eliminate errors, ensure compliance, and create the "perfect paycheck every time."

22.     UKG's website indicates that its payroll services and solutions "drive accuracy, improve efficiency, and ensure compliance by controlling and running payroll how you want, all based on the unique needs of your organization."

23.     In connection with its timekeeping and payroll services, UKG is also tasked with collecting and storing sensitive personal data, including Personally Identifiable Information ("PII") for its large corporate customers and their millions of workers.

24.     UKG's website indicates that it is committed to protecting the privacy of individuals who use UKG's services, including but not limited to UKG's customers and their

- 4 -

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

employees. The privacy notice on UKG's website also indicates that UKG uses physical, technical, and administrative controls and procedures to safeguard PII.

25.     Specifically, UKG's website indicates that "to protect the confidentiality, integrity, availability and resilience of your PI[I], we utilize a variety of physical and logical access controls, firewalls, intrusion detection/prevention systems, network and database monitoring, anti-virus, and backup systems."[1]

26.     On  July 25, 2019, Plaintiff entered into a contract with Kronos incorporated for the provision of certain human resources management services, specifically, Workforce Central Software, and Kronos Private Cloud services.

27.     On December 13, 2021, UKG sent a communication to impacted Kronos Private Cloud customers, including Plaintiff, informing them that UKG experienced a cybersecurity incident that rendered the Kronos Private Cloud (KPC) services unavailable. According to the communication, UKG became aware of unusual activity on December 11, 2021, and determined that the activity was a result of a ransomware attack.

28.     While UKG sent correspondence to its customers regarding the attack, the vague correspondence failed to provide any remedy to access the critical payroll information, and as a result, Plaintiff was unable to provide its employees with access to some of the payroll software until five weeks later, on January 19, 2022.

29.     On January 22, 2022, UKG posted an update to its website stating that "[b]etween January 4 and January 22, all affected customers in the Kronos Private Cloud were restored with safe and secure access to their core time, scheduling, and HR/payroll capabilities. We are now focused on the restoration of supplemental features and non-production environments and are extraordinarily grateful for the patience and partnership our customers have shown."

30.     UKG's carefully worded announcement failed to clarify that UKG's payroll services were still not fully operational, falsely suggesting that its services had been restored to a reliable state and suggesting Plaintiff and others could rely upon UKG for the payroll services it had agreed to provide. In reality, and contrary to this announcement, UKG did not have in place

---

[1] https://www.ukg.com/privacy (July 14, 2022)

backup systems or contingency plans that would have in fact ensured that payroll services were "restored."

31.     UKG confirmed as much on February 11, 2022, when it announced that only the first phase of the restoration process was complete and that many of KPC applications, such as Citrix, Workforce Analytics, and non-production environments, were still offline.

32.     The February 11, 2022, announcement went on to state that UKG had discovered and notified customers whose personal data of its employees "was exfiltrated."

33.     UKG claimed the theft of personal data was contained to employees of only two of its customers; however, in the same announcement, UKG admitted its forensic investigation was still ongoing.[2]

34.     The UKG outage affected approximately 8 million total employees, leaving employers to rely on handwritten timecards to process payroll until the system became available and leaving employees concerned about the security of their PII.

35.     Many employers were forced to warn their employees that some private information, including social security numbers, were potentially compromised and in the hands of the attackers. Specifically, UKG notified Puma North America Inc., a shoe and apparel company, that the attackers acquired social security numbers and other PII of approximately 6,632 employees.[3]

36.     The Federal Bureau of Investigations ("FBI") provides business continuity considerations that data companies should implement in anticipation of an attack. Some considerations include: backing up data regularly, verifying the integrity of those backups and testing the restoration process to ensure it is working; and conducting an annual penetration test and vulnerability assessment. On information and belief, UKG failed to adopt and implement the FBI's recommendations regarding preserving business continuity prior to the December 2021 attack.

---

[2] Hackers disrupt payroll for thousands of employers — including hospitals https://www.npr.org/2022/01/15/1072846933/kronos-hack-lawsuits. (last visited June 6, 2022).
[3] https://www.securityweek.com/data-puma-employees-stolen-kronos-ransomware-attack

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

COMPLAINT

37.     Prior to this attack, and as a result of the meteoric rise in ransomware attacks, the FBI created a Ransomware Prevention and Response Guide which compiles federal government and private industry best practices and mitigation strategies to prevent and respond to ransomware incidents. Some of the best practices include: Configuring firewalls to block access to known malicious IP addresses; patching operating systems, software, and firmware on devices; and setting anti-virus and anti-malware programs to conduct regular scans automatically. On information and belief, UKG failed to adopt and implement such practices and strategies prior to the December 2021 attack.

38.     The National Institute of Standards and Technology ("NIST") is part of the U.S. Department of Commerce. NIST guidelines and controls, including NIST 800-53, are generally used to enhance the cybersecurity framework, risk posture, information protection, and security standards of organizations. NIST 800-53 is mandatory for federal agencies, and commercial entities may also utilize its guidelines and controls in their security programs.

39.     NIST guidelines and controls are also used to assess vendors and contractors prior to contracting with the federal government.

40.     NIST recognizes the importance of having a contingency plan, and the controls for cybersecurity include a large section concerning appropriate contingency planning.[4] On information and belief, UKG failed to implement and adopt NIST's guidance regarding appropriate contingency planning.

- NIST also released a list of basic guidelines for organizations to follow to prevent and respond to ransomware attacks.[5] On information and belief, UKG failed to adopt and implement such guidelines.

41.     UKG could have prevented the ransomware attack by implementing preventative measures as advised by the federal government and the National Institute of Standards and Technology.

---

[4] Security and Privacy Controls for Information Systems and Organizations https://csrc.nist.gov/CSRC/media/Projects/risk-management/800-53%20Downloads/800-53r5/SP_800-53_v5_1-derived-OSCAL.pdf
[5] Ransomware Risk Management: A Cybersecurity Framework Profile https://nvlpubs.nist.gov/nistpubs/ir/2022/NIST.IR.8374.pdf

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

42.     UKG could and should have mitigated the damage of the attack and allowed employers access to timekeeping and payroll services by creating a continuity and recovery plan as advised by the federal government and the National Institute of Standards and Technology.

43.     Upon information and belief, UKG did not create a continuity and recovery plan as advised by the federal government and the National Institute of Standards and Technology.

44.     Upon information and belief, UKG did not create or maintain any continuity or recovery plan to anticipate a foreseeable data breach.

45.     UKG was on notice of the rise in ransomware attacks and was on notice that it was a target for ransomware attackers.

46.     In April and May 2021, the Colonial Pipeline Company was forced to shut down its pipeline system in response to a ransomware attack. Colonial Pipeline gave into demands and paid the attackers $4.4 million. As a result of the attack, government officials urged owners of critical infrastructure companies, like UKG, to follow best practices to prevent against ransomware attacks and to adopt a heightened state of awareness for the risks of ransomware.[6] [7]

47.     UKG's knowledge and notice of a potential ransomware attack is highlighted by the string of attacks against payroll companies in particular.

48.     In November 2021, Frontier Software, a payroll and talent management software, was the victim of a ransomware attack. The attack compromised the data of approximately 38,000 to 80,000 South Australian government employees, including dates of birth, start dates, and other payroll data.[8]

49.     In January 2021, the third-party payroll provider for Arup, a UK-based engineering firm that employees 6,000 employees, was a victim of a ransomware attack.  Arup

---

[6] DarkSide Ransomware: Best Practices for Preventing Business Disruption from Ransomware Attacks. https://www.cisa.gov/uscert/ncas/alerts/aa21-131a

[7] Joint CISA-FBI Cybersecurity Advisory on DarkSide Ransomware. https://www.cisa.gov/uscert/ncas/current-activity/2021/05/11/joint-cisa-fbi-cybersecurity-advisory-darkside-ransomware.

[8] Frontier Software data breach. https://www.sa.gov.au/topics/emergencies-and-safety/types/cyber-security/frontier-software-data-breach

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

was only informed in March of 2021. In April 2021, the full details of the attack were published. Data stolen included employee names, bank details, and home addresses.[9]

50.     In May 2020, Interserve, a contractor for Britain's Ministry of Defense, was hacked. The hackers managed to gain access to up to 100,000 past and current employee details, including names, addresses, bank details, HR records, payroll, and pension information.[10]

51.     In February 2021, about 4,500 customers of a Honolulu payroll processing company, Hawaii Payroll Services, LLC, were potentially affected by a ransomware attack that exposed Social Security numbers, dates of birth, the full names of clients and bank account information.[11]

52.     Despite having ample notice of the prevalence of data breaches, and specifically data breaches against payroll services, UKG failed to prioritize data security by failing to adopt reasonable and government-suggested data security measures to prevent and detect unauthorized access to its sensitive and critical infrastructure systems and databases. Despite knowing that its software provided critical payroll and timesheet services for millions of employees, UKG failed to adopt and implement reasonable and well-known restoration and business continuity measures. UKG is a multinational company with the resources to prevent and properly react to a breach, but refused to adequately invest in data security, even at a time where data breaches were on the rise. UKG failed to undertake adequate analyses and testing of its systems, training of its personnel, and other data security measures to ensure vulnerabilities were avoided or remedied. UKG also deliberately chose not to implement basic backup measures or create or implement any contingency plan to ensure continuity of payroll services so that Plaintiff could accurately and efficiently pay its employees.

**PLAINTIFF'S ALLEGATIONS**

53.     Plaintiff became a customer of UKG's Kronos Workforce Central Software after signing a statement of work contract on July 25, 2019. (**Ex. A**.) Plaintiff purchased UKG's

---

[9] Global consultancy firm Arup victim of data breach. https://celsolicitors.co.uk/global-consultancy-firm-arup-victim-of-data-hackers/
[10] Interserve data breach. https://www.dataleaklawyers.co.uk/blog/interserve-data-breach
[11] Thousands Affected by Ransomware Attack on Hawaii Company.  https://www.govtech.com/security/thousands-affected-by-ransomware-attack-on-hawaii-company

Kronos Workforce Central Software to provide timekeeping and payroll services for its employees, and agreed on monthly service fees of $8,725. Among other services, UKG was to provide the following applications:

- Workforce Timekeeper
- Workforce Manager
- Workforce Accruals
- Workforce Scheduler
- Workforce AR
- Workforce Payroll
- KSS Tool, Timecard Confirmation Tool
- Workforce Employee
- Workforce Administrator HR/PR

54.    According to the UKG Website, Kronos Workforce would "manage schedules, track time and attendance, administer absence and leave, and measure productivity."[12]

55.    Plaintiff purchased Kronos Workforce to manage schedules, track time and attendance, administer absence and leave (which is particularly complex and important in the healthcare industry), and measure productivity.

56.    According to the UKG Website, Kronos Timekeeper is guaranteed to "track, manage, and control employee time and attendance for **uncompromised** results."[13] UKG also promises that Kronos Timekeeper will "centrally enforce labor laws, union rules, and organization-specific policies."

57.    Plaintiff purchased Kronos Timekeeper from UKG to track, manage, and control employee time and attendance, and expected uncompromised results, as advertised and promised by UKG

---

[12] https://www.kronos.co.uk/products/workforce-central-suite
[13] https://www.kronos.com/resource/download/8066

COMPLAINT

58.     Plaintiff purchased Kronos Timekeeper from UKG to centrally enforce labor laws, union rules, and organization-specific policies, which are of utmost important in the healthcare industry.

59.     UKG's Terms and Conditions in the contract provide that the Applications, under normal operation as specified in the Documentation and when used as authorized, will perform substantially in accordance with such Documentation.

60.     UKG's Terms and Conditions in the contract provide that UKG shall provide administrative, physical, and technical safeguards for protection of the security, confidentiality, and integrity of customer data.

61.     Plaintiff fundamentally relied on UKG's representations that the software would perform as described.

62.     Plaintiff fundamentally relied on UKG's representations UKG's software would drive accuracy, improve efficiency, ensure compliance, and create the "perfect paycheck every time."

63.     Plaintiff fundamentally relied on UKG's representations that it would provide administrative, physical, and technical safeguards for protection of the security, confidentiality, and integrity of customer data.

64.     On December 13, 2021, UKG sent a communication to impacted KPC customers, including Plaintiff, informing them that UKG experienced a cybersecurity incident that rendered the KPC services unavailable. According to the communication, UKG became aware of unusual activity on December 11, 2021, and determined that the activity was a result of a ransomware attack.

65.     While UKG sent correspondence to its customers regarding the attack, the vague correspondence failed to provide any remedy to access the critical payroll information.

66.     As a direct and foreseeable result of UKG's grossly negligent failure to implement and maintain critical data security procedures or continuity plans, Plaintiff's timekeeping and payroll systems were instantly unavailable as of approximately December 11, 2021 and remained inaccessible for use to Aegis employees until January 19, 2022, approximately five weeks

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

following the initial breach. UKG lacked any back up or business continuity protocols, so all customers, including Plaintiff, were deprived of the software and services for which they had contracted and paid.

67. Plaintiff was unable to access the UKG services and software it was promised for the period between approximately December 11, 2021 and January 19, 2022.

68. Plaintiff attempted to have its employees accurately record their hours manually so that they could be paid accurately and efficiently while UKG's promised services were failing.

69. Plaintiff operates in a fast-paced healthcare environment where the number one priority is resident care.

70. Plaintiff's employees work complex shifts and require different regulatory breaks across different states.

71. Prior to UKG's data breach, Plaintiff paid its employees consistently and accurately, and provided breaks in accordance with state and federal laws.

72. Plaintiff relied on UKG's expertise to calculate nursing, care and other staff breaks, shift differentials, and other complex payroll solutions that Plaintiff paid for and UKG advertised. Plaintiff does not have the infrastructure to accurately record the hours of its employees without UKG's systems.

73. Plaintiff maintained a leanly staffed payroll department because it fundamentally relied on UKG's representations that it would provide consistent and accurate payroll services.

74. Despite Plaintiff's best efforts, Plaintiff could not accurately keep and manage time worked for employees, and some employees received inaccurate pay.

75. On March 18, 2022, Daniela Melgoza, an employee of Aegis, filed a putative class action against Plaintiff on behalf of herself and other employees, due to the payment and break inaccuracies caused by the data breach which rendered UKG's payroll services unavailable to Plaintiff. (**Ex. B**)

76. On May 5, 2022, Daniela Melgoza, an employee of Aegis, filed a Labor Code Private Attorneys General Act ("PAGA") enforcement action against Plaintiff on behalf of herself

COMPLAINT

and other employees, due to the payment and break inaccuracies caused by the data breach which rendered UKG's payroll services unavailable to Plaintiff.

77.     As a direct result of UKG's breaches and failures, Plaintiff has incurred damages and additional costs including but not limited to:

- Outside contractors and consultants to assist in processing manual payroll
- Overtime hours paid to employees tasked with manually recording working hours and breaks
- Defending labor claims caused by inaccurate or untimely payments
- Outside consultant to assist with getting the payroll system back online
- Outside consultant to assist with exporting time information from timeclocks during the period of the outage
- Overpayments to employees as a result of not being able to accurately capture their time
- Shipping costs for shipping paper checks to employees via FedEx
- Costs associated with issuing amended W-2 forms

## CLAIMS FOR RELIEF

### COUNT I

### NEGLIGENCE

78.     Plaintiff re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

79.     UKG owes Plaintiff and its employees a duty to exercise reasonable care in protecting the PII of Plaintiff's employees. This duty includes implementing and maintaining reasonable security procedures and practices appropriate to the nature of the PII that are compliant with and/or better than industry-standard practices. UKG's duties included a duty to design, maintain, and test its security systems to ensure that customer PII was adequately secured and protected, to implement processes that would detect a breach of its security system in a timely manner, to timely act upon warnings and alerts, including those generated by its own security

systems regarding intrusions to its networks, and to have a continuity plan in place to ensure that it can continue to provide its critical payroll services.

80.     UKG breached its duty to Plaintiff by failing to design, maintain, and test its security systems to ensure that customer PII was adequately secured and protected.

81.     It was foreseeable that a failure to implement adequate, industry-standard security measures would result in a data breach, causing injury to customers and their employees.

82.     Such failure did result in a data breach, which exposed PII and caused injury to Plaintiff and its employees.

## COUNT II

### GROSS NEGLIGENCE

83.     Plaintiff re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

84.     Given the highly sensitive nature of the PII UKG collects from its customers' employees and the likelihood of harm resulting from its unauthorized access, acquisition, use, or disclosure, UKG owes Plaintiff and its employees a duty to exercise reasonable care in protecting such information. This duty includes implementing and maintaining reasonable security procedures and practices appropriate to the nature of the PII that are compliant with and/or better than industry-standard practices. UKG's duties included a duty to design, maintain, and test its security systems to ensure that customer PII was adequately secured and protected, to implement processes that would detect a breach of its security system in a timely manner, to timely act upon warnings and alerts, including those generated by its own security systems regarding intrusions to its networks, and to have a continuity plan in place to ensure that it can continue to provide its critical payroll services.

85.     Given UKG's size and market share of payroll services, including processing data for millions of employees, and managing the processing of hundreds of millions of dollars, UKG owes a duty to customers to use reasonable measures to create a continuity plan in the event of a highly foreseeable data breach. This duty includes implementing and maintaining reasonable security procedures and practices appropriate to the nature of the PII that are compliant with

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

- 14 -

and/or better than industry-standard practices. UKG's duties include a duty to design, maintain, and test its security systems to ensure that customer PII is adequately secured and protected, to implement processes that would detect a breach of its security system in a timely manner, to timely act upon warnings and alerts, including those generated by its own security systems regarding intrusions to its networks, and to have a continuity plan in place to ensure that it can continue to provide its critical payroll services.

86.    It was foreseeable to UKG that a failure to follow federal guidelines to protect against data breaches would result in injury to its customers and their employees, including by exposing its customers to legal liability arising from, among other things, employee and wage-related litigation.  In fact, multiple UGK customers, including Aegis, have been sued by their employees as a result of UGK's failure to follow such guidelines.

87.    Actual and attempted breaches of data security were reasonably foreseeable to UKG given that other payroll companies had suffered such attacks as well as the known frequency of data breaches and various warnings from industry experts.

88.    In connection with the conduct described above, UKG acted willfully, wantonly, and without even scant care in neglecting to adequately protect its software from a data breach.

89.    In connection with the conduct described above, UKG acted willfully, wantonly, and without even scant care in neglecting to create a continuity plan in the event of a highly foreseeable data breach.

90.    UKG owed a duty to Plaintiff to exercise reasonable care to avoid sudden disruption to its human resources services, including its timekeeping and payroll services. UKG was responsible for providing continuous and ongoing timekeeping and payroll services to Plaintiff, knowing that such services were for the benefit of making timely wage payments to employees, among other things, and that any disruption, particularly any sudden disruption, would cause Plaintiff and its employees harm.

91.    UKG's duty also arose from its unique position as one of the largest cloud computing companies in the world whose services constitute a linchpin of the payroll services of a substantial fraction of the nation. Because of its crucial role within the payroll system, UKG

was in a unique and superior position to protect against the harm suffered by Plaintiff and its employees as a result of the UKG data breach.

92.     But for UKG's wrongful and grossly negligent breach of its duties owed to Plaintiff and its employees, Plaintiff's timekeeping and payroll services would not have been disabled and Plaintiff would have been able to accurately compensate its employees, avoiding injury, including from the class action suit filed against Plaintiff.

93.     As a direct and proximate result of UKG's gross negligence, Plaintiff and its employees have been injured as described herein, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

## COUNT III

## VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE § 17200, et seq.

94.     Plaintiff re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

95.     Defendant violated California's Unfair Competition Law ("UCL") Cal. Bus. & Prof. Code § 17200, *et seq*., by engaging in unlawful, unfair, or fraudulent business acts and practices, and unfair, deceptive, untrue, or misleading advertising that constitute acts of unfair competition as defined in the UCL, including, but not limited to, the following:

a.   by representing and advertising that it would maintain adequate data privacy and security practices using physical, technical, and administrative controls and procedures;

b.   by representing and advertising that it would track, manage, and control employee time and attendance for uncompromised results and that it would centrally enforce labor laws, union rules, and organization-specific policies.

c.   by representing and advertising that its services would eliminate errors, ensure compliance, and create the "perfect paycheck every time."

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

96.     These unfair acts and practices were immoral, unethical, oppressive, unconscionable, and substantially injurious to Plaintiff.

97.     As a result of UKG's unfair and unlawful practices, Plaintiff was, and continues to be injured and lost money or property, including but not limited to the fees paid to defend itself from the class action caused by UKG's unfair business practices.

98.     UKG knew or should have known that its computer systems and data security systems were inadequate and that the risk of a data breach or theft was highly likely. UKG's actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing, and willful, and/or wanton and reckless.

99.     Plaintiff seeks relief under the UCL, including restitution to the Class of money or property that UKG may have acquired by means of Defendant's deceptive, unlawful, and unfair business practices, declaratory relief, attorney fees, costs and expenses.

## COUNT IV

### EQUITABLE INDEMNITY

100.    Plaintiff re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

101.    As a result of UKG's grossly negligent and unfair acts described above, Plaintiff has been required to defend against a class action filed by Plaintiff's employees. To the extent Plaintiff is found liable for the conduct alleged in the employees' putative class action complaint, UKG's conduct caused or substantially contributed to the damages as alleged by the employees' complaint.

102.    As such, should Plaintiff's employees recover any amount of damages against Plaintiff by way of judgment, settlement, or otherwise, Plaintiff is entitled to an equitable apportionment of liability, and any judgment must be apportioned to UKG for its role in causing the damages.

/ / /

/ / /

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

## COUNT V

### BREACH OF CONTRACT

103.     Plaintiff re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

104.     The parties, for valuable consideration, entered into a valid and enforceable contract on July 25, 2019 for the performance of software and services by UKG, formerly Kronos, Incorporated, in return for money payments by Aegis.

105.     The contract provided that UKG would provide Workforce Central Software as a Service (SaaS) to Aegis. Workforce Central Software provided services including, but not limited to, Workforce Timekeeper, Workforce HR, Workforce Payroll, and Workforce Timecard Confirmation Tool.

106.     Section 12 of the contract provided that UKG would provide administrative, physical, and technical safeguards for the protection of the security, confidentiality, and integrity of customer data.

107.     UKG breached the contract by failing to provide the Workforce Central Software as a service (SaaS) to Aegis for a period of approximately 5 weeks. During that time, Aegis was unable to access services critical to its day to day business operations. UKG breached the contract by failing to provide adequate safeguards to protect customer data, and allowing a data breach.

108.     UKG willfully and knowingly engaged in unfair and deceptive conduct by failing to provide adequate safeguards to protect customer data, and by failing to provide the services as promised in the contract.

109.     Such unfair and deceptive conduct caused substantial injury to Plaintiff, as a consumer, and to its employees.

110.     As a result of UKG's breach of contract, Aegis has been injured as described herein, and is entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

/ / /

/ / /

## COUNT VI

## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

111.    Plaintiff re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

112.    At all times relevant to this litigation, UKG was in a contractual relationship with Plaintiff.

113.    This contract was subject to an implied Covenant of Good Faith and Fair Dealing that all parties would act in good faith and with reasonable efforts to perform their contractual duties. This included the covenant that UKG would act fairly and in good faith in carrying out its contractual obligations to provide Plaintiff with the timekeeping and payroll services for which it contracted and adequately protect the PII of its employees.

114.    Defendant breached the Covenant of Good Faith and Fair Dealing by refusing to implement the agreement as intended, including failing to provide Plaintiff with its payroll and timekeeping services, and failing to adequately protect the PII of Plaintiff's employees.

115.    As a result of UKG's breach of the Covenant of Good Faith and Fair Dealing, Aegis has been injured as described herein, and is entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the Court grant Plaintiff the following relief against Defendant:

a.    An award to Plaintiff of compensatory, consequential, nominal, statutory, and treble damages as set forth above;

b.    An award of attorneys' fees, costs, and expenses, as provided by law or equity;

c.    An award of pre-judgment and post-judgment interest, as provided by law or equity; and

COMPLAINT

1      d.   Such other relief as the Court may allow.

2

3   Dated:    January 25, 2023                    Respectfully submitted,

4

5                                                  BAKER & HOSTETLER LLP

6                                                  By:    /s/ Shareef Farag
                                                          Shareef Farag
7

8                                                  Attorneys for Plaintiff
                                                   AEGIS SENIOR COMMUNITIES LLC
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A



**Quote#: Q-27903**
**Expires: 7/26/2019**
**Sales Executive: Jennifer Ellis**

<span style="color:red">**ORDER FORM**</span>
**Order Type: Quote**
**Date: 7/25/2019**

---

**Bill To Contact:**

**Bill To: AEGIS SENIOR COMMUNITIES, LLC**
**17602 NE UNION HILL RD**
**REDMOND, WA 98052 USA**

**Ship To Contact:Amy Nelson**

**Ship To: AEGIS SENIOR COMMUNITIES, LLC**
**17602 NE UNION HILL RD**
**REDMOND, WA 98052 USA**

**Ship to Phone:425-895-7614**
**Contact:AMY NELSON**
**Email:cloudservices-licensing@kronos.com**

---

**Currency: USD**
**Customer PO Number:**
**Solution ID: 6072632**
**Initial Term:24 months**
**Billing Start Date: 120 Days from Execution of Order Form**
**Data Center Location: USA**

**FOB: Shipping Point**
**Ship Method:**
**Freight Term: Prepay & Add**
**Renewal Term:12 months**
**Payment Term: Net 30 Days**

---

**Order Notes:**

This order is made as part of a Kronos promotion. All pricing is discounted solely in connection with such promotion and will not be applied to future orders. In consideration of the foregoing and discounted pricing and other good and valuable considerations, the receipt and sufficiency of which is hereby acknowledged, Kronos shall provide Workforce Central Software as a Service (SaaS) applications to Customer, in exchange for Customer's existing perpetual licenses for same, as indicated on this Order Form. Customer's existing Software License Agreement, including Software Support services, and Cloud Hosting services, as applicable, shall continue to apply to the perpetual licenses for a period of ninety (90) days from execution of this Order Form, and shall terminate thereafter. Customer agrees and understands that they are giving up their right to use the existing Workforce Central perpetual software licenses upon termination of the existing Software License Agreement. Notwithstanding the foregoing, Customer may continue to access the Software for historical viewing purposes only. The Workforce Central Software as a Service Terms and Conditions, as agreed upon by Customer and Kronos, shall apply to the Workforce Central Applications set forth on this Order Form. Workforce Central SaaS Monthly Service Fees shall be invoiced at the Billing Frequency indicated on this Order Form, commencing on the Billing Start Date. As of the Billing Start Date, Kronos will credit any pre-paid but unused fees for Software Support and/or Cloud Hosting Services on the perpetual licenses, as applicable. Credits may be applied against any amounts owed to Kronos by Customer until such credit is expended. Customer shall pay for Software Support and Cloud Hosting services fees, as applicable, on the perpetual licenses until the Workforce Central SaaS Billing Start Date. Professional Services concessions valid only for the Workforce Central licenses included on this Order Form.


For a period of 2 years from the date of this Order Form, Customer may purchase additional employee capacity for the Applications set forth herein at the following prices: The costs of any individual Application(s) included in the Timekeeper Bundle (i.e., Workforce Manager) will be set forth on a mutually agreed upon Order Form based on Kronos' then current list price. The costs of any individual

---

Application(s) included in the HR Bundle (i.e., HR/Payroll Manager) will be set forth on a mutually agreed upon Order Form based on Kronos' then current list price.

| Applications | PEPM |
|---|---|
| Workforce Timekeeper | $3.40 |
| Workforce Manager | Included |
| Workforce Employee | Included |
| Workforce Integration Manager | Included |
| Workforce Mobile Employee | Included |
| Workforce Mobile Manager | Included |
| Workforce Scheduler | $1.00 |
| Workforce Accruals | $0.40 |
| Workforce Human Resources | $2.80 |
| Workforce HR/Payroll Employee | Included |
| Workforce HR/Payroll Manager | Included |
| Workforce HR/Payroll Administrator | Included |
| Workforce Payroll | $2.80 |
| KSS Tool Attestation Tool Kit | $0.20 |
| KSS Tool FT-PT Analysis Report | $250.00 |
| KSS Timecard Confirmation | $200.00 |

Future Capacity and Capacity Added above Converted license counts will be added via the Timekeeper bundle, which includes: Workforce Timekeeper; Workforce Manager 1:10 Ratio; Workforce Employee; Workforce Integration Manager; Workforce Mobile Employee; Workforce Mobile Manager. The costs of any individual Application(s) included in the Timekeeper Bundle (i.e., Workforce Manager) will be set forth on a mutually agreed upon Order Form based on Kronos' then current list price.

Future Capacity and Capacity Added above Converted license counts will be added via the Workforce HR Bundle which includes: Workforce HR; Workforce HR/Payroll Administrator 1:100 Ratio; Workforce HR/PR Manager 1:10 Ratio; Workforce HR/PR Employee. The costs of any individual Application(s) included in the HR Bundle (i.e., Workforce HR/PR Manager) will be set forth on a mutually agreed upon Order Form based on Kronos' then current list price.

**PERPETUAL TO SAAS CONVERSION TABLE**
Billing Frequency: Monthly in Arrears

| Converted Applications | License Count | PEPM | Monthly Service Fee |
|---|---|---|---|
| Perpetual License to SaaS Conversion Monthly Service Fee | N/A | N/A | 8,725.00 |

| Converted Applications | License Count |
|---|---|
| WORKFORCE TIMEKEEPER V8 SAAS | 2,500 |
| WORKFORCE MANAGER V8 SAAS | 165 |
| WORKFORCE ACCRUALS V8 SAAS | 2,500 |
| WORKFORCE SCHEDULER V8 SAAS | 600 |
| WORKFORCE HR V8 SAAS | 2,500 |
| WORKFORCE PAYROLL V8 SAAS | 2,500 |
| KSS TOOL,ATTESTATION TOOL KIT V8 SAAS | 2,500 |
| KSS TOOL,FT-PT ANALYSIS REPORT V8 SAAS | 1 |
| KSS TOOL,TIMECARD CONFIRMATION TOOL V8 SAAS | 1 |
| WORKFORCE EMPLOYEE V8 SAAS | 650 |
| WORKFORCE INTEGRATION MANAGER V8 SAAS | 2,500 |

| Converted Applications | License Count |
|---|---|
| WORKFORCE ADMINISTRATOR HR/PR V8 SAAS | 20 |

**Education Services**
Billing Frequency: Invoiced Upon signature of the Order form

| Item | Quantity | Total Price |
|---|---|---|
| KNOWLEDGE PASS | 2,500 | USD 4,625.00 |
| **Total Price** | | **USD 4,625.00** |

**Bill As You Go Services**
Billing Frequency: Monthly as Delivered

| Item | Billing Role | Quantity | Unit Price | Total Price |
|---|---|---|---|---|
| PARAGON ONLINE REMOTE TEAM | Project Manager | 65 | USD 180.00 | USD 11,700.00 |
| PARAGON ONLINE REMOTE TEAM | Solution Consultant | 68 | USD 180.00 | USD 12,240.00 |
| PARAGON ONLINE HRMS REMOTE TEAM | Integration Consultant | 34 | USD 180.00 | USD 6,120.00 |
| PRO SVCS WFC UPGRADE TO CLOUD HOSTING/SAAS CONVERSION | Project Manager | 112 | USD 0.00 | USD 0.00 |
| PRO SVCS WFC UPGRADE TO CLOUD HOSTING/SAAS CONVERSION | Technology Consultant | 78 | USD 0.00 | USD 0.00 |
| PRO SVCS WFC UPGRADE TO CLOUD HOSTING/SAAS CONVERSION | Integration Consultant | 62 | USD 0.00 | USD 0.00 |
| PRO SVCS WFC UPGRADE TO CLOUD HOSTING/SAAS CONVERSION | Solution Consultant | 86 | USD 0.00 | USD 0.00 |
| | | | | **USD 30,060.00** |

**Bill As You Go Instructor Lead Training**
Billing Frequency: Monthly as Delivered

| Item | Points | Total Price |
|---|---|---|
| Bill-As-You-Go Instructor Lead Training | 7,750 | USD 7,750.00 |
| | | **USD 7,750.00** |

**Quote Summary**

| Item | Total Price |
|---|---|
| Total Monthly Service Fees | USD 8,725.00 |

| | Total Price |
|---|---|

| | |
|---|---|
| Purchased Training | USD 4,625.00 |

| | Total Price |
|---|---|
| Bill As You Go Instructor Led Training | USD 7,750.00 |

| | Total Price |
|---|---|
| Total Bill As You Go Services | USD 37,810.00 |

**AEGIS SENIOR COMMUNITIES, LLC**          **Kronos Incorporated**

Signature: _____          Signature:_____

Name: Walter Jossart                       Name:_____

Title: CFO                                 Title:_____

Effective Date: 7/26/19                    Effective Date:_____

Invoice amount will reflect deposit received. All professional services are billed as delivered with a payment term of Net Upon Receipt. Unless otherwise indicated above, this order is subject to the attached terms and conditions which the customer acknowledges have been read. THIS ORDER IS SUBJECT TO APPLICABLE TAXES.  THE ACTUAL TAX AMOUNT TO BE PAID BY CUSTOMER WILL BE SHOWN ON CUSTOMER'S INVOICE. Shipping and handling charges will be reflected on the final invoice. The Monthly Price on this Order Form has been rounded to two decimal places for display purposes. As many as eight decimal places may be present in the actual price. Due to the rounding calculations, the actual price may not display as expected when displayed on your Order Form. Nonetheless, the actual price on your invoice is the true and binding total for this order for purposes of amounts owed for the term. If you are tax exempt; please provide a copy of your "Tax Exempt Certificate" with your signed quote.



# Statement of Work for AEGIS SENIOR COMMUNITIES, LLC

## WFC SaaS Migration

| | |
|---|---|
| Sales Executive | Jennifer Ellis |
| Author | James Polachy |
| Expiration Date | 7/26/2019 |
| Quote Number | 2019-49380 |
| Revision # | 1 |
| Opportunity ID | Opp-261385 |
| Status | Approved |
| Customer SID | 6072632 |

(c) 2019, Kronos Incorporated and related companies. All rights reserved.
CONFIDENTIAL - Not to be disclosed to third parties without specific written consent from Kronos.

# Overview

This Statement of Work ("SOW") provides an overview of the project including scope, approach, costs, and how the project will be managed. To support a successful implementation, the customer will provide the required internal project resources.

# Project Objectives WFC SaaS

Aegis is installing ~~Workforce Dimensions~~ on the Kronos Professional Cloud to modernize their workforce management platform,  improve employee engagement, and reduce technological debt.

*No customs or customs reports included
*No additional interfaces included
*Additional services may require a change order and incurr fees

# Proposed Solution

| Module | Project Type |
|---|---|
| Workforce Timekeeper | Upgrade |
| Workforce Manager | Upgrade |
| Workforce Employee | Upgrade |
| Workforce Integration Manager | Upgrade |
| Workforce Scheduler | Upgrade |
| Workforce Accruals | Upgrade |
| Workforce HR | Upgrade |
| Workforce Payroll | Upgrade |
| Workforce HR/Payroll Administrator | Upgrade |
| KSS Tool Attestation Tool Kit | Upgrade |

Project duration is expected to be 12 working weeks, based upon our experience with our customers and products. Depending upon the preparation and engagement of your organization, there may be opportunity to complete the project in a compressed duration.  However, if project resources are unprepared or unavailable, the duration of the project may need to be extended, increasing the budget required to successfully complete this scope of work.  Requests for additional scope or activities outside of this planned project scope may be accommodated through the change process. In this circumstance, Kronos may issue a change order to ensure the appropriate budget is available.

Kronos will deliver the scope of this project utilizing a remote approach.



## KnowledgePass

KnowledgePass™ is a subscription to an online educational portal. It provides enterprise access to tutorials, task simulations, job aids, sandboxes, webinars, and additional educational documents to help your team succeed.

KnowledgePass provides tools that allow you to build role specific learning paths and assign them to your users. Kronos will guide you on the creation of 2 user roles, including title selection and learning path assignments. The offering is delivered by a KnowledgePass Mentor via a remote interactive workshop.

## Instructor Led Training

Kronos Instructor Led Training is purchased as Training Points. Training Points allow you to budget for training with the flexibility to adjust your plan during implementation.

**Core Team** training will help your key functional and technical users to make informed solution design, configuration decisions and provide core product knowledge.

| Module | Description |
|--------|-------------|
| Workforce Timekeeper | Public instructor led training for 2 |

**Train-the-Trainer Programs** prepares internal training teams to deliver user training to managers, supervisors and employees.

| Module | Description |
|--------|-------------|
| Workforce Timekeeper | Public instructor led training for 1 |
| Workforce Scheduler for HC | Public instructor led training for 1 |



# Project Approach

The project team will collaborate to establish a project plan with tasks, responsibilities, and milestone dates and provide the foundation for project control. Kronos will complete an environment readiness review with your project team resources to ensure the server environment is available and pre-requisites have been installed. Kronos will perform test upgrade, deploy interfaces and complete validation testing of upgraded environment. Upon completion of customer user acceptance testing, Kronos will complete the upgrade to production.

## Project Leadership

Kronos will provide guidance through the life cycle of the project and provide best practices to implement the solution. As the main point of contact, the Kronos Project Manager will partner with the customer project leadership to develop the project plan to ensure objectives are achieved. The Kronos Project Manager will also deliver a collaborative workspace, which will serve as the dashboard for all aspects of the progress of the implementation.

# Solution Assumptions

## Workforce Central

- 2 Workforce Central environment(s) included in this deployment
- Customer has SQL Database
- The Authentication method will be Standard
- 3 existing interface(s) included

## Workforce Timekeeper

- 5 Standard Timeclocks will be upgraded
- 5 Timeclocks with TouchID will be upgraded

## Workforce HR

- 5 HR/PR Custom Reports
- 10 HR/PR Interfaces

## Workforce Payroll

- 1 Custom check(s)



## Services Investment Summary

This SOW represents a time and materials engagement.  Travel expenses are not included and will be invoiced separately as incurred.

| Service Type | |
|---|---|
| Professional Services | $30,060.00 |
| Educational Services | $12,375.00 |
| | $42,435.00 |



## Signatures and Approvals

SUBMITTED AND APPROVED BY KRONOS REPRESENTATIVE

By: _____   Date: _____

Title: _____

This Statement of Work is subject to the AEGIS SENIOR COMMUNITIES, LLC's Workforce Central SaaS or perpetual license agreement with Kronos governing Professional and Education Services. By signing below, the authorized AEGIS SENIOR COMMUNITIES, LLC's representative agrees to purchase the services described herein.

ACCEPTED AND AGREED
AEGIS SENIOR COMMUNITIES, LLC

By: _____   Date: __7/2u/19_____

Title: _____CFO_____

AEGIS SENIOR COMMUNITIES, LLC may make necessary copies of this document for the sole purpose of facilitating internal evaluation and/or execution of proposed project. Otherwise, the document or any part thereof may not be reproduced in any form without the written permission of Kronos Incorporated. All rights reserved. Copyright 2019.

## WORKFORCE CENTRAL - SOFTWARE AS A SERVICE
## TERMS AND CONDITIONS

Customer and Kronos Incorporated ("Kronos") agree that the terms and conditions set forth below shall apply to the Kronos supply of the commercially available version of the Workforce Central SaaS Applications in Kronos' hosting environment, the services related thereto, and the sale or rental of Equipment (if any) specified on a Kronos Order Form.  The Applications described on the Order Form shall be delivered by means of Customer's permitted access to the Kronos infrastructure hosting such Applications.

Kronos and Customer hereby further agree that Kronos and/or its direct and indirect majority owned subsidiaries may enter into orders with Customer and/or its direct and indirect majority owned subsidiaries subject to the terms and conditions of this Agreement.  By signing and entering into an Order Form that expressly references this Agreement, each such subsidiary of Kronos and/or Customer will be deemed to have agreed to be bound by the terms and conditions of this Agreement and all references in this Agreement to "Kronos" shall be references to the applicable Kronos entity entering into the order, and all references in this Agreement to "Customer" shall be references to the applicable Customer entity entering into the order.

## 1.  DEFINITIONS
**"Acceptable Use Policy"** means the Kronos policy describing prohibited uses of the Services as further described at: https://www.kronos.com/policies/acceptable-use
 **"Agreement"** means these terms and conditions and the Order Form(s).
**"Application(s)"** or **"SaaS Application(s)"** means those Kronos software application programs set forth on an Order Form which are made accessible for Customer to use under the terms of this Agreement.
**"Billing Start Date"** means the date the billing of the Monthly Service Fees begin to accrue as indicated on the applicable Order Form.  Notwithstanding, Implementation Services provided on a time and material basis are billed monthly as delivered.  The Billing Start Date of the Monthly Service Fees for any Services ordered by Customer after the date of this Agreement which are incremental to Customer's then-existing Services shall be the date the applicable Order Form is executed by Kronos and Customer.
**"Cloud Services"** means those services related to Customer's cloud environment as further described at: http://www.kronos.com/products/workforce-central-cloud/cloud-guidelines.aspx
 **"Confidential Information"** means any non-public information of a party or its Suppliers relating to such entity's business activities, financial affairs, technology, marketing or sales plans that is disclosed pursuant to this Agreement and reasonably should have been understood by the receiving party, because of (i) legends or other markings, (ii) the circumstances of disclosure or (iii) the nature of the information itself, to be proprietary or confidential to the disclosing party or its Suppliers.
**"Customer Content"** means all content Customer, or others acting on behalf of or through Customer, posts or otherwise inputs into the Services.
**"Documentation"** means user manuals published by Kronos relating to the features and functionality of the Applications.
**"Equipment"** means the Kronos equipment specified on an Order Form.
**"Implementation Services"** means those professional and educational services provided by Kronos to set up the cloud environment and configure the Applications.  Unless otherwise set forth on an Order Form as "a la carte" services (supplemental fixed fee, fixed scope services) or "bill as you go" services (time and material services described in a Statement of Work), Kronos will provide, as part of the Monthly Service Fee for the Applications, the fixed fee, fixed scope Implementation Services described in the Services Implementation Detail set forth at:  https://www.kronos.com/wfc-saas-implementation-guideline-details-flat-fee
 **"Initial Term"** means the initial billing term of the Services as indicated on the Order Form.  The Initial Term commences on the Billing Start Date.  Customer may have access to the Services prior to the commencement of the Initial Term.
**"KnowledgePass Content"/"KnowledgePass Education Subscription"** have the meanings ascribed in Section 7.5.
**"Monthly Service Fee(s)"** means the monthly fees described in an Order Form.  Monthly Service Fees include fees for usage of the Applications and the Services, Cloud Services as applicable, and Equipment rental, if any.  Billing of the Monthly Service Fee(s) commences on the Billing Start Date.

1

"**Order Form**" means an order form mutually agreed upon by Kronos and Customer setting forth the items ordered by Customer and to be provided by Kronos, including without limitation the prices and fees to be paid by Customer.

"**Personally Identifiable Data**" means information concerning individually identifiable employees of Customer that is protected against disclosure under applicable law or regulation.

"**Renewal Term**" means the renewal billing term of the Services as indicated on the Order Form.

"**Services**" means (i) the Cloud Services, (ii) accessibility to the commercially available version of the Applications by means of access to the password protected customer area of a Kronos website, and all such services, items and offerings accessed by Customer therein, and (ii) the Equipment rented hereunder, if any.

"**Statement of Work**", "**SOW**", "**Services Scope Statement**" and "**SSS**" are interchangeable terms referring to a written description of the Implementation Services mutually agreed upon by Kronos and Customer and set forth as "bill as you go" services on the Order Form.

"**Supplier**" means any contractor, subcontractor or licensor of Kronos providing software, equipment and/or services to Kronos which are incorporated into or otherwise related to the Services. Kronos may at its sole discretion replace a Supplier, provided that a change to Supplier will not have a materially adverse effect on the Services delivered by Kronos under this Agreement.

"**Term**" means the Initial Term and any Renewal Terms thereafter.

"**Training Points**" has the meaning ascribed to it in Section 7.6 below.

## 2. TERM

**2.1**  Billing for the Services commences on the Billing Start Date, and continues for the Initial Term or until terminated in accordance with the provisions hereof.  At the expiration of the Initial Term and each Renewal Term as applicable, the Services shall automatically renew each year for an additional Renewal Term until terminated in accordance with the provisions hereof.

**2.2**  Either party may terminate the Services and this Agreement to be effective at the expiration of the then current Term upon no less than sixty (60) days prior written notice.

**2.3**  Either party may terminate the Services and the Agreement upon a material breach of the Agreement by the other party if such breach is not cured within thirty (30) days after receipt of written notice.

**2.4**  In the event that either party becomes insolvent, makes a general assignment for the benefit of creditors, is adjudicated a bankrupt or insolvent, commences a case under applicable bankruptcy laws, or files a petition seeking reorganization, the other party may request adequate assurances of future performance.  Failure to provide adequate assurances, in the requesting party's reasonable discretion, within ten (10) days of delivery of the request shall entitle the requesting party to terminate the Agreement immediately upon written notice to the other party.

**2.5**  If the Agreement is terminated for any reason:

(a)  Customer shall pay Kronos within thirty (30) days of such termination, all fees accrued and unpaid under this Agreement prior to the effective date of such termination, provided however, if Customer terminates for material breach of the Agreement by Kronos, Kronos shall refund Customer any pre-paid fees for Services not delivered by Kronos;

(b)  Customer's right to access and use the Applications shall be revoked and be of no further force or effect and return rented Equipment as provided in Section 9.1 below;

(c)  Customer agrees to timely return all Kronos-provided materials related to the Services to Kronos at Customer's expense or, alternatively, destroy such materials and provide Kronos with an officer's certification of the destruction thereof; and

(d)  All provisions in the Agreement, which by their nature are intended to survive termination, shall so survive.

**2.6**  Customer Content shall be available to Customer to retrieve at any time and at no additional charge throughout the Term and for no more than thirty (30) days after expiration or termination of the Agreement for any reason.  After such time period, Kronos shall have no further obligation to store or make available the Customer Content and will securely delete all Customer Content without liability of any kind.

## 3. FEES AND PAYMENT

**3.1**  Customer shall pay Kronos the Monthly Service Fees, the fees for the Implementation Services and any additional one time or recurring fees for Equipment, Training Points, KnowledgePass Education Subscription and such other Kronos offerings, all as set forth on the Order Form.  The Monthly Service Fees will be invoiced on the frequency set forth on the Order Form ("**Billing Frequency**").  If Customer and Kronos

Rev. 07182019

have signed a Statement of Work for the Implementation Services, Implementation Services will be invoiced monthly as delivered unless otherwise indicated on the Order Form.  If Kronos is providing Implementation Services in accordance with the Services Implementation Guideline or as "a la carte" services on the Order Form, Kronos will invoice Customer for Implementation Services in advance of providing such Implementation Services unless otherwise indicated on the Order Form.  All other Kronos offerings will be invoiced upon execution of the applicable Order Form by Kronos and Customer.  Unless otherwise indicated on an Order Form, payment for all items shall be due 30 days following date of invoice.  All payments shall be sent to the attention of Kronos as specified on the invoice.  Except as expressly set forth in this Agreement, all amounts paid to Kronos are non-refundable.  Customer is responsible for all applicable federal, state, country, provincial or local taxes relating to the goods and services provided by Kronos hereunder (including without limitation GST and/or VAT if applicable), excluding taxes based on Kronos' income or business privilege.

**3.2**   If any amount owing under this or any other agreement between the parties is thirty (30) days or more overdue, Kronos may, without limiting Kronos' rights or remedies, suspend Services until such amounts are paid in full.  Kronos will provide at least seven (7) days prior written notice that Customer's account is overdue before suspending Services.

**3.3**   At the later of (i) one (1) year after the effective date of this Agreement, or (ii) expiration of the Initial Term, and at each annual anniversary of that date thereafter, Kronos may increase the Monthly Service Fee rates in an amount not to exceed four percent (4%).  The increased Monthly Service Fees will be reflected in the monthly invoice following the effective date of such increase without additional notice.

## 4. RIGHTS TO USE

**4.1**   Subject to the terms and conditions of the Agreement, Kronos hereby grants Customer a limited, revocable, non-exclusive, non-transferable, non-assignable right to use during the Term and for internal business purposes only: a) the Applications and related services, including the Documentation; b) training materials and KnowledgePass Content; and, c) any embedded third party software, libraries, or other components, which form a part of the Services.  The Services contain proprietary trade secret technology of Kronos and its Suppliers.  Unauthorized use and/or copying of such technology are prohibited by law, including United States and foreign copyright law.  Customer shall not reverse compile, disassemble or otherwise convert the Applications or other software comprising the Services into uncompiled or unassembled code.  Customer shall not use any of the third party software programs (or the data models therein) included in the Services except solely as part of and in connection with the Services.  The JBoss® Enterprise Middleware components of the Service are subject to the end user license agreement found at http://www.redhat.com/licenses/jboss_eula.html   Customer acknowledges that execution of separate third party agreements may be required in order for Customer to use certain add-on features or functionality, including without limitation tax filing services.

**4.2**   Customer acknowledges and agrees that the right to use the Applications is limited based upon the amount of the Monthly Service Fees paid by Customer.  Customer agrees to use only the modules and/or features for the number of employees and users as described on the Order Form.  Customer agrees not to use any other modules or features nor increase the number of employees and users unless Customer pays for such additional modules, features, employees or users, as the case may be.  Customer may not license, relicense or sublicense the Services, or otherwise permit use of the Services (including timesharing or networking use) by any third party.  Customer may not provide service bureau or other data processing services that make use of the Services without the express prior written consent of Kronos.  No license, right, or interest in any Kronos trademark, trade name, or service mark, or those of Kronos' licensors or Suppliers, is granted hereunder.

**4.3**   Customer may authorize its third party contractors and consultants to access the Services through Customer's administrative access privileges on an as needed basis, provided Customer: a) abides by its obligations to protect Confidential Information as set forth in this Agreement; b) remains responsible for all such third party usage and compliance with the Agreement; and c) does not provide such access to a competitor of Kronos who provides workforce management services.

**4.4**   Customer acknowledges and agrees that, as between Customer and Kronos, Kronos retains ownership of all right, title and interest to the Services, all of which are protected by copyright and other intellectual property rights, and that, other than the express rights granted herein and under any other agreement in writing with Customer, Customer shall not obtain or claim any rights in or ownership interest to the Services or Applications or any associated intellectual property rights in any of the foregoing.  Customer agrees to

Rev. 07182019

comply with all copyright and other intellectual property rights notices contained on or in any information obtained or accessed by Customer through the Services.

**4.5** When using and applying the information generated by the Services, Customer is responsible for ensuring that Customer complies with applicable laws and regulations. If the Services include the Workforce Payroll Applications or Workforce Absence Management Applications: (i) Customer is solely responsible for the content and accuracy of all reports and documents prepared in whole or in part by using these Applications, (ii) using these Applications does not release Customer of any professional obligation concerning the preparation and review of any reports and documents, (iii) Customer does not rely upon Kronos, Best Software, Inc. or these Applications for any advice or guidance regarding compliance with federal and state laws or the appropriate tax treatment of items reflected on such reports or documents, and (iv) Customer will review any calculations made by using these Applications and satisfy itself that those calculations are correct.

## 5. ACCEPTABLE USE

**5.1** Customer shall take all reasonable steps to ensure that no unauthorized persons have access to the Services, and to ensure that no persons authorized to have such access shall take any action that would be in violation of this Agreement. Customer is responsible for all activities undertaken under the auspices of its passwords and other login credentials to use the Services.

**5.2** Customer represents and warrants to Kronos that Customer has the right to publish and disclose the Customer Content in connection with the Services. Customer represents and warrants to Kronos that the Customer Content will comply with the Acceptable Use Policy.

**5.3** Customer will not (a) use, or allow the use of, the Services in contravention of the Acceptable Use Policy.

**5.4** Kronos may suspend the Services immediately upon written notice in the event of any security risk, negative impact on infrastructure or Acceptable Use Policy violation.

## 6. CONNECTIVITY AND ACCESS

Customer acknowledges that Customer shall (a) be responsible for securing, paying for, and maintaining connectivity to the Services (including any and all related hardware, software, networking, internet access, third party services and related equipment and components); and (b) provide Kronos and Kronos' representatives with such physical or remote access to Customer's computer and network environment as Kronos deems reasonably necessary in order for Kronos to perform its obligations under the Agreement. Customer will make all necessary arrangements as may be required to provide access to Customer's computer and network environment if necessary for Kronos to perform its obligations under the Agreement.

## 7. IMPLEMENTATION AND SUPPORT

**7.1** *Implementation Services*. Kronos will provide the Implementation Services to Customer. Implementation Services described in an SOW are provided on a time and materials basis, billed monthly as delivered unless otherwise indicated on the Order Form. Implementation Services described in the Services Implementation Guideline are provided on a flat fee basis. If Customer requests additional Implementation Services beyond those described in the Services Implementation Guideline, Kronos will create a change order for Customer's review and approval and any additional Implementation Services to be provided by Kronos will be billed as delivered at the then-current Kronos professional services rates. Kronos' configuration of the Applications will be based on information and work flows that Kronos obtains from Customer during the discovery portion of the implementation. Customer shall provide Kronos with all necessary and accurate configuration-related information in a timely manner to ensure that mutually agreed implementation schedules are met. In the event that Kronos is required to travel to Customer's location during the implementation, Customer agrees to pay any travel expenses, such as airfare, lodging, meals and local transportation, plus an administrative fee of ten percent (10%) of the amount of such travel expenses, incurred by Kronos in accordance with the then-current standard Kronos travel and expense policies, which Kronos will provide to Customer upon request. Kronos shall invoice Customer for such travel expenses and payment thereof shall be due net thirty (30) days from date of invoice. Kronos' then-current Professional/Educational Services Policies shall apply to all Implementation Services provided by Kronos and may be accessed at: http://www.kronos.com/Support/ProfessionalServicesEngagementPolicies.htm ("Professional Services Policies"). In the event of a conflict between the Professional Services Policies and this Agreement, the terms of this Agreement shall prevail.

**7.2** *Additional Services*. Customer may engage Kronos to provide other services which may be fixed by activity ("a la carte") or provided on a time and materials basis ("bill as you go") as indicated on the applicable Order Form.

4

**7.3** *Support*.  Kronos will provide 24x7 support for the cloud infrastructure, the availability to the cloud environment, and telephone support for the logging of functional problems and user problems.  Customer may log questions online via the Kronos Customer Portal.  As part of such support, Kronos will make updates to the Services available to Customer at no charge as such updates are released generally to Kronos' customers.  Customer agrees that Kronos may install critical security patches and infrastructure updates automatically as part of the Services.  Kronos' then-current Support Services Policies shall apply to all Support Services provided by Kronos and may be accessed at: http://www.kronos.com/Support/SupportServicesPolicies.htm ("**Support Policies**").  In the event of a conflict between the Support Policies and this Agreement, the terms of this Agreement shall prevail.

**7.4** *Support Services for Equipment*.  Provided Customer has purchased support services for the Equipment, the following terms shall apply (Depot Exchange support services for rented Equipment are included in the rental fees for such Equipment):

(a)  Customer may select, as indicated on an Order Form, an Equipment Support Services option offered by the local Kronos entity responsible for supporting the Equipment if and as such offerings are available within the Kronos territory corresponding to the Equipment's location.  Kronos shall provide each Equipment Support Services offering as specified herein.

(i)  Depot Exchange and Depot Repair.  If Customer has selected Depot Exchange or Depot Repair Equipment Support Services, the following provisions shall apply:  Upon the failure of installed Equipment, Customer shall notify Kronos of such failure and Kronos will provide remote fault isolation at the FRU (Field Replacement Unit) or subassembly level and attempt to resolve the problem. Those failures determined by Kronos to be Equipment related shall be dispatched to a Kronos Depot Repair Center, and Customer will be provided with a Return Material Authorization Number (RMA) for the failed Equipment if Customer is to return the failed Equipment to Kronos, as reasonably determined by Kronos. Customer must return the failed Equipment with the supplied RMA number. Hours of operation, locations and other information related to Kronos' Depot Repair Centers are available upon request and are subject to change. Return and repair procedures for failed Equipment shall be provided based on the Depot option - Depot Exchange or Depot Repair - selected by Customer on the applicable Order Form and as specified herein and in Kronos' then-current Support Services Policies.  Service packs for the Equipment (as described in subsection (ii) below) are included in both Depot Exchange and Depot Repair Support Services.

*Depot Exchange*: Kronos will provide a replacement for the failed Equipment at the FRU or subassembly level on an "advanced exchange" basis, utilizing a carrier of Kronos' choice. Replacement Equipment will be shipped for delivery to Customer's location as further described in the Support Policies. REPLACEMENT EQUIPMENT MAY BE NEW OR RECONDITIONED. Customer shall specify the address to which the Equipment is to be shipped. All shipments will include the Kronos provided RMA designating the applicable Kronos Depot Repair Center, as the recipient. Customer, upon receipt of the replacement Equipment from Kronos, shall package the defective Equipment in the materials provided by Kronos, with the RMA supplied and promptly return failed Equipment directly to Kronos.

*Depot Repair*: Upon failure of installed Equipment, Customer shall install a Spare Product (as defined below) to replace the failed Equipment. Customer shall then return the failed Equipment, with the required RMA, to the applicable Kronos Depot Repair Center. Customer shall make reasonable efforts to return the failed Equipment using the same or substantially similar packing materials in which the original Equipment was sent. Customer shall also specify the address to which the repaired Equipment should be return shipped.  Upon receipt of the failed Equipment, Kronos shall repair the failed Equipment and ship it, within ten (10) business days after receipt, to Customer. Kronos shall ship the repaired Equipment by regular surface transportation to Customer.

(ii)  Device Software Updates Only.  If Customer has selected Device Software Equipment Support Services, Customer shall be entitled to receive:
(A) Service packs for the Equipment (which may contain system software updates, firmware updates, security updates, and feature enhancements) available for download at Kronos' customer portal.  Service packs for the Equipment are not installed by the Kronos Depot Repair Center but are available for download at Kronos' customer portal, provided Customer is maintaining the Equipment under an annual Equipment Support Services plan with Kronos.; and

Rev. 07182019

(B) Access to the Kronos Support Services Center for the logging of requests for assistance downloading service packs for the Equipment.

(b) *Warranty*. Kronos warrants that all service packs and firmware updates provided under this Agreement shall perform in accordance with the Kronos published specifications in all material respects for a period of ninety (90) days after download by Customer. In the event of a breach of this warranty, Customer's exclusive remedy shall be Kronos' repair or replacement of the deficient service pack(s) or firmware update(s), at Kronos' option, provided that Customer's use, installation and maintenance thereof have conformed to the specifications.

(c) *Responsibilities of Customer*. It is Customer's responsibility to purchase and retain, at Customer's location and at Customer's sole risk and expense, a sufficient number of spare products (**"Spare Products"**) to allow Customer to replace failed Equipment at Customer's locations in order for Customer to continue its operations while repairs are being performed and replacement Equipment is being shipped to Customer. For each of the Depot Exchange and Depot Repair Equipment Support Services options, Customer agrees that it shall return failed Equipment promptly as the failures occur and that it shall not hold failed Equipment and send failed Equipment to Kronos in "batches" which shall result in a longer turnaround time to Customer. In addition, Customer agrees to:
    (i) Maintain the Equipment in an environment conforming to the Kronos published specifications for such Equipment;
    (ii) Not perform self-repairs on the Equipment (i.e., replacing components) without prior written authorization from Kronos;
    (iii) De-install all failed Equipment and install all replacement Equipment in accordance with Kronos' written installation guidelines;
    (iv) Ensure that the Equipment is returned to Kronos properly packaged; and
    (v) Obtain an RMA before returning any Equipment to Kronos and place the RMA clearly and conspicuously on the outside of the shipping package. Customer may only return the specific Equipment authorized by Kronos when issuing the RMA.

(d) *Delivery*. All domestic shipments within the United States are FOB Destination to/from Customer and Kronos with the shipping party bearing all costs and risks of loss, and with title passing upon delivery to the identified destination. All international shipments from Kronos to Customer are DAP (Incoterms 2010) to the applicable Customer location, and are DDP (Incoterms 2010) to the applicable Kronos Depot Repair Center when Customer is shipping to Kronos, and with title passing upon delivery to the identified destination. Customer is responsible for all duties and taxes when sending Equipment to Kronos.

**7.5** *KnowledgePass Education Subscription*. When KnowledgePass Education Subscription is purchased on an Order Form (i.e., not indicated as "Included" in the Monthly Service Fees), Kronos will provide Customer with the KnowledgePass Education Subscription for a period of one (1) year from execution of the Order Form. Kronos will send Customer a renewal invoice for renewal of the KnowledgePass Education Subscription, and the KnowledgePass Education Subscription shall renew for an additional one (1) year term if Customer pays such invoice before the end of the then-current term for the KnowledgePass Education Subscription. The KnowledgePass Education Subscription provides access to certain educational offerings provided by Kronos (the "**KnowledgePass Content**"). Customer recognizes and agrees that the KnowledgePass Content is copyrighted by Kronos. Customer is permitted to make copies of the KnowledgePass Content provided in *pdf form solely for Customer's internal use. Customer may not disclose such KnowledgePass Content to any third party other than Customer's employees. Customer may not edit, modify, revise, amend, change, alter, customize or vary the KnowledgePass Content without the written consent of Kronos, provided that Customer may download and modify contents of training kits solely for Customer's internal use.

**7.6** *Training Points*. "**Training Points**" are points which are purchased by Customer that may be redeemed for an equivalent value of instructor-led training sessions offered by Kronos. Training Points may be redeemed only during the Term but only prior to the date which is no more than twelve (12) months after the date of the Order Form pursuant to which the Training Points were acquired, after which time such Training Points shall expire and be of no value. Training Points may not be exchanged for other Kronos products or services.

**7.7** *Training Courses*. When Training Points or training sessions are set forth in an SSS, the SSS applies. When Training Points or training sessions are not set forth in an SSS, as part of the Services, for each SaaS application module included in the Services purchased by Customer, Customer's employees shall be entitled

Rev. 07182019

to attend, in the quantity indicated, the corresponding training courses set forth at: www.kronos.com/products/workforce-central-saas/training-guidlines.aspx
Participation in such training courses is limited to the number of seats indicated for the courses corresponding to the modules forming a part of the Services purchased by Customer.

**7.8** *Technical Account Manager*. Customers purchasing a Kronos Technical Account Manager ("**TAM**") as indicated on the Order Form shall receive the services of a dedicated, but not exclusive, TAM for one production instance of the Software. Customer will designate up to two primary and three secondary backup technical contacts ("**Technical Contacts**") to be the sole contacts with the TAM. Upon request, Customer may designate a reasonable number of additional and/or backup Technical Contacts. Customer is required to place all primary Technical Contacts through Kronos training for the Applications covered under this Agreement at Customer's expense.

## 8. CUSTOMER CONTENT

Customer shall own all Customer Content. Kronos acknowledges that all of the Customer Content is deemed to be the Confidential Information of Customer. Customer will ensure that all Customer Content conforms with the terms of this Agreement and applicable law. Kronos and its Suppliers may, but shall have no obligation to, access and monitor Customer Content from time to time to provide the Services and to ensure compliance with this Agreement and applicable law. Customer is solely responsible for any claims related to Customer Content and for properly handling and processing notices that are sent to Customer regarding Customer Content.

## 9. EQUIPMENT

If Customer purchases or rents Equipment from Kronos, a description of such Equipment (model and quantity), the applicable pricing, and delivery terms shall be listed on the Order Form.

**9.1** *Rented Equipment*. The following terms apply only to Equipment Customer rents from Kronos:
(a)     Rental Term and Warranty Period. The term of the Equipment rental and the "Warranty Period" for such Equipment shall run coterminously with the Term of the other Services provided under the Agreement.
(b)     Insurance. Customer shall insure the Equipment for an amount equal to the replacement value of the Equipment for loss or damage by fire, theft, and all normal extended coverage at all times. No loss, theft or damage after shipment of the Equipment to Customer shall relieve Customer from Customer's obligations under the Agreement.
(c)     Location/Replacement. Customer shall not make any alterations or remove the Equipment from the place of original installation without Kronos' prior written consent. Kronos shall have the right to enter Customer's premises to inspect the Equipment during normal business hours. Kronos reserves the right, at its sole discretion and at no additional cost to Customer, to replace any Equipment with newer or alternative technology Equipment as long as the replacement Equipment at least provides the same level of functionality as that being replaced.
(d)     Ownership. All Equipment shall remain the property of Kronos. All Equipment is, and at all times shall remain, separate items of personal property, notwithstanding such Equipment's attachment to other equipment or real property. Customer shall not sell or otherwise encumber the Equipment. Customer shall furnish any assurances, written or otherwise, reasonably requested by Kronos to give full effect to the intent of terms of this paragraph (d).
(e)     Equipment Support. Kronos shall provide to Customer the Equipment support services described in Section 7.
(f)     Return of Equipment. Upon termination of the Agreement or the applicable Order Form, Customer shall return, within thirty (30) days of the effective date of termination and at Customer's expense, the Equipment subject to this Section 9.1. Equipment will be returned to Kronos in the same condition as and when received, reasonable wear and tear excepted. If Customer fails to return Equipment within this time period, upon receiving an invoice from Kronos, Customer shall pay Kronos the then list price of the unreturned Equipment.

**9.2** *Purchased Equipment*. The following terms apply only to Equipment Customer purchases from Kronos:
(a)     Title and Warranty Period. When the Order Form indicates FOB – Shipping Point, title to the Equipment passes to Customer upon delivery to the carrier; for all other shipping terms, title passes upon delivery to Customer. The "**Warranty Period**" for the Equipment shall be for a period of 90 days  from such delivery (unless otherwise required by law).

Rev. 07182019

(b)      Kronos shall provide to Customer the Equipment support services described in this Agreement if purchased separately by Customer as indicated on the applicable Order Form.  If purchased, Equipment support services have a term of one (1) year commencing upon expiration of the Warranty Period. Equipment support services will be automatically extended for additional one (1) year terms on the anniversary of its commencement date ("Renewal Date"), unless either party has given the other thirty (30) days written notification of its intent not to renew. Kronos may change the annual support charges for Equipment support services effective at the end of the initial one (1) year term or effective on the Renewal Date, by giving Customer at least thirty (30) days prior written notification.

**9.3** *Equipment with Finger Scan Sensor Technology.* The following terms apply only to any Equipment with finger scan sensor technology purchased by Customer from Kronos or a Kronos reseller ("Finger Scan Equipment"):

(a)  To the extent that any biometric privacy laws may apply to Customer's use of the Finger Scan Equipment, Customer warrants that they will comply with any such laws prior to commencing use of the Finger Scan Equipment and will remain in compliance at all times.   Customer further warrants that, if required by law, prior to such use it will (i) obtain signed releases from employees consenting to the use of the Finger Scan Equipment for employee timekeeping purposes and (ii) issue policies made available to their employees and the public regarding its retention and destruction of the Finger Scan data.  Customer further warrants that it will ensure that any releases, consents, or policies, as required by applicable law, will by their terms expressly apply to Kronos and its authorized subcontractors.

(b)  Customer agrees to defend, hold harmless and indemnify Kronos, its employees, directors, parent, subsidiaries and authorized partners and subcontractors (collectively, "Kronos Indemnitees") for any claims, damages, penalties or fines asserted or awarded against a Kronos Indemnitee arising out of or relating to Customer's breach of any of the foregoing warranties in Section 9.3(a) above.  Upon receipt of such notice, the Customer shall assume sole control of the defense and settlement of such claim; provided that (i) Kronos will be entitled to participate in the defense of such claim and to employ counsel at its own expense to assist in the handling of such claim, on a monitoring and a non-controlling basis; (ii) Customer shall not settle any claim on any terms or in any manner that adversely affects the rights of Kronos without its prior written consent; and (iii) Kronos will provide reasonable cooperation and assistance at Customer's sole cost and expense.

## 10.  SERVICE LEVEL AGREEMENT

Kronos shall provide the service levels and associated credits, when applicable, in accordance with the Service Level Agreement attached hereto as Exhibit A and which is hereby incorporated herein by reference. CUSTOMER'S SOLE AND EXCLUSIVE REMEDY IN THE EVENT OF ANY SERVICE OUTAGE OR INTERRUPTION OF THE SERVICES OR FAILURE BY KRONOS TO MEET THE TERMS OF THE APPLICABLE SERVICE LEVEL AGREEMENT, SHALL BE THE REMEDIES PROVIDED IN EXHIBIT A.

## 11.  LIMITED WARRANTY; DISCLAIMERS OF WARRANTY

**11.1**  Kronos represents and warrants to Customer that the Applications, under normal operation as specified in the Documentation and when used as authorized herein, will perform substantially in accordance with such Documentation during the Term.

**11.2**  Kronos' sole obligation and Customer's sole and exclusive remedy for any breach of the foregoing warranty is limited to Kronos' reasonable commercial efforts to correct the non-conforming Applications at no additional charge to Customer. In the event that Kronos is unable to correct material deficiencies in the Services arising during the Warranty Period, after using Kronos' commercially reasonable efforts to do so, Customer shall be entitled to terminate the then remaining Term of the Agreement as Customer's sole and exclusive remedy.  Kronos' obligations hereunder for breach of warranty are conditioned upon Customer notifying Kronos of the material breach in writing, and providing Kronos with sufficient evidence of such non-conformity to enable Kronos to reproduce or verify the same.

**11.3**  Kronos warrants to Customer that each item of Equipment shall be free from defects in materials and workmanship during the Warranty Period.  In the event of a breach of this warranty, Customer's sole and exclusive remedy shall be Kronos' repair or replacement of the deficient Equipment, at Kronos' option, provided that Customer's use, installation and maintenance thereof have conformed to the Documentation for such Equipment. This warranty is extended to Customer only and shall not apply to any Equipment (or parts thereof) in the event of:

Rev. 07182019

(a)      damage, defects or malfunctions resulting from misuse, accident, neglect, tampering, (including without limitation modification or replacement of any Kronos components on any boards supplied with the Equipment), unusual physical or electrical stress or causes other than normal and intended use;

(b)      failure of Customer to provide and maintain a suitable installation environment, as specified in the published specifications for such Equipment; or

(c)      malfunctions resulting from the use of badges or supplies not approved by Kronos.

EXCEPT AS PROVIDED FOR IN THIS SECTION 11, KRONOS HEREBY DISCLAIMS ALL WARRANTIES, CONDITIONS, GUARANTIES AND REPRESENTATIONS RELATING TO THE SERVICES, EXPRESS OR IMPLIED, ORAL OR IN WRITING, INCLUDING WITHOUT LIMITATION THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE AND NON-INFRINGEMENT, AND WHETHER OR NOT ARISING THROUGH A COURSE OF DEALING, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY THAT MAY OTHERWISE ARISE PURSUANT TO ANY STATUTE, CODE, COMMON LAW OR JUDICIAL DECISION.  THE SERVICES ARE NOT GUARANTEED TO BE ERROR-FREE OR UNINTERRUPTED.  EXCEPT AS SPECIFICALLY PROVIDED IN THIS AGREEMENT, KRONOS MAKES NO WARRANTIES OR REPRESENTATIONS CONCERNING THE COMPATIBILITY OF THE SERVICES, THE SAAS APPLICATIONS OR THE EQUIPMENT NOR ANY RESULTS TO BE ACHIEVED THEREFROM.

## 12. DATA SECURITY

**12.1** As part of the Services, Kronos shall provide those administrative, physical, and technical safeguards for protection of the security, confidentiality and integrity of Customer data as described at: http://www.kronos.com/products/workforce-central-cloud/cloud-guidelines.aspx

**12.2** As between Customer and Kronos, all Personally Identifiable Data is Customer's Confidential Information and will remain the property of Customer.  Customer represents that to the best of Customer's knowledge such Personally Identifiable Data supplied to Kronos is accurate.  Customer hereby consents to the use, processing or disclosure of Personally Identifiable Data by Kronos and Kronos' Suppliers wherever located only for the purposes described herein and only to the extent such use or processing is necessary for Kronos to carry out Kronos' duties and responsibilities under the Agreement or as required by law.

**12.3** Prior to initiation of the Services under the Agreement and on an ongoing basis thereafter, Customer agrees to provide notice to Kronos of any extraordinary privacy or data protection statutes, rules, or regulations which are or become applicable to Customer's industry and which could be imposed on Kronos as a result of provision of the Services.  Customer will ensure that: (a) the transfer to Kronos and storage of any Personally Identifiable Data by Kronos or Kronos' Supplier's data center is permitted under applicable data protection laws and regulations; and, (b) Customer will obtain consents from individuals for such transfer and storage to the extent required under applicable laws and regulations.

## 13. INDEMNIFICATION

**13.1**   Kronos shall defend Customer and its respective directors, officers, and employees (collectively, the "**Customer Indemnified Parties**"), from and against any and all notices, charges, claims, proceedings, actions, causes of action and suits, brought by a third party (each a "**Claim**") alleging that the permitted uses of the Services infringe or misappropriate any United States or Canadian copyright or patent, and Kronos will indemnify and hold harmless the Customer Indemnified Parties against any liabilities, obligations, costs or expenses (including without limitation reasonable attorneys' fees) actually awarded to a third party as a result of such Claim by a court of applicable jurisdiction or as a result of Kronos' settlement of such a Claim.  In the event that a final injunction is obtained against Customer's use of the Services by reason of infringement or misappropriation of such copyright or patent, or if in Kronos' opinion, the Services are likely to become the subject of a successful claim of such infringement or misappropriation, Kronos, at Kronos' option and expense, will use commercially reasonable efforts to (a) procure for Customer the right to continue using the Services as provided in the Agreement,  (b) replace or modify the Services so that the Services become non-infringing but remain substantively similar to the affected Services, and if neither (a) or (b) is commercially feasible, to (c) terminate the Agreement and the rights granted hereunder after provision of a refund to Customer of the Monthly Service Fees paid by Customer for the infringing elements of the Services covering the period of their unavailability.

**13.2**   Kronos shall have no liability to indemnify or defend Customer to the extent the alleged infringement is based on:  (a) a modification of the Services by anyone other than Kronos; (b) use of the Applications other than in accordance with the Documentation for such Service or as authorized by the Agreement; (c) use of

Rev. 07182019

the Services in conjunction with any data, equipment, service or software not provided by Kronos, where the Services would not otherwise itself be infringing or the subject of the claim; or (d) use of the Services by Customer other than in accordance with the terms of the Agreement. Notwithstanding the foregoing, with regard to infringement claims based upon software created or provided by a licensor to Kronos or Suppliers, Kronos' maximum liability will be to assign to Customer Kronos' or Supplier's recovery rights with respect to such infringement claims, provided that Kronos or Kronos' Supplier shall use commercially reasonable efforts at Customer's cost to assist Customer in seeking such recovery from such licensor.

**13.3** Customer shall defend Kronos, its Suppliers and their respective directors, officers, employees, agents and independent contractors (collectively, the "**Kronos Indemnified Parties**") from and against any and all Claims, and will indemnify and hold harmless the Kronos Indemnified Parties against liabilities, obligations, costs or expenses (including without limitation reasonable attorneys' fees), arising out of: (a) employment-related claims arising out of Customer's configuration of the Services; (b) Customer's modification or combination of the Services with other services, software or equipment not furnished by Kronos, provided that such Customer modification or combination is the cause of such infringement and was not authorized by Kronos; or, (c) a claim that the Customer Content infringes in any manner any intellectual property right of any third party, or any of the Customer Content contains any material or information that is obscene, defamatory, libelous, or slanderous violates any person's right of publicity, privacy or personality, or has otherwise caused or resulted in any tort, injury, damage or harm to any other person. Customer will have sole control of the defense of any such action and all negotiations for its settlement or compromise. Kronos will cooperate fully at Customer's expense with Customer in the defense, settlement or compromise of any such action.

**13.4** The Indemnified Party(ies) shall provide written notice to the indemnifying party promptly after receiving notice of such Claim. If the defense of such Claim is materially prejudiced by a delay in providing such notice, the purported indemnifying party shall be relieved from providing such indemnity to the extent of the delay's impact on the defense. The indemnifying party shall have sole control of the defense of any indemnified Claim and all negotiations for its settlement or compromise, provided that such indemnifying party shall not enter into any settlement which imposes any obligations or restrictions on the applicable Indemnified Parties without the prior written consent of the other party. The Indemnified Parties shall cooperate fully, at the indemnifying party's request and expense, with the indemnifying party in the defense, settlement or compromise of any such action. The indemnified party may retain its own counsel at its own expense, subject to the indemnifying party's rights above.

## 14. LIMITATION OF LIABILITY

**14.1** EXCEPT AS SPECIFICALLY PROVIDED IN THIS AGREEMENT, KRONOS AND ITS SUPPLIERS WILL NOT BE LIABLE FOR ANY DAMAGES OR INJURIES CAUSED BY THE USE OF THE SERVICES OR BY ANY ERRORS, DELAYS, INTERRUPTIONS IN TRANSMISSION, OR FAILURES OF THE SERVICES.

**14.2** EXCEPT FOR KRONOS' INDEMNIFICATION OBLIGATIONS SET FORTH IN SECTION 13 ABOVE, THE TOTAL AGGREGATE LIABILITY OF KRONOS OR KRONOS' SUPPLIERS TO CUSTOMER AND/OR ANY THIRD PARTY IN CONNECTION WITH THE AGREEMENT SHALL BE LIMITED TO DIRECT DAMAGES PROVEN BY CUSTOMER, SUCH DIRECT DAMAGES NOT TO EXCEED AN AMOUNT EQUAL TO THE TOTAL NET PAYMENTS RECEIVED BY KRONOS FOR THE SERVICES IN THE TWELVE (12) MONTH PERIOD IMMEDIATELY PRECEDING THE DATE IN WHICH SUCH CLAIM ARISES.

**14.3** EXCEPT FOR KRONOS' INDEMNIFICATION OBLIGATIONS SET FORTH IN SECTION 13 ABOVE, IN NO EVENT SHALL KRONOS OR KRONOS' SUPPLIERS, THEIR RESPECTIVE AFFILIATES, SERVICE PROVIDERS, OR AGENTS BE LIABLE TO CUSTOMER OR ANY THIRD PARTY FOR ANY INCIDENTAL, SPECIAL, PUNITIVE, CONSEQUENTIAL OR OTHER INDIRECT DAMAGES OR FOR ANY LOST OR IMPUTED PROFITS OR REVENUES, LOST DATA OR COST OF PROCUREMENT OF SUBSTITUTE SERVICES RESULTING FROM DELAYS, NONDELIVERIES, MISDELIVERIES OR SERVICES INTERRUPTION, HOWEVER CAUSED, ARISING FROM OR RELATED TO THE SERVICES OR THE AGREEMENT, REGARDLESS OF THE LEGAL THEORY UNDER WHICH SUCH LIABILITY IS ASSERTED, WHETHER BREACH OF WARRANTY, INDEMNIFICATION, NEGLIGENCE, STRICT LIABILITY OR OTHERWISE, AND WHETHER LIABILITY IS ASSERTED IN CONTRACT, TORT OR OTHERWISE, AND REGARDLESS OF WHETHER KRONOS OR SUPPLIER HAS BEEN ADVISED OF THE POSSIBILITY OF ANY SUCH LIABILITY, LOSS OR DAMAGE.

Rev. 07182019

**14.4** EXCEPT WITH RESPECT TO LIABILITY ARISING FROM KRONOS' GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, KRONOS DISCLAIMS ANY AND ALL LIABILITY, INCLUDING WITHOUT LIMITATION LIABILITY RELATED TO A BREACH OF DATA SECURITY AND CONFIDENTIALITY OBLIGATIONS, RESULTING FROM ANY EXTERNALLY INTRODUCED HARMFUL PROGRAM (INCLUDING WITHOUT LIMITATION VIRUSES, TROJAN HORSES, AND WORMS), CUSTOMER'S CONTENT OR APPLICATIONS, THIRD PARTY UNAUTHORIZED ACCESS OF EQUIPMENT, SAAS APPLICATIONS OR SYSTEMS, OR MACHINE ERROR.

## 15. CONFIDENTIAL INFORMATION

**15.1** Each Party shall protect the Confidential Information of the other Party with at least the same degree of care and confidentiality, but not less than a reasonable standard of care, which such Party utilizes for its own information of similar character that it does not wish disclosed to the public. Neither Party shall disclose to third parties the other Party's Confidential Information, or use it for any purpose not explicitly authorized herein, without the prior written consent of the other Party. The obligation of confidentiality shall survive for five (5) years after the return of such Confidential Information to the disclosing party or five (5) years after the expiration or termination of the Agreement, whichever is later, as applicable. Notwithstanding anything herein to the contrary, each party acknowledges and agrees that all trade secrets shall be safeguarded by a receiving party as required by this Agreement for so long as such information remains a trade secret pursuant to applicable law.

**15.2** Notwithstanding the foregoing, a party may disclose Confidential Information to the extent required: (a) to any subsidiary or affiliate of such Party, or (b) to any consultants, contractors, and counsel who have a need to know in connection with the Agreement and have executed a non-disclosure agreement with obligations at least as stringent as this Section 15, or (c) by law, or by a court or governmental agency, or if necessary in any proceeding to establish rights or obligations under the Agreement; provided, the receiving party shall, unless legally prohibited, provide the disclosing party with reasonable prior written notice sufficient to permit the disclosing party an opportunity to contest such disclosure. If a party commits, or threatens to commit, a breach of this Section 15, the other party shall have the right to seek injunctive relief from a court of competent jurisdiction.

**15.3** This Agreement imposes no obligation upon either Party with respect to the other Party's Confidential Information which the receiving Party can establish: (a) is or becomes generally known through no breach of the Agreement by the receiving party, or (b) is already known or is independently developed by the receiving party without use of or reference to the Confidential Information.

## 16. EXPORT

Customer understands that any export of the Equipment may require an export license and Customer assumes full responsibility for obtaining such license. Customer must obtain Kronos' prior written consent before exporting the Equipment.

## 17. GENERAL

**17.1** This Agreement shall be governed by and construed in accordance with the laws of the state, province and country in which Kronos is incorporated without regard to any conflict of law provisions. The parties waive the application of the United Nations Commission on International Trade Law and United Nations Convention on Contracts for the International Sale of Goods as to the interpretation or enforcement of the Agreement and waive and "opt out" of the Uniform Computer Information Transactions Act (UCITA), or such other similar law.

**17.2** The invalidity or illegality of any provision of the Agreement shall not affect the validity of any other provision. The parties intend for the remaining unaffected provisions to remain in full force and effect.

**17.3** Customer shall not assign the Agreement or the rights to use the Services without the prior written consent of Kronos and any purported assignment, without such consent, shall be void.

**17.4** Neither Party shall be responsible for any failure to perform or delay in performing any of its obligations under this Agreement (other than a failure to comply with payment obligations) where and to the extent that such failure or delay results from an unforeseeable event beyond a party's reasonable control, including but not limited to, acts of war; acts of nature; earthquake; flood; embargo; riot; sabotage; labor shortage or dispute; changes in government codes, ordinances, laws, rules, regulations or restrictions; failure of the Internet; terrorist acts; failure of data, products or services controlled by any third party, including the providers of communications or network services; utility power failure; material shortages or unavailability or other delay in delivery not resulting from the responsible party's failure to timely place orders therefor, or

Rev. 07182019

lack of or delay in transportation (each a "**Force Majeure Event**").

**17.5** All notices given under the Agreement shall be in writing and sent postage pre-paid, if to Kronos, to the Kronos address on the Order Form, or if to Customer, to the billing address on the Order Form.

**17.6** No action, regardless of form, may be brought by either party more than two (2) years after the cause of action has arisen.

**17.7** The section headings herein are provided for convenience only and have no substantive effect on the construction of the Agreement.

**17.8** The parties agree that if the Agreement is accepted by the parties and that acceptance is delivered via fax or electronically delivered via email or the internet it shall constitute a valid and enforceable agreement.

**17.9** This Agreement and any information expressly incorporated by reference herein, together with the applicable Order Form, constitute the entire agreement between the parties for the Services described herein and supersede all prior or contemporaneous representations, negotiations, or other communications between the parties relating to the subject matter of this Agreement. This Agreement may be amended only in writing signed by authorized representatives of both parties. Customer understands and acknowledges that while Kronos may disclose to customers certain confidential information regarding general Service or product development direction, potential future Services, products or product enhancements under consideration, Customer is not entitled to any Services, products or product enhancements other than those contained on the Order Form. Customer has not relied on the availability of any future version of the Services (including SaaS Applications or equipment) identified on an Order Form, nor any other future product in executing the Agreement.

CUSTOMER AGREES TO THESE TERMS AND CONDITIONS FOR ALL ORDER FORMS FOR THE SERVICES. THE INDIVIDUAL ACCEPTING THESE TERMS AND CONDITIONS ON BEHALF OF CUSTOMER REPRESENTS THAT HE/SHE HAS THE AUTHORITY TO CONTRACTUALLY BIND CUSTOMER.

| Customer |
| AEGIS SENIOR COMMUNITIES, LLC |
| Dated: 7/26/19 |
| By: |
| Name: Walter Jossart |
| Title: CFO |

| Kronos Incorporated |
| Dated: |
| By: |
| Name: |
| Title: |

Rev. 07182019

## EXHIBIT A

## SERVICE LEVEL AGREEMENT (SLA)

**Service Level Agreement**:  The Services, in a production environment, are provided with the service levels described in this Exhibit A.  SLAs are only applicable to production environments.  SLAs will be available upon Customer's signature of Kronos' Go Live Acceptance Form for Customer's production environment.

**99.75% Application Availability**

**Actual Application Availability %** = (Monthly Minutes (MM) minus Total Minutes Not Available (TM)) multiplied by 100) and divided by Monthly Minutes (MM), but not including Excluded Events

**Service Credit Calculation**:  An Outage will be deemed to commence when the Applications are unavailable to Customer in Customer's production environment hosted by Kronos and end when Kronos has restored availability of the Applications.  Failure to meet the 99.75% Application Availability SLA, other than for reasons due to an Excluded Event, will entitle Customer to a credit as follows:

| Actual Application Availability % (as measured in a calendar month) | Service Credit to be applied to Customer's monthly invoice for the affected month |
|---|---|
| <99.75% to 98.75% | 10% |
| <98.75% to 98.25% | 15% |
| <98.25% to 97.75% | 25% |
| <97.75 to 96.75% | 35% |
| <96.75 | 50% |

**"Outage"** means the accumulated time, measured in minutes, during which Customer is unable to access the Applications for reasons other than an Excluded Event.

"**Excluded Event**" means any event that results in an Outage and is caused by (a) the acts or omissions of Customer, its employees, customers, contractors or agents; (b) the failure or malfunction of equipment, applications or systems not owned or controlled by Kronos, including without limitation Customer Content, failures or malfunctions resulting from circuits provided by Customer, any inconsistencies or changes in Customer's source environment, including either intentional or accidental connections or disconnections to the environment; (c) Force Majeure events; (d) expected downtime during the Maintenance Periods described below; (e) any suspension of the Services in accordance with the terms of the Agreement to which this Exhibit A is attached; (f) the unavailability of required Customer personnel, including as a result of failure to provide Kronos with accurate, current contact information; or (g) using an Application in a manner inconsistent with the Documentation for such Application.

"**Maintenance Period**" means scheduled maintenance periods established by Kronos to maintain and update the Services, when downtime may be necessary, as further described below.  The Maintenance Period is used for purposes of the Service Credit Calculation; Kronos continuously maintains the production environment on a 24x7 basis to reduce disruptions.

### Customer Specific Maintenance Period

1.  Customer will choose one of the following time zones for their Maintenance Period:
    a.   United States Eastern Standard Time,
    b.   GMT/UTC,
    c.   Central European Time (CET) or
    d.   Australian Eastern Standard Time (AEST).

13

2. Customer will choose one of the following days of the week for their Maintenance Period: Saturday, Sunday, Wednesday or Thursday.

3. Kronos will use up to six (6) hours in any two (2) consecutive rolling months (specifically: January and February; March and April; May and June; July and August; September and October; November and December) to perform Customer Specific Maintenance, excluding any customer requested Application updates. Downtime in excess of these six (6) hours will be deemed to be an Outage.

4. Customer Specific Maintenance will occur between 12am-6am during Customer's selected time zone.

5. Excluding any customer requested Application updates, Kronos will provide notice for planned downtime via an email notice to the primary Customer contact at least seven (7) days in advance of any known downtime so planning can be facilitated by Customer.

6. Customer Specific Maintenance Windows also include additional maintenance windows mutually agreed upon by Customer and Kronos.

7. In absence of instruction from Customer, Kronos will by default perform Maintenance in the time zone where the Data Center is located.

**Non-Customer Specific Maintenance Period**

Kronos anticipates non-Customer Specific Maintenance to be performed with no or little (less than three hours per month) Customer downtime. If for any reason non-Customer Specific Maintenance requires downtime, Kronos will provide as much notice as reasonably possible of the expected window in which this will occur. Downtime in excess of three (3) hours per month for Non-Customer Specific Maintenance will be deemed to be an Outage.

"**Monthly Minutes (MM)**" means the total time, measured in minutes, of a calendar month commencing at 12:00 am of the first day of such calendar month and ending at 11:59 pm of the last day of such calendar month.

"**Total Minutes Not Available (TM)**" means the total number of minutes during the calendar month that the Services are unavailable as the result of an Outage.

**Reporting and Claims Process**: Service Credits will not be provided if: (a) Customer is in breach or default under the Agreement at the time the Outage occurred; or (b) the Outage results from an Excluded Event.

Kronos will provide Customer with an Application Availability report on a monthly basis for each prior calendar month. Within sixty (60) days of receipt of such report, Customer must request the applicable Service Credit by written notice to Kronos. Customer waives any right to Service Credits not requested within this time period. All performance calculations and applicable Service Credits are based on Kronos records and data unless Customer can provide Kronos with clear and convincing evidence to the contrary.

The Service Level Agreements in this Exhibit, and the related Service Credits, apply on a per production environment basis. For the avoidance of doubt, Outages in one production environment may not be added to Outages in any other production environment for purposes of calculating Service Credits.

Customer acknowledges that Kronos manages its network traffic in part on the basis of Customer's utilization of the Services and that changes in such utilization may impact Kronos' ability to manage network traffic. Therefore, notwithstanding anything else to the contrary, if Customer significantly changes its utilization of the Services than what is contracted with Kronos and such change creates a material and adverse impact on the traffic balance of the Kronos network, as reasonably determined by Kronos, the parties agree to co-operate, in good faith, to resolve the issue.

14

Rev. 07182019

# EXHIBIT B

Carolyn Hunt Cottrell (SBN 166977)
Samantha A. Smith (SBN 233331)
**SCHNEIDER WALLACE**
**COTTRELL KONECKY LLP**
2000 Powell Street, Suite 1400
Emeryville, California 94608
Tel: (415) 421-7100; Fax: (415) 421-7105
ccottrell@schneiderwallace.com
sasmith@schneiderwallace.com

*Attorneys for Plaintiff,*
*on behalf of the putative Class*

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| DANIELA MELGOZA, on behalf of herself and all others similarly situated,<br><br>*Plaintiff,*<br><br>vs.<br><br>AEGIS SENIOR COMMUNITIES LLC d/b/a AEGIS LIVING,<br><br>*Defendant.* | Case No. _____<br><br>**CLASS AND COLLECTIVE ACTION COMPLAINT**<br>1. **Violations of the Fair Labor Standards Act (29 U.S.C. §§ 201 *et seq.*);**<br>2. **Failure to Pay for All Hours Worked (Cal. Lab. Code § 204)**<br>3. **Failure to Pay Minimum Wage for All Hours Worked (Cal. Lab. Code §§ 204, 1194, 1197, and 1198);**<br>4. **Failure to Pay Overtime Wages (Cal. Lab. Code § 510);**<br>5. **Failure to Authorize and Permit and/or Make Available Meal and Rest Periods (Cal. Lab. Code §§ 226.7 and 512);**<br>6. **Failure to Provide Timely and Accurate Itemized Wage Statements (Cal. Lab. Code § 226);**<br>7. **Waiting Time Penalties (Cal. Lab. Code §§ 201-203)**<br>8. **Unlawful Business Practices (Cal. Bus. & Prof. Code §§ 17200 *et seq.*);**<br><br>**DEMAND FOR JURY TRIAL** |

**INTRODUCTION**

1.   Plaintiff Daniela Melgoza ("Plaintiff"), individually and on behalf of all other similarly situated individuals, brings this class and collective action against Aegis Senior Communities LLC d/b/a Aegis Living ("Defendant") for violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.* ("FLSA") and California wage and hour laws.

2.   This action stems from Defendant's policies and practices of: (1) failing to properly compensate Plaintiff and putative Class and Collective members for all hours worked; (2) failing to pay minimum wage for all hours worked; (3) failing to pay all overtime wages owed; (4) failing to make available, authorize, and/or permit Plaintiff and putative Class members to take timely and compliant meal and/or rest periods to which they are entitled by law and failing to make premium payments for those non-compliant meal and rest periods; (5) failing to provide accurate, itemized wage statements, and (6) failing to timely pay all wages due upon separation from employment.

3.   Plaintiff seeks damages, penalties, and interest to the full extent permitted by the FLSA, California Labor Code, and Industrial Welfare Commission ("IWC") Wage Orders, as well as other relief requested herein.

**SUBJECT MATTER JURISDICTION AND VENUE**

4.   The FLSA authorizes private rights of action to recover damages for violation of the FLSA's wage and hour provisions. 29 U.S.C. § 216(b). This Court has original federal question jurisdiction under 28 U.S.C. § 1331. This Court has supplemental jurisdiction over the California state law claims under 28 U.S.C. § 1367(a) because they are so related to this action that they form part of the same case or controversy.

5.   Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b). Plaintiff was employed in this District and the claims asserted arose in this District. At all material times Defendant has been actively conducting business in the State of California and within the geographic area encompassing the Northern District of the State of California.

**PARTIES**

6.   Plaintiff Daniela Melgoza is an individual over the age of eighteen, and at all times

2

relevant to this Complaint was a resident of the State of California, County of Santa Cruz. Plaintiff was employed as a caregiver by Defendant in Aptos, California from approximately November 2021 until January 2022.

7. The Collective members are people who are or who have been employed by Defendant as hourly, non-exempt employees in the United States at any time within the three years preceding the filing of this Complaint.

8. The Class members are all people who are or who have been employed by Defendant as hourly, non-exempt employees in California within the four years preceding the filing of this Complaint.

9. Plaintiff is informed, believes, and thereon alleges that Defendant Aegis Senior Communities LLC, doing business as Aegis Living, is a Washington corporation with its principal place of business located in Bellevue, WA. Defendant is registered to do business in the State of California and does business in the State of California. Defendant may be served with process by serving its registered agent, Corporation Service Company, 2710 Gateway Oaks Drive, Suite 150N, Sacramento, California 95833.

10. Upon information and belief, Defendant is part of the residential care facilities industry. Defendant operates assisted living and memory care facilities that provide care to elder residents suffering from physical and cognitive impairments. Defendant operates facilities throughout the United States, including in the State of California. Defendant employs hundreds of hourly, non-exempt workers similarly situated to Plaintiff throughout the United States, including in the State of California.

11. Plaintiff is informed, believes, and thereon alleges that Defendant exercises control over Plaintiff and putative Class and Collective members with respect to their employment.

12. Plaintiff and Class and Collective members were and are employees of Defendant within the meaning of 29 U.S.C. § 203(e).

13. At all material times, Defendant has been an enterprise in commerce or in the production of goods for commerce within the meaning of section 3(s)(1) of the FLSA because Defendant has had and continues to have employees engaged in commerce. 29 U.S.C. § 203(s)(1).

CLASS AND COLLECTIVE ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
*Melgoza v. Aegis Senior Communities LLC*

14.     Plaintiff is informed, believes, and thereon alleges that Defendant has had, and continues to have, an annual gross business volume of not less than $500,000, thereby exceeding the statutory standard. 29 U.S.C. § 203(s)(1)(A)(ii).

15.     In addition to Plaintiff, Defendant has employed numerous other employees who, like Plaintiff, are hourly, non-exempt employees engaged in interstate commerce.  Further, Defendant is engaged in interstate commerce since it orders supplies across state lines, conducts business deals with merchants across state lines, and processes patient credit cards with banks in other states.

16.     At all material times, Plaintiff and Collective and Class members were employees who engaged in commerce or in the production of goods for commerce as required by 29 U.S.C. § 207.

17.     At all material times, Defendant has done business under the laws of California, has places of business in the State of California, including in this judicial district, and has employed putative Class members in this judicial district. Defendant is a "person" as defined in California Labor Code § 18 and California Business and Professions Code § 17201. Defendant is also an "employer" as that term is used in the FLSA, California Labor Code, and the IWC Wage Orders.

## FACTUAL ALLEGATIONS

18.     Upon information and belief, Defendant Aegis Senior Communities LLC, doing business as Aegis Living is part of the residential care facilities industry. Defendant owns and operates assisted living and memory care facilities across the United States, including in California. Defendant provides a continuum of care to elder residents suffering from physical and cognitive impairments.

19.     Plaintiff worked for Defendant as a caregiver in Aptos, California from approximately November 2021 until January 2022. Her duties included, but were not limited to, assisting residents with activities of daily living; aiding residents in eating, dressing, and washing; providing other care as needed; and reporting resident status. Excluding time worked off the clock, Ms. Melgoza typically worked eight hours per shift and five shifts per week, for a total of 40 hours per week, earning $17.00 per hour.

20.     Like Ms. Melgoza, the putative Class and Collective members are current and former non-exempt employees of Defendant throughout the United States, including in the State of California.

4

As a result of such uncompensated time worked off the clock, Plaintiff and putative Class and Collective members worked over eight hours in a day and/or over 40 hours in a week without receiving pay at the appropriate overtime rate for such work.

21.    Plaintiff is informed, believes, and thereon alleges that Defendant employs and has employed hundreds of non-managerial employees throughout the United States, including in the State of California and uniformly classifies them as hourly, non-exempt employees under the FLSA and California law.

22.    Plaintiff is informed, believes, and based thereon, alleges that putative Class and Collective members are employed by Defendant in a similar manner throughout the United States, including in this judicial district, and perform work materially similar to Plaintiff.

23.    Non-exempt, hourly workers employed by Defendant have a variety of responsibilities. These responsibilities include: cleaning resident rooms, communicating with doctors, administering medicine, recording medical history and symptoms, performing diagnostic tests, checking residents' vital signs, feeding and washing residents, documenting information, and assisting with medical procedures, among other tasks.

24.    Defendant requires Plaintiff and putative Class and Collective members to perform work-related activities for Defendant's benefit without adequate compensation. In particular, Defendant required Plaintiff and putative Class members to work 40-hour weeks while vastly underpaying them for the number of hours worked. For example, throughout Plaintiff's tenure working for Defendant, Plaintiff received bi-weekly payments of $465.80 from Defendant, despite working 40 hours per week at a pay-rate of $17.00 per hour. These wage payments calculate to roughly $5.82 per hour – well below the requirements of the FLSA and State of California. Putative Class and Collective members suffer similar underpayments from Defendant. Upon Plaintiff and putative Class and Collective members' complaints to Defendant regarding the severe underpayments, Defendant blamed the underpayments on a breach in the Kronos payroll system that Defendant used to record hours and wages. Despite it being Defendant's responsibility, not the responsibility of Kronos, to make sure Plaintiff and putative Class and Collective members are

properly compensated, Defendant has failed to timely and accurately issue Plaintiff and putative Class and Collective members the correct payment for the hours of work that they have labored for the benefit of Defendant.

25.     As a result of these policies and/or practices, Plaintiff and putative Class and Collective members are denied compensation for all hours worked, including minimum wages and overtime, which they are lawfully owed resulting from the additional off-the-clock work in excess of eight (8) hours per day and forty (40) hours per week.

26.     Plaintiff is informed, believes, and thereon alleges that Defendant utilizes the same or substantially similar timekeeping and payroll mechanisms throughout all its facilities in the United States, including in the State of California.

27.     Plaintiff and putative Class members are routinely denied rest breaks because Defendant does not authorize permit, and/or make available timely rest breaks periods. Specifically, pursuant to uniform, companywide policies and practices, Defendant requires Plaintiff and putative Class members to remain on duty throughout their scheduled shifts, including during rest break periods. Additionally, Plaintiff and putative Class members are either too busy with work during the day to have time to take bona fide rest breaks or get called back to work mid-break to assist with a resident. Plaintiff, for example, was unable to take a compliant rest break an average of four times per week.

28.     Despite these recurring violations, Defendant does not provide Plaintiff and putative Class members premium pay for missed rest periods.

29.     Plaintiff is informed, believes, and thereon alleges that the same rest break polices are used across all Defendant's facilities throughout California.

30.     Defendant also does not permit Plaintiff and putative Class and Collective members to take compliant meal break periods. Specifically, Plaintiff and putative Class and Collective members are routinely denied timely meal breaks because Defendant does not make available timely meal break periods. Plaintiff and putative Class and Collective members are too busy with work during the day to have time to take bona fide meal breaks before the fifth hour of work

31.     Despite these recurring violations, Defendant does not provide Plaintiff and putative

CLASS AND COLLECTIVE ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
*Melgoza v. Aegis Senior Communities LLC*

Class members with premium pay for missed or untimely meal breaks.

32.    Plaintiff is informed, believes, and thereon alleges that the same meal break policies are used across all Defendant's facilities.

33.    Defendant's common course of wage-and-hour abuse includes routinely failing to maintain true and accurate records of the hours worked by Collective and putative Class members.

34.    Defendant fails to provide Plaintiff and putative Class members with accurate and itemized wage statements as required by the State of California. Defendant has provided Plaintiff and putative Class members with statements that show only the total amount paid on each paycheck. The statements do not indicate the rate of pay or the number of hours that Plaintiff and putative Class members worked.

35.    Defendant's failure to compensate employees for all hours worked, including missed rest and meal breaks, further results in a failure to provide putative Class members, including Plaintiff, accurate itemized wage statements. The wage statements are inaccurate because they do not include off-the-clock work and premium pay for missed or untimely meal breaks. Moreover, as discussed above, Defendant issues wages statements for wage payments that are vastly less than what is owed to Plaintiff and putative Class members.

36.    Further, Defendant does not provide putative Class members, including Plaintiff, whose employment has ended, with full payment of all wages owed at the end of their employment. As these workers are owed for Defendant's vast underpayments, premium pay, and reimbursements for all business expenses when their employment ends, and these amounts remain unpaid under Defendant's policies and practices, Defendant fails to pay all wages due upon termination. As a consequence, Defendant is subject to waiting time penalties.

37.    Defendant has employed hundreds of people similarly situated to Plaintiff during the four-year period prior to the filing of this Complaint.

38.    Defendant's method of paying Plaintiff and putative Class members was willful and was not based on a good faith and reasonable belief that their conduct complied with California law.

39.    Defendant's conduct was willful, carried out in bad faith, and caused significant

_____
CLASS AND COLLECTIVE ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
*Melgoza v. Aegis Senior Communities LLC*

1  damages to non-exempt hourly employees in an amount to be determined at trial.

2  **COLLECTIVE ALLEGATIONS UNDER THE FLSA**

3  40.    Plaintiff re-alleges and incorporates the foregoing paragraphs as though fully set forth

4  herein.

5  41.    Plaintiff brings this Complaint as a collective action pursuant to 29 U.S.C. § 216(b) on

6  behalf of the following collective of individuals:

**All current and former hourly, non-exempt employees employed by Defendant**
7  **Aegis Senior Communities LLC d/b/a Aegis Living in the United States any time**
**starting three years prior to the filing of this Complaint until resolution of this**
8  **action.**

9  42.    Defendant has not compensated these employees for all hours worked, including

10  minimum wage and overtime compensation for all hours worked over 40 hours per week, liquidated

11  damages, and attorneys' fees and costs under the FLSA.

12  43.    Plaintiff's claims for violations of the FLSA may be brought and maintained as an "opt-

13  in" collective action pursuant to Section 216(b) of the FLSA because Plaintiff's FLSA claims are

14  similar to the claims of the Collective members.

15  44.    Plaintiff is informed, believes, and thereon alleges that Collective members have been

16  denied compensation, including overtime compensation for time worked "off-the-clock," and would

17  therefore likely join this collective action if provided a notice of their rights to do.

18  45.    Plaintiff and the Collective members are similarly situated. Collective Members have

19  substantially similar job duties and requirements. Like Plaintiff, Defendant subjected Collective

20  members to Defendant's common practices, policies, or plans that requires them to perform work

21  without compensation in clear violation of the FLSA. Collective Members work, or have worked, for

22  Defendant but were not paid overtime at the rate of one and one-half times their regular hourly rate

23  when those hours exceeded forty per workweek. Collective Members also performed compensable

24  work while "off-the-clock" which, when included with their recorded hours, results in additional

25  overtime hours worked that were not compensated at the rate of one and one-half times their regular

26  hourly in violation of the FLSA.

27  46.    Although Defendant permitted and/or required Collective members to work in excess

28

8

1   of forty hours per workweek, Defendant has denied them full compensation for their hours worked

2   over forty as a result of meal breaks that were interrupted due to work demands and "off-the-clock"

3   work.

4        47.    Collective members regularly work or have worked in excess of forty hours during a

5   workweek.

6        48.    Collective members are not exempt from receiving overtime compensation under the

7   FLSA.

8        49.    Defendant's failure to pay overtime compensation as required by the FLSA resulted

9   from generally applicable policies and practices and did not depend on the personal circumstances of

10   FLSA Collective members.

11        50.    This action may be properly maintained as a collective action on behalf of the defined

12   Collective because, throughout the relevant time period:

13              a.    Defendant maintained common scheduling systems and policies with respect to

14                    Plaintiff and Collective members, controlled the scheduling systems and policies

15                    implemented throughout their facilities and retained authority to review and revise

16                    or approve the schedules assigned to Plaintiff and Collective members;

17              b.    Defendant maintained common timekeeping systems and policies with respect to

18                    Plaintiff and Collective members; and

19              c.    Defendant maintained common payroll systems and policies with respect to

20                    Plaintiff and Collective members, controlled the payroll systems and policies

21                    applied to Plaintiff and Collective members, and set the pay rates assigned to

22                    Plaintiff and Collective members.

23        51.    Plaintiff and Collective members' claims arise from a common nucleus of operative

24   facts; namely, the continued and willful failure of Defendant to comply with its obligation to legally

25   compensate its employees. Liability is based on a systematic course of wrongful conduct by Defendant

26   that caused harm to all Collective members. Defendant had a plan, policy or practice that resulted in

27   inaccurately recording Plaintiff and Collective members' workhours, causing vast underpayments for

28

CLASS AND COLLECTIVE ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

*Melgoza v. Aegis Senior Communities LLC*

the amount of hours Plaintiff and Collective members worked. These underpayments caused Plaintiff and Collective members to receive wages below the federal minimum wage. Further, Defendant had a plan, policy or practice of not recording or paying Plaintiff and Collective members for interrupted, interruptible, or missed meal and rest breaks. These unpaid hours are typically worked in excess of 40 hours per week, and therefore the failure to track these hours results in a violation of the FLSA.

52.     The similarly situated Collective members are known to Defendant, are readily identifiable, and may be located through Defendant's records.  These similarly situated employees may readily be notified of this action, and allowed to "opt-in" to this case pursuant to 29 U.S.C. § 216(b) for the purpose of collectively adjudicating their claims for unpaid wages, liquidated damages (or, alternatively, interest), and attorneys' fees and costs under the FLSA.

## **RULE 23 CLASS ACTION ALLEGATIONS**

53.     Plaintiff brings causes of action as a class action on behalf of herself and all others similarly situated pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3). The California Class that Plaintiff seeks to represent is defined as follows:

> **All current and former hourly, non-exempt employees employed by Defendant Aegis Senior Communities LLC d/b/a Aegis Living in California any time starting four years prior to the filing of this Complaint until resolution of this action.**

54.     This action has been brought and may properly be maintained as a class action because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

55.     <u>Numerosity</u>:  The potential members of the class are so numerous that joinder of all the members of the Class is impracticable. Plaintiff is informed and believes that the number of California Class members exceeds 40. This volume makes bringing the claims of each individual member of the class before this Court impracticable. Likewise, joining each individual member of the California Class as a plaintiff in this action is impracticable. Furthermore, the identities of the California Class will be determined from Defendant's records, as will the compensation paid to each of them. As such, a class action is a reasonable and practical means of resolving these claims. To require individual

actions would prejudice the California Class and Defendant.

56. <u>Commonality</u>: There are questions of law and fact common to Plaintiff and the California Class that predominate over any questions affecting only individual members of the Class. These common questions of law and fact include, but are not limited to:

a. Whether Defendant fails to pay putative Class members for all hours worked, including at minimum wage and as overtime compensation, in violation of the Labor Code and Wage Orders;

b. Whether Defendant fails to authorize and permit, make available, and/or provide putative Class members with timely meal and/or rest periods to which they are entitled in violation of the Labor Code and Wage Orders;

c. Whether Defendant fails to provide putative Class members with timely, accurate itemized wage statements in violation of the Labor Code and Wage Orders;

d. Whether Defendant fails to provide putative Class members with all owed wages upon separation from employment in violation of the Labor Code and Wage Orders;

e. Whether Defendant violates Business and Professions Code §§ 17200 *et seq.*, by:

    (a) failing to pay putative Class members for all hours worked, including at minimum wage and as overtime compensation;

    (b) failing to authorize and permit, make available, and/or provide Class members with timely meal and/or rest periods to which they are entitled;

    (c) failing to provide putative Class members with timely, accurate itemized wage statements; and

    (d) failing to pay putative Class members for all wages owed upon separation of employment;

f. The proper formula for calculating restitution, damages and penalties owed to Plaintiff and the putative Class as alleged herein.

57. <u>Typicality</u>: Plaintiff's claims are typical of the claims of the California Class. Defendant's common course of conduct in violation of law as alleged herein caused Plaintiff and

11

1  putative Class members to sustain the same or similar injuries and damages. Plaintiff's claims are

2  thereby representative of and co-extensive with the claims of the putative Class.

3      58.    Adequacy of Representation:  Plaintiff seeks relief for state law violations perpetrated

4  by Defendant. In that sense, Plaintiff does not have any conflicts of interest with other putative Class

5  members and will prosecute the case vigorously on behalf of the putative Class. Counsel representing

6  Plaintiff is competent and experienced in litigating complex cases and large class actions, including

7  wage and hour cases. Plaintiff will fairly and adequately represent and protect the interests of the

8  putative Class members.

9      59.    Superiority of Class Action:  A class action is superior to other available means for the

10  fair and efficient adjudication of this controversy. Individual joinder of all proposed Class members is

11  not practicable, and questions of law and fact common to the Class predominate over any questions

12  affecting only individual members of the Class. Each proposed Class member has been damaged and

13  is entitled to recovery by reason of Defendant's illegal policies and/or practices. Class action treatment

14  will allow those similarly situated persons to litigate their claims in the manner that is most efficient

15  and economical for the parties and the judicial system.

16      60.    In the alternative, the putative Class may be certified because the prosecution of

17  separate actions by the individual members of the putative Class would create a risk of inconsistent or

18  varying adjudication with respect to individual members of the putative Class which would establish

19  incompatible standards of conduct for Defendant.

20      61.    If each individual putative Class member were required to file an individual lawsuit,

21  Defendant would necessarily gain an unconscionable advantage because Defendant would be able to

22  exploit and overwhelm the limited resources of each member of the putative Class with Defendant's

23  vastly superior financial legal resources.

24      62.    Requiring each individual putative Class member to pursue an individual remedy

25  would also discourage the assertion of lawful claims by the putative Class members who would be

26  disinclined to pursue these claims against Defendant because of an appreciable and justifiable fear of

27  retaliation and permanent damage to their lives, careers and well-being.

28

CLASS AND COLLECTIVE ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
*Melgoza v. Aegis Senior Communities LLC*

**FIRST CAUSE OF ACTION**
**Violation of the Fair Labor Standards Act**
**Pursuant to 29 U.S.C. §§ 201, et seq.**
**(On Behalf of the Collective)**

63.     Plaintiff re-alleges and incorporates the foregoing paragraphs as though fully set forth herein.

64.     The FLSA requires that covered employees receive compensation for all hours worked and overtime compensation of not less than one and one-half times the regular rate of pay for all hours worked in excess of forty hours in a workweek.  29 U.S.C. §§ 206(a)(1), 207(a)(1).

65.     At all times material herein, Plaintiff and the Collective are covered employees entitled to the rights, protections, and benefits provided under the FLSA. 29 U.S.C. §§ 203(e) and 207(a).

66.     Defendant is a covered employer required to comply with the FLSA's mandates.

67.     Defendant has violated the FLSA with respect to Plaintiff and the Collective, by, inter alia, failing to compensate Plaintiff and the Collective for all hours worked and, with respect to such hours, failing to pay the legally mandated overtime premium for such work and/or minimum wage. Defendant has also violated the FLSA by failing to keep required, accurate records of all hours worked by Plaintiff and the Collective. 29 U.S.C. § 211(c).

68.     Plaintiff and the Collective are victims of a uniform and company-wide compensation policy that has been applied to current and former non-exempt, hourly employees of Defendant, working throughout the United States.

69.     Plaintiff and the Collective are entitled to damages equal to the mandated pay, including minimum wage, straight time, and overtime premium pay within the three years preceding the filing of the complaint, plus periods of equitable tolling, because Defendant has acted willfully and knew or showed reckless disregard for whether the alleged conduct was prohibited by the FLSA.

70.     Defendant has acted neither in good faith nor with reasonable grounds to believe that its actions and omissions were not a violation of the FLSA, and as a result thereof, Plaintiff and the Collective are entitled to recover an award of liquidated damages in an amount equal to the amount of unpaid overtime pay and/or prejudgment interest at the applicable rate.  29 U.S.C. § 216(b).

71.     Pay, including minimum wage, straight time, and overtime compensation, has been

13

_____
CLASS AND COLLECTIVE ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
*Melgoza v. Aegis Senior Communities LLC*

unlawfully withheld by Defendant from Plaintiff and the Collective as a result of Defendant's violations of the FLSA. Accordingly, Defendant is liable for unpaid wages, together with an amount equal as liquidated damages, attorneys' fees, and costs of this action.

72. Wherefore, Plaintiff and the Collective request relief as hereinafter provided.

**SECOND CAUSE OF ACTION**
**Failure to Pay for All Hours Worked**
**Pursuant to California Labor Code § 204**
**(On Behalf of the Class)**

73. Plaintiff realleges and incorporates the foregoing paragraphs as though fully set forth herein.

74. Labor Code § 200(a) defines wages as "all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis or other method of calculation."

75. Labor Code § 204 provides that employers must compensate employees for all hours worked "twice during each calendar month, on days designated in advance by the employer as the regular paydays."

76. Labor Code §§ 221-223 prohibit employers from withholding and deducting wages, or otherwise artificially lowering the wage scale of an employee.

77. Labor Code § 1194(a) provides as follows:

Notwithstanding any agreement to work for a lesser wage, any employee receiving less than the legal minimum wage or the legal overtime compensation applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage or overtime compensation, including interest thereon, reasonable attorneys' fees, and costs of suit.

78. Labor Code § 1198 makes it unlawful for employers to employ employees under conditions that violate the Wage Orders.

79. IWC Wage 5-2001(2)(K) define hours worked as "the time during which an employee is subject to the control of an employer and includes all the time the employee is suffered or permitted to work, whether or not required to do so."

80. Defendant willfully engaged in and continues to engage in a policy and practice of not

CLASS AND COLLECTIVE ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
*Melgoza v. Aegis Senior Communities LLC*

compensating Plaintiff and putative Class members for all hours worked or spent in Defendant's control.

81. Defendant routinely denies Plaintiff and putative Class members compensation for all hours worked. In particular, Defendant has required Plaintiff and putative Class members to work 40-hour weeks while vastly underpaying them for the number of hours worked. For example, at Plaintiff's payrate of $17.00 per hour, her bi-weekly paycheck for working 80 hours should have added up to roughly $1,360. Instead, throughout Plaintiff's tenure working for Defendant, Plaintiff received bi-weekly payments of $465.80 from Defendant, a figure that covers only 27.4 hours of pay. In essence, Plaintiff worked more than 52 hours per week that she did not get paid for. Putative Class members suffer similar underpayments from Defendant. Upon Plaintiff and putative Class members' complaints regarding the severe underpayments, Defendant blamed the underpayments on a breach in the Kronos payroll system that Defendant used to record hours and wages. Despite it being Defendant's responsibility, not the responsibility of Kronos, to make sure Plaintiff and putative Class members are properly compensated, Defendant has failed to timely and accurately issue Plaintiff and putative Class members the correct payment for the hours of work that they have labored for the benefit of Defendant.

82. In violation of California law, Defendant knowingly and willfully refuses to perform its obligations to provide Plaintiff and putative Class members with compensation for all time worked. Defendant regularly fails to track the time Plaintiff and putative Class members actually worked and fail to compensate them for all hours worked.

83. Therefore, Defendant has committed, and continues to commit, the acts alleged herein knowingly and willfully, and in conscious disregard of the Plaintiff and putative Class members' rights. Plaintiff and putative Class members are thus entitled to recover nominal, actual, and compensatory damages, plus interest, attorneys' fees, expenses, and costs of suit.

84. As a proximate result of the aforementioned violations, Plaintiff and putative Class members have been damaged in an amount according to proof at time of trial.

85. Wherefore, Plaintiff and the putative Class request relief as hereinafter provided.

**THIRD CAUSE OF ACTION**

**Failure to Pay Minimum Wage for All Hours Worked**
**Pursuant to the California Labor Code §§ 204, 1194, 1197 & 1198**
**(On Behalf of the Class)**

86.     Plaintiff realleges and incorporates the foregoing paragraphs as though fully set forth herein.

87.     Labor Code § 200(a) defines wages as "all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation."

88.     Labor Code § 204 provides that employers must compensate employees for all hours worked "twice during each calendar month, on days designated in advance by the employer as the regular paydays."

89.     Labor Code §§ 221-223 prohibit employers from withholding and deducting wages, or otherwise artificially lowering the wage scale of an employee.

90.     Labor Code § 1194(a) provides as follows:

> Notwithstanding any agreement to work for a lesser wage, any employee receiving less than the legal minimum wage or the legal overtime compensation applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage or overtime compensation, including interest thereon, reasonable attorneys' fees, and costs of suit.

91.     Labor Code § 1198 makes it unlawful for employers to employ employees under conditions that violate the Wage Orders.

92.     IWC Wage Order 5-2001(2)(K) defines hours worked as "the time during which an employee is subject to the control of an employer and includes all the time the employee is suffered or permitted to work, whether or not required to do so."

93.     During the applicable statutory period, California Labor Code §§ 1182.12 and 1197, and the Minimum Wage Order were in full force and effect and required that Defendant's hourly employees receive the minimum wage for all hours worked at the rate of eleven dollars ($11.00) per hour commencing on January 1, 2018, twelve dollars ($12.00) per hour commencing on January 1, 2019, thirteen dollars ($13.00) per hour commencing on January 1, 2020, fourteen dollars ($14.00) per hour commencing January 1, 2021, and fifteen dollars ($15.00) per hour commencing January 1,

16

2022.

94.     Defendant has maintained policies and procedures which created a working environment where Plaintiff and putative Class members are routinely compensated at a rate that is less than the statutory minimum wage.

95.     Defendant routinely denies Plaintiff and putative Class members compensation for all hours worked, including minimum wage. Plaintiff and putative Class members are regularly compensated for less than the total amount of hours they actually work. For example, as explained above, during Plaintiff's tenure working for Defendant, Plaintiff received bi-weekly payments of $465.80 from Defendant, despite working 40 hours per week at a pay-rate of $17.00 per hour. These wage payments calculate to roughly $5.82 per hour – well below the State of California's minimum wage requirements. Putative Class members suffer similar underpayments from Defendant. Thus, Defendant underpays Plaintiff and putative Class members by routinely refusing to compensate all time worked resulting in minimum wage violations.

96.     In violation of California law, Defendant knowingly and willfully refuses to perform their obligations to pay minimum wage to Plaintiff and putative Class members for all time worked.

97.     Therefore, Defendant committed, and continues to commit the acts alleged herein knowingly and willfully, and in conscious disregard of Plaintiff's and putative Class members' rights. Plaintiff and the putative Class are thus entitled to recover nominal, actual, and compensatory damages, plus interest, attorneys' fees, expenses, and costs of suit.

98.     As a proximate result of the aforementioned violations, Plaintiff and the putative Class have been damaged in an amount according to proof at time of trial.

99.     Wherefore, Plaintiff and the putative Class request relief as hereinafter provided.

**FOURTH CAUSE OF ACTION**
**Failure to Pay Overtime Wages**
**Pursuant to California Labor Code § 510**
**(On Behalf of the Class)**

100.     Plaintiff realleges and incorporates the foregoing paragraphs as though fully set forth herein.

CLASS AND COLLECTIVE ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
*Melgoza v. Aegis Senior Communities LLC*

101.     Defendant does not compensate Plaintiff and Class members with appropriate overtime, including time and a half, as required by California law.

102.     Labor Code § 510 provides as follows:

Eight hours of labor constitutes a day's work. Any work in excess of eight hours in one workday and any work in excess of 40 hours in any one workweek and the first eight hours worked on the seventh day of work in any one workweek shall be compensated at the rate of no less than one and one-half times the regular rate of pay for an employee. Any work in excess of 12 hours in one day shall be compensated at the rate of no less than twice the regular rate of pay for an employee. In addition, any work in excess of eight hours on any seventh day of a workweek shall be compensated at the rate of no less than twice the regular rate of pay of an employee.

103.     The IWC Wage Order 5-2001(3)(A)(1) states:

The following overtime provisions are applicable to employees 18 years of age or over and to employees 16 or 17 years of age who are not required by law to attend school and are not otherwise prohibited by law from engaging in the subject work. Such employees shall not be employed more than eight (8) hours in any workday or more than 40 hours in any workweek unless the employee receives one and one-half (1 ½) times such employee's regular rate of pay for all hours worked over 40 hours in the workweek. Eight (8) hours of labor constitutes a day's work. Employment beyond eight (8) hours in any workday or more than six (6) days in any workweek is permissible provided the employee is compensated for such overtime at not less than: . . . One and one-half (1 ½) times the employee's regular rate of pay for all hours worked in excess of eight (8) hours up to and including 12 hours in any workday, and for the first eight (8) hours worked on the seventh (7th) consecutive day of work in a workweek; and … [d]ouble the employee's regular rate of pay for all hours worked in excess of 12 hours in any workday and for all hours worked in excess of eight (8) hours on the seventh (7th) consecutive day of work in a workweek.

104.     Labor Code § 1194(a) provides as follows:

Notwithstanding any agreement to work for a lesser wage, any employee receiving less than the legal minimum wage or the legal overtime compensation applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage or overtime compensation, including interest thereon, reasonable attorneys' fees, and costs of suit.

105.     Labor Code § 200 defines wages as "all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis or other method of calculation." All such wages are subject to California's overtime requirements, including those set forth above.

106.     Defendant routinely denies Plaintiff and putative Class members compensation for all hours worked, including overtime. Plaintiff and putative Class members are regularly compensated for less than the total amount of hours they actually work. Plaintiff and putative Class members receive

18

bi-weekly payments for the hours that they work, however, the amount of pay issued to Plaintiff and putative Class members is often insufficient and grossly less than what is owed, *i.e.*, Plaintiff's and putative Class members' pay does not reflect the total amount of hours they actually work. Thus, Defendant underpays Plaintiff and putative Class members by routinely refusing to compensate all time worked, including at overtime.

107. As a result, Plaintiff and putative Class members have worked overtime hours for Defendant without being paid overtime premiums in violation of the Labor Code, applicable IWC Wage Orders, and other applicable law.

108. Defendant knowingly and willfully refuses to perform its obligations to provide Plaintiff and the Class members with premium wages for all overtime work. As a proximate result of the aforementioned violations, Defendant has damaged Plaintiff and the Class members in amounts to be determined according to proof at time of trial.

109. Defendant is liable to Plaintiff and the putative Class alleged herein for the unpaid overtime and civil penalties, with interest thereon. Furthermore, Plaintiff is entitled to an award of attorneys' fees and costs as set forth below.

110. Wherefore, Plaintiff and the Class request relief as hereinafter provided.

## **FIFTH CAUSE OF ACTION**
### **Failure to Authorize and Permit and/or Make Available Meal and/or Rest Periods Pursuant to California Labor Code §§ 226.7 & 512**
### **(On Behalf of the Class)**

111. Plaintiff realleges and incorporates the foregoing paragraphs as though fully set forth herein.

112. Defendant routinely fails to authorize, permit and/or make available compliant meal periods to Plaintiff and putative Class members. Plaintiff's and putative Class members' schedules regularly prevent them from taking compliant meal periods. Plaintiff and putative Class members are routinely denied meal breaks for three reasons: (i) Plaintiff and putative class members are often called away from their meal breaks to provide care to a resident; (ii) Defendant does not authorize, permit, and/or make available timely meal breaks to Plaintiff and putative Class members; and (iii) Plaintiff

19

and putative Class members are often too busy with work during the day to have time to take bona fide meal breaks.

113.     When Plaintiff and putative Class members attempt a meal break, such is often interrupted and/or untimely, *i.e.*, Defendant does not provide Plaintiff and putative Class members with duty-free, uninterrupted, and timely thirty-minute meal periods during which Plaintiff and putative Class members should be completely relieved of any duty, by the end of the fifth hour of work.

114.     Plaintiff and putative Class members are not provided with one (1) hour of premium pay for each day they do not receive a complaint meal break.

115.     Similarly, Defendant regularly fails to make rest periods available to Plaintiff and putative Class members.  Plaintiff and putative Class members' schedules regularly prevent them from taking *bona fide* rest breaks throughout the day. When available, if ever, such are often untimely and/or interrupted, *i.e.*, Defendant does not provide Plaintiff and putative Class members with duty-free, uninterrupted, and timely ten-minute rest periods during which Plaintiff and putative Class members should be completely relieved of any duty, by the end of the fourth hour of work, and again by the end of the eighth hour of work.

116.     Plaintiff and putative Class members are not provided with one (1) hour of premium pay for each day they do not receive a complaint rest break.

117.     Labor Code § 226.7 and the applicable Wage Order require Defendant to authorize and permit meal and rest periods to its employees.  Labor Code §§ 226.7 and 512 and the Wage Orders prohibit employers from employing an employee for more than five (5) hours without a meal period of not less than thirty minutes, and from employing an employee more than ten (10) hours per day without providing the employee with a second meal period of not less than thirty minutes.

118.     Labor Code § 226.7 and the applicable Wage Order also require employers to authorize and permit employees to take ten (10) minutes of net rest time per (4) four hours or major fraction thereof of work, and to pay employees their full wages during those rest periods. Unless the employee is relieved of all duty during the thirty-minute meal period, the employee is considered "on duty" and

1    the meal period is counted as time worked under the applicable Wage Order.

2        119.    Under Labor Code § 226.7(b) and the applicable Wage Order, an employer who fails

3    to authorize, permit, and/or make available a required meal period must, as compensation, pay the

4    employee one (1) hour of pay at the employee's regular rate of compensation for each workday that

5    the meal period was not authorized and permitted.  Similarly, an employer must pay an employee

6    denied a required rest period one (1) hour of pay at the employee's regular rate of compensation for

7    each workday that the rest period was not authorized and permitted and/or not made available.

8        120.    Despite these requirements, Defendant has often knowingly and willfully refused to

9    perform its obligations to authorize and permit and/or make available to Plaintiff and putative Class

10   members the ability to take the meal and/or rest periods to which they are entitled.

11       121.    Defendant has also failed to pay Plaintiff and putative Class one hour of pay for each

12   day an off-duty meal and/or rest period was denied. Defendant's conduct described herein violates

13   Labor Code § 226.7 and 512.  Therefore, pursuant to Labor Code § 226.7(b), Plaintiff and putative

14   Class members are entitled to compensation for the failure to authorize and permit and/or make

15   available meal and rest periods, plus interest, attorneys' fees, expenses and costs of suit.

16       122.    As a proximate result of the aforementioned violations, Plaintiff and the putative Class

17   have been damaged in an amount according to proof at time of trial.

18       123.    Wherefore, Plaintiff and the putative Class request relief as hereinafter provided.

19                           **SIXTH CAUSE OF ACTION**

20                    **Failure to Provide Accurate Itemized Wage Statements**
                        **Pursuant to California Labor Code § 226**

21                              **(On Behalf of the Class)**

22       124.    Plaintiff realleges and incorporates the foregoing paragraphs as though fully set forth

23   herein.

24       125.    Defendant does not provide Plaintiff and putative Class members with accurate

25   itemized wage statements as required by California law.

26       126.    Labor Code § 226(a) provides:

27       An employer, semimonthly or at the time of each payment of wages, shall furnish to
         his or her employees, either as a detachable part of the check, draft, or voucher paying
28       the employee's wages, or separately if wages are paid by personal check or cash, an

                                        21
_____

accurate itemized statement in writing showing: (1) gross wages earned, (2) total hours worked by the employee, except as provided in subdivision (j), (3) the number of piece-rate units earned and any applicable piece rate if the employee is paid on a piece-rate basis, (4) all deductions, provided that all deductions made on written orders of the employee may be aggregated and shown as one item, (5) net wages earned, (6) the inclusive dates of the period for which the employee is paid, (7) the name of the employee and only the last four digits of his or her social security number, (8) the name and address of the legal entity that is the employer and, if the employer is a farm labor contractor, as defined in subdivision (b) of Section 1682, the name and address of the legal entity that secured the services of the employer, and (9) all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee .... The deductions made from payments of wages shall be recorded in ink or other indelible form, properly dated, showing the month, day, and year, and a copy of the statement or a record of the deductions shall be kept on file by the employer for at least three years at the place of employment or at a central location within the State of California.

127. IWC Wage Order 5-2001(7) establishes similar wage statement requirements.

128. Labor Code § 226(e) provides:

An employee suffering injury as a result of a knowing and intentional failure by an employer to comply with subdivision (a) is entitled to recover the greater of all actual damages or fifty dollars ($50) for the initial pay period in which a violation occurs and one hundred dollars ($100) per employee for each violation in a subsequent pay period, not exceeding an aggregate penalty of four thousand dollars ($4,000), and is entitled to an award of costs and reasonable attorney's fees.

129. Plaintiff seeks to recover actual damages, costs, and attorneys' fees under this section.

130. Defendant does not provide timely, accurate itemized wage statements to Plaintiff and putative Class members in accordance with Labor Code § 226(a) and the IWC Wage Orders. The wage statements Defendant provides its employees, including Plaintiff and putative Class members, do not accurately reflect all hours worked, including minimum wages and overtime. In addition, Defendant's wage statements do not include premium pay for missed meal and rest period.

131. Defendant is liable to Plaintiff and the putative Class alleged herein for the amounts described above in addition to the civil penalties set forth below, with interest thereon. Furthermore, Plaintiff is entitled to an award of attorneys' fees and costs as set forth below, pursuant to Labor Code § 226(e).

132. Wherefore, Plaintiff and the putative Class request relief as hereinafter provided.

**SEVENTH CAUSE OF ACTION**
**Waiting Time Penalties Pursuant to California Labor Code §§ 201-203**
**(On Behalf of the Class)**

22

133. Plaintiff re-alleges and incorporates the foregoing paragraphs as though fully set forth herein.

134. Defendant does not provide putative Class members with their wages when due under California law after their employment with Defendant ends.

135. Labor Code § 201 provides:

If an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately.

136. Labor Code § 202 provides:

If an employee not having a written contract for a definite period quits his or her employment, his or her wages shall become due and payable not later than 72 hours thereafter, unless the employee has given 72 hours previous notice of his or her intention to quit, in which case the employee is entitled to his or her wages at the time of quitting.

137. Labor Code § 203 provides, in relevant part:

If an employer willfully fails to pay, without abatement or reduction, in accordance with Sections 201, 201.5, 202, and 205.5, any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days.

138. Some of the putative Class members, including Plaintiff, left their employment with Defendant during the statutory period, at which time Defendant owed them unpaid wages. These earned, but unpaid, wages derive from time spent working for the benefit of Defendant, which went unrecorded and/or uncompensated. In addition, Plaintiff and putative Class members who left their employment during the statutory period were owed premium pay for missed, interrupted and/or untimely meal and rest periods.

139. Defendant willfully refused and continues to refuse to pay putative Class members all the wages that are due and owing to them, in the form of uncompensated time worked, upon the end of their employment as a result of Defendant's willful failure to provide Plaintiff and the putative Class members with payment for all hours worked, including minimum wage and overtime. In addition, Defendant willfully refused and continues to refuse to pay Plaintiff and putative Class members premium pay for missed, interrupted and/or untimely meal and rest periods. As a result of

23

Defendant's actions, Plaintiff and putative Class members have suffered and continue to suffer substantial losses, including lost earnings, and interest.

140.    Defendant's willful failure to pay Plaintiff and putative Class members the wages due and owing them constitutes a violation of Labor Code §§ 201-202. As a result, Defendant is liable to Plaintiff and proposed Class members for all penalties owing pursuant to Labor Code §§ 201-203.

141.    In addition, Labor Code § 203 provides that an employee's wages will continue as a penalty up to thirty(30)  days from the time the wages were due. Therefore, the Plaintiff and putative Class members are entitled to penalties pursuant to Labor Code § 203, plus interest.

142.    Wherefore, Plaintiff and the Class request relief as hereinafter provided.

## EIGHTH CAUSE OF ACTION
### Violation of California Business and Professions Code §§ 17200, *et seq*.
### (On Behalf of the Class)

143.    Plaintiff realleges and incorporates the foregoing paragraphs as though fully set forth herein.

144.    California Business and Professions Code § 17200, *et seq*., prohibits unfair competition in the form of any unlawful, unfair, or fraudulent business acts or practices.

145.    Business and Professions Code § 17204 allows a person injured by the unfair business acts or practices to prosecute a civil action for violation of the UCL.

146.    Labor Code § 90.5(a) states it is the public policy of California to vigorously enforce minimum labor standards in order to ensure employees are not required to work under substandard and unlawful conditions, and to protect employers who comply with the law from those who attempt to gain competitive advantage at the expense of their workers by failing to comply with minimum labor standards.

147.    Beginning at an exact date unknown to Plaintiff, but at least since the date four years prior to the filing of this suit, Defendant has committed acts of unfair competition as defined by the UCL, by engaging in the unlawful, unfair, and fraudulent business acts and practices described in this Complaint, including, but not limited to:

24

a. Violations of Labor Code § 1194 and IWC Wage Order 5-2001 pertaining to payment of wages, including minimum wage, for all hours worked;

b. violations of Labor Code § 510 and Wage Order 5-2001 pertaining to overtime;

c. violations of Labor Code §§ 226.7, 512 and Wage Order 5-2001 pertaining to meal periods and rest breaks;

d. violations of Labor Code § 226 regarding accurate, timely itemized wage statements; and

e. violations of Labor Code §§ 201-302 pertaining to payment of all due wages upon separation from employment.

148. The violations of these laws and regulations, as well as of the fundamental California public policies protecting wages, serve as unlawful predicate acts and practices for purposes of Business and Professions Code §§ 17200 *et seq*.

149. The acts and practices described above constitute unfair, unlawful and fraudulent business practices, and unfair competition, within the meaning of Business and Professions Code §§ 17200 *et seq*. Among other things, the acts and practices have taken from Plaintiff and the Class wages rightfully earned by them, while enabling Defendant to gain an unfair competitive advantage over law-abiding employers and competitors.

150. Business and Professions Code § 17203 provides that a court may make such orders or judgments as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition. Injunctive relief is necessary and appropriate to prevent Defendant from repeating the unlawful, unfair, and fraudulent business acts and practices alleged above.

151. As a direct and proximate result of the aforementioned acts and practices, Plaintiff and the Class members have suffered a loss of money and property, in the form of unpaid wages which are due and payable to them.

152. Business and Professions Code § 17203 provides that the Court may restore to any person in interest any money or property which may have been acquired by means of such unfair competition. Plaintiff and the Class are entitled to restitution pursuant to Business and Professions Code § 17203 for all wages and payments unlawfully withheld from employees during the four-year

period prior to the filing of this Complaint. Plaintiff's success in this action will enforce important rights affecting the public interest and, in that regard, Plaintiff sues on behalf of herself as well as others similarly situated. Plaintiff and putative Class members seek and are entitled to gratuity payments retained by Defendant, unpaid wages, declaratory and injunctive relief, and all other equitable remedies owing to them.

153.    Plaintiff herein takes upon herself enforcement of these laws and lawful claims. There is a financial burden involved in pursuing this action, the action is seeking to vindicate a public right, and it would be against the interests of justice to penalize Plaintiff by forcing her to pay attorneys' fees from the recovery in this action. Attorneys' fees are appropriate pursuant to Code of Civil Procedure §1021.5 and otherwise.

154.    Wherefore, Plaintiff and the putative Class request relief as hereinafter provided.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of the Class and Collective members, requests the following relief:

1.    For an order certifying that the First Cause of Action in this Complaint may be maintained as a collective action pursuant to 29 U.S.C. § 216(b) and that prompt notice of this action be issued to potential members of the Collective, apprising them of the pendency of this action, and permitting them to assert their FLSA claims;

2.    For an order equitably tolling the statute of limitations for the potential members of the Collective;

3.    Damages and restitution according to proof at trial for all unpaid gratuities, wages and other injuries, as provided by the FLSA, California Labor Code, and California Business and Professions Code;

4.    For a declaratory judgment that Defendant violated the FLSA, California Labor Code, California law, and public policy as alleged herein;

5.    For a declaratory judgment that Defendant violated California Business and Professions Code §§ 17200 *et seq*. as a result of the aforementioned violations of the

26

California Labor Code;

6. For preliminary, permanent, and mandatory injunctive relief prohibiting Defendant, its officers, agents, and all those acting in concert with them from committing in the future those violations of law herein alleged;

7. For an equitable accounting to identify, locate, and restore to all current and former employees the wages they are due, with interest thereon;

8. For an equitable accounting to identify, locate, and restore to all current and former employees the wages they are due, with interest thereon;

9. For an order awarding Plaintiff and putative Class and Collective members compensatory damages, including gratuities owed, lost wages, earnings, liquidated damages, and other employee benefits, restitution, recovery of all money/property, actual damages, and all other sums of money owed to Plaintiff and putative Class and Collective members, together with interest on these amounts according to proof;

10. For an order awarding Plaintiff and putative Class and Collective members civil penalties pursuant to the FLSA, California Labor Code, and the laws of the State of California, with interest thereon;

11. For an order awarding reasonable attorneys' fees as provided by the FLSA, California Labor Code, California Code of Civil Procedure § 1021.5, the laws of the State of California, and/or other applicable law;

12. For all costs of suit;

13. For interest on any penalties awarded, as provided by applicable law;

14. For injunctive relief requiring Defendant to correct its unlawful practices; and

15. For such other and further relief as this Court deems just and proper.

CLASS AND COLLECTIVE ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
*Melgoza v. Aegis Senior Communities LLC*

Respectfully Submitted,

Date: March 18, 2022

_____

Carolyn H. Cottrell
Samantha A. Smith
**SCHNEIDER WALLACE**
**COTTRELL KONECKY LLP**

*Attorneys for Plaintiff,*
*on behalf of the putative Class and Collective*

CLASS AND COLLECTIVE ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
*Melgoza v. Aegis Senior Communities LLC*

1                       **DEMAND FOR JURY TRIAL**

2        Plaintiff hereby demands a jury trial on all claims and issues for which Plaintiff is entitled to

3 a jury.

4                                Respectfully Submitted,

5  Date: March 18, 2022

6

7                                Carolyn H. Cottrell

8                                Samantha A. Smith

                               **SCHNEIDER WALLACE**

9                                **COTTRELL KONECKY LLP**

10                                *Attorneys for Plaintiff,*

11                                *on behalf of the putative Class and Collective*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS AND COLLECTIVE ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
*Melgoza v. Aegis Senior Communities LLC*