Shareef Farag (Bar No. 251650)
Alex Spjute (Bar No. 229796)
Ava Claypool (Bar No. 327059)
**BAKER & HOSTETLER LLP**
11601 Wilshire Boulevard
Suite 1400
Los Angeles, CA  90025-0509
Telephone:  310.820.8800
Facsimile:  310.820.8859
Email:      sfarag@bakerlaw.com
            aspjute@bakerlaw.com
            aclaypool@bakerlaw.com

Attorneys for Plaintiff
AEGIS SENIOR COMMUNITIES LLC

# IN THE UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AEGIS SENIOR COMMUNITIES LLC,<br><br>            Plaintiff,<br><br>    v.<br><br>UKG, INC.; and DOES 1 through 20, inclusive,<br><br>            Defendants. | Case No.: 3:23-cv-01076-AMO<br><br>Hon. Araceli Martinez-Olguin<br><br>**[FIRST] AMENDED COMPLAINT**<br><br>Complaint Filed: January 25, 2023 |

Plaintiff AEGIS SENIOR COMMUNITIES, LLC hereby complains and alleges as follows:

1.      Aegis Senior Communities, LLC ("Aegis" or Plaintiff") relied upon United Kronos Group, Inc. ("UKG" or "Defendant")'s promise it would provide a secure payroll system that safeguarded Aegis's employees' personal data, and, on the basis of those representations, Aegis, just like many of UKG's other corporate clients, entered into contracts for UKG to handle payroll responsibilities.  But what Aegis and countless other of UKG's corporate clients did not know, was that

BAKER & HOSTETLER LLP<br>ATTORNEYS AT LAW<br>LOS ANGELES

UKG's promises of security and reliability were false, that UKG knew or should have known that its security features, internal security policies, and security practices were below industry standards and grossly inadequate, and that UKG had no intention of providing the as-promised data security procedures and practices. As a result of UKG's reckless and misleading behavior, not only was Aegis's employees' personal information breached in December 2021, but the payroll services UKG promised were compromised for nearly 6 weeks, resulting in damages to Aegis.

2.      Nor has UKG adjusted its cavalier attitude towards data security, as UKG's continuing lack of security policies and practices resulted in a subsequent breach of personal data from a corporate client as recently as October 2023, confirming that UKG's malfeasance continues unabated.

3.      Plaintiff brings this action against UKG for its failure to implement and maintain reasonable security procedures and practices, including with respect to the sensitive and confidential personal information UKG obtains from its customers' employees; the consequent data breach of its systems that began in December of 2021; its failure to implement and maintain reasonable backup or contingency procedures and practices to prevent or minimize disruption of services; and the resultant shut down of payroll services for approximately five weeks.

4.      UKG is one of the world's biggest workforce management software companies. The company collects, stores, and processes data for thousands of companies and millions of workers.

5.      As a result of UKG's grossly inadequate security measures, UKG was subject to a ransomware attack on its timekeeping system, Kronos Private Cloud, on or around December 11, 2021.

6.      Because of its extraordinary failure and refusal to create a safeguard or any backup plan for the event of a data breach, both UKG and its thousands of customers—including Plaintiff—were unable to access any of UKG's timekeeping

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

and payroll systems, resulting in extreme difficulties for Plaintiff attempting to correctly calculate and pay its employees.

7.     Many of the affected organizations included hospitals and healthcare systems, including Plaintiff, an Assisted Living and Memory Care Provider serving seniors in California, Nevada, and Washington.

8.     Plaintiff provides a continuum of care to elder residents suffering from physical and cognitive impairments. The care includes but is not limited to living arrangements, memory care, laundry, cleaning and dining services, and health and wellness activities.

9.     Plaintiff employs thousands of employees with a variety of responsibilities to help the elderly residents.

10.     As a result of UKG's payroll services going offline, it became very difficult for Plaintiff to correctly calculate and pay its employees, resulting in disruption of and harm to Plaintiff's business and other damages, as described below.

11.     On March 18, 2022, due to the failure of UKG's services and the subsequent difficulties by Plaintiff to compensate for that failure, Daniela Melgoza, an employee of Aegis, filed a putative class action in the Superior Court of California against Plaintiff on behalf of herself and other employees.

12.     On May 5, 2022, due to the failure of UKG's services and the subsequent difficulties faced by Aegis to compensate for that failure, Daniela Melgoza, filed a Labor Code Private Attorneys General Act ("PAGA") enforcement action on behalf of herself and other employees against Plaintiff in the Northern District of California.

## PARTIES

13.     Plaintiff Aegis Senior Communities LLC, doing business as Aegis Living, is a Washington limited liability company with its principal place of business located in Bellevue, Washington. Plaintiff is registered to do business in

the State of California and does business in the State of California.

14.     Defendant UKG, Inc. is a corporation formed under the laws of the State of Delaware, with dual corporate headquarters in Weston, Florida and Lowell, Massachusetts. UKG is the result of a merger between Ultimate Software and Kronos Incorporated. The merger was complete as of April 1, 2020.

## JURISDICTION AND VENUE

15.     This Court has diversity jurisdiction over these claims by operation of 28 U.S.C. §§ 1332.

16.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Aegis Senior Communities LLC operates in this district, and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## FACTUAL ALLEGATIONS

17.     UKG is a multinational technology company that provides workforce and human resources management services, including timekeeping and payroll services, to many large businesses including Marriott International, MGM Resorts, PepsiCo, Tesla, Inc. and others.

18.     UKG was established in April 2020 as a result of a merger between Ultimate Software and Kronos Incorporated. UKG is one of the largest HR technology companies in the world, valued at $22 billion.

19.     Kronos Incorporated was an American multinational workforce management and human capital management cloud provider which provided cloud applications for workforce management and human capital management, as well as consulting, education, and support services to its customers.

20.     UKG currently provides its professional timekeeping services to many companies and organizations in California including PepsiCo, Tesla, GameStop, the University of California system, the County of Santa Clara, and many private and public hospital and healthcare organizations, including Aegis. UKG provides timekeeping and payroll services to thousands of employers.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

21.    UKG's website indicates that its payroll services and solutions will eliminate errors, ensure compliance, and create the "perfect paycheck every time."

22.    In connection with its timekeeping and payroll services, UKG is also tasked with collecting and storing sensitive personal data, including personal identifying information ("PII") for its large corporate customers and their millions of workers.

23.    UKG affirmatively represents on its website that it is committed to protecting the privacy of individuals who use UKG's services, including but not limited to UKG's customers and their employees. UKG further represents through its privacy notice on its website that UKG safeguards PII through physical, technical, and administrative controls and procedures. Such representations appeared on UKG's website during the time Plaintiff was negotiating a contract with UKG's predecessor, Kronos Incorporated.

24.    Specifically, through its website UKG represents to both its customers and their respective workers that "to protect the confidentiality, integrity, availability and resilience of your PI[I], we utilize a variety of physical and logical access controls, firewalls, intrusion detection/prevention systems, network and database monitoring, anti-virus, and backup systems."[1]

25.    Despite UKG's representations on its website of security practices and policies to safeguard PII, UKG knew or should have known that it did not actually provide the level and degree of security that it promised and had no intention of doing so.

26.    On July 25, 2019, Plaintiff entered into a contract with UKG's predecessor, Kronos Incorporated, for the provision of certain human resources management services, specifically, Workforce Central Software as a Service (SAAS), and Kronos Private Cloud services.

27.    On December 13, 2021, UKG sent a communication to impacted

---

[1] https://www.ukg.com/privacy (July 14, 2022)

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

Kronos Private Cloud customers, including Plaintiff, informing them that UKG experienced a cybersecurity incident that rendered the Kronos Private Cloud ("KPC") services unavailable. According to the communication, UKG became aware of unusual activity on December 11, 2021, and determined that the activity was a result of a ransomware attack ("the Attack").

28.     On January 22, 2022, over one month after the Attack, UKG posted an update to its website stating that "[b]etween January 4 and January 22, all affected customers in the Kronos Private Cloud were restored with safe and secure access to their core time, scheduling, and HR/payroll capabilities. We are now focused on the restoration of supplemental features and non-production environments and are extraordinarily grateful for the patience and partnership our customers have shown."

29.     UKG's carefully worded announcement failed to clarify that UKG's payroll services were still not fully operational, falsely suggesting that its services had been restored to a reliable state and suggesting Plaintiff and others could rely upon UKG for the payroll services it had agreed to provide. In reality, and contrary to this announcement, UKG did not have in place backup systems or contingency plans that would have in fact ensured that payroll services were "restored."

30.     UKG confirmed as much on February 11, 2022, when it announced that only the first phase of the restoration process was complete and that many of KPC applications, such as Citrix, Workforce Analytics, and non-production environments, were still offline.

31.     The February 11, 2022, announcement went on to state that UKG had discovered and notified customers whose personal data of its employees "was exfiltrated."

32.     UKG claimed the theft of personal data was contained to employees of only two of its customers; however, in the same announcement, UKG admitted

1  its forensic investigation was still ongoing.[2]

2  33.    The UKG outage affected approximately 8 million total employees,

3  leaving employers to rely on handwritten timecards to process payroll until the

4  system became available and leaving employees concerned about the security of

5  their PII.

6  34.    UKG knew that it was a prime target for hackers given the significant

7  amount of sensitive personal information processed through its computer data and

8  storage systems. UKG's knowledge is underscored by the massive number of data

9  breaches that have occurred in recent years and by the guidance given to businesses

10  like UKG regarding data security.

11  35.    The Federal Bureau of Investigations ("FBI") provides business

12  continuity considerations that data companies should implement in anticipation of

13  an attack. Some considerations include: backing up data regularly, verifying the

14  integrity of those backups and testing the restoration process to ensure it is

15  working; and conducting an annual penetration test and vulnerability assessment.

16  On information and belief, UKG failed to adopt and implement the FBI's

17  recommendations regarding preserving business continuity prior to the December

18  2021 attack.

19  36.    Prior to this attack, and as a result of the meteoric rise in ransomware

20  attacks, the FBI created a Ransomware Prevention and Response Guide which

21  compiles federal government and private industry best practices and mitigation

22  strategies to prevent and respond to ransomware incidents. Some of the best

23  practices include: Configuring firewalls to block access to known malicious IP

24  addresses; patching operating systems, software, and firmware on devices; and

25  setting anti-virus and anti-malware programs to conduct regular scans

26  automatically. On information and belief, UKG failed to adopt and implement such

27

28  [2] Hackers disrupt payroll for thousands of employers — including hospitals
https://www.npr.org/2022/01/15/1072846933/kronos-hack-lawsuits. (Last visited June 6, 2022).

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

practices and strategies prior to the December 2021 attack.

37. The National Institute of Standards and Technology ("NIST") is part of the U.S. Department of Commerce. NIST guidelines and controls, including NIST 800-53, are generally used to enhance the cybersecurity framework, risk posture, information protection, and security standards of organizations. NIST 800-53 is mandatory for federal agencies, and commercial entities may also utilize its guidelines and controls in their security programs.

38. NIST guidelines and controls are also used to assess vendors and contractors prior to contracting with the federal government.

39. NIST recognizes the importance of having a contingency plan, and the controls for cybersecurity include a large section concerning appropriate contingency planning.[3] UKG failed to implement and adopt NIST's guidance regarding appropriate contingency planning.

40. NIST also released a list of basic guidelines for organizations to follow to prevent and respond to ransomware attacks.[4] UKG failed to adopt and implement such guidelines.

41. Despite knowing the prevalence of data breaches, UKG failed to prioritize data security by adopting reasonable data security measures to prevent and detect unauthorized access to its highly sensitive systems and databases.  Worse still, UKG affirmatively represented on its website, marketing materials, and in the negotiations for the contract, to Plaintiff and others that it did prioritize data security and had adopted reasonable data security measures, when in fact it did not and had not.   UKG has the resources to prevent a breach, but neglected to adequately invest in data security, despite the growing number of well-publicized breaches and the guidance from federal agencies.  UKG failed to undertake

---

[3] Security and Privacy Controls for Information Systems and Organizations
https://csrc.nist.gov/CSRC/media/Projects/risk-management/800-53%20Downloads/800-53r5/SP_800-53_v5_1-derived-OSCAL.pdf
[4] Ransomware Risk Management: A Cybersecurity Framework Profile
https://nvlpubs.nist.gov/nistpubs/ir/2022/NIST.IR.8374.pdf

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

adequate analyses and testing of its own systems, training of its own personnel, and other data security measures as described herein to ensure vulnerabilities were avoided or remedied and that Plaintiffs had access to its contracted for services.

42.     UKG could have prevented the Attack by implementing preventative measures as advised by the federal government and the NIST.

43.     UKG could and should have mitigated the damage of the attack and allowed employers access to timekeeping and payroll services by creating a continuity and recovery plan as advised by the federal government and the NIST and as promised in the contract.

44.     Upon information and belief, UKG did not create a continuity and recovery plan as advised by the federal government and the NIST.

45.     Upon information and belief, UKG did not create or maintain any continuity or recovery plan to anticipate a foreseeable data breach.

46.     UKG's failure to safeguard against a cybersecurity attack is exacerbated by the repeated warnings and alerts from public and private institutions, including the federal government, directed to protecting and securing sensitive data.  Experts studying cybersecurity routinely identify companies such as UKG that collect, process, and store massive amounts of data on cloud-based systems as being particularly vulnerable to cyberattacks because of the value of the personal information that they collect and maintain. Accordingly, UKG knew or should have known that it was a prime target for hackers.

47.     According to the FTC, the need for data security should be factored into all business decision making. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established guidelines for fundamental data security principles and practices for business.[5] Among other things, the guidelines note that businesses should protect the personal

---

[5] *Protecting Personal Information, A Guide for Business*, FTC (Oct. 2016),
https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf

customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

48.     UKG failed to follow FTC guidelines as it:

- failed to protect customer information;
- failed to encrypt information stored on computer networks;
- failed to understand its network's vulnerabilities;
- failed to implement policies to correct security problems;
- failed to use an intrusion detection system which would have exposed a breach as soon as it occurred; and
- failed to have a response plan ready in the event of a breach.

49.     The State of California also recognizes the need for businesses such as UKG to maintain data security measures, and enacted the California Consumer Privacy Act ("CCPA") to ensure that personal information about California residents is protected. Cal. Civ. Code § 1798.81.5. The CCPA mandates that a business such as UKG that owns, licenses, or maintains personal information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure.

50.     UKG did not implement and maintain reasonable security procedures and practices to protect the personal information of Plaintiff's employees from unauthorized access.

51.     UKG was on notice of the rise in ransomware attacks and was on notice that it was a target for ransomware attackers.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

52.     In April and May 2021, the Colonial Pipeline Company was forced to shut down its pipeline system in response to a ransomware attack. Colonial Pipeline gave into demands and paid the attackers $4.4 million. As a result of the attack, government officials urged owners of critical infrastructure companies, like UKG, to follow best practices to prevent against ransomware attacks and to adopt a heightened state of awareness for the risks of ransomware.[67]

53.     UKG's knowledge and notice of a potential ransomware attack is highlighted by the string of attacks against payroll companies in particular.

54.     In November 2021, Frontier Software, a payroll and talent management software, was the victim of a ransomware attack. The attack compromised the data of approximately 38,000 to 80,000 South Australian government employees, including dates of birth, start dates, and other payroll data.[8]

55.     In January 2021, the third-party payroll provider for Arup, a UK-based engineering firm that employs 6,000 employees, was a victim of a ransomware attack.  Arup was only informed in March of 2021. In April 2021, the full details of the attack were published.  Data stolen included employee names, bank details, and home addresses.[9]

56.     In May 2020, Interserve, a contractor for Britain's Ministry of Defense, was hacked. The hackers managed to gain access to up to 100,000 past and current employee details, including names, addresses, bank details, HR records, payroll, and pension information.[10]

57.     In February 2021, about 4,500 customers of a Honolulu payroll processing company, Hawaii Payroll Services, LLC, were potentially affected by a

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

[6] DarkSide Ransomware: Best Practices for Preventing Business Disruption from Ransomware Attacks. https://www.cisa.gov/uscert/ncas/alerts/aa21-131a.
[7] Joint CISA-FBI Cybersecurity Advisory on DarkSide Ransomware. https://www.cisa.gov/uscert/ncas/current-activity/2021/05/11/joint-cisa-fbi-cybersecurity-advisory-darkside-ransomware.
[8] Frontier Software data breach. https://www.sa.gov.au/topics/emergencies-and-safety/types/cyber-security/frontier-software-data-breach
[9] Global consultancy firm Arup victim of data breach. https://celsolicitors.co.uk/global-consultancy-firm-arup-victim-of-data-hackers/
[10] Interserve data breach. https://www.dataleaklawyers.co.uk/blog/interserve-data-breach

ransomware attack that exposed Social Security numbers, dates of birth, the full names of clients and bank account information.[11]

58.     Despite having ample notice of the prevalence of data breaches, and specifically data breaches against payroll services, UKG failed to prioritize data security by failing to adopt reasonable and government-suggested data security measures to prevent and detect unauthorized access to its sensitive and critical infrastructure systems and databases.

59.      Despite knowing that its software provided critical payroll and timesheet services for millions of employees, UKG failed to adopt and implement reasonable and well-known restoration and business continuity measures.

60.     UKG is a multinational company with the resources to prevent and properly react to a breach, but refused to adequately invest in data security, even at a time when data breaches were on the rise.  Even worse, UKG promoted itself on its website and marketing materials to its customers, including to Plaintiff, as having adopted security measures when in fact it had not.  UKG also deliberately chose not to implement basic backup measures or create or implement any contingency plan to ensure continuity of payroll services so that Plaintiff could accurately and efficiently pay its employees.

**PLAINTIFF'S ALLEGATIONS**

61.     Plaintiff became a customer of UKG's Kronos Workforce Central Software as a Service after signing a statement of work contract on July 25, 2019. (**Ex. A.**) Plaintiff purchased UKG's Kronos Workforce Central Software as a Service to provide timekeeping and payroll services for its employees, and agreed on monthly service fees of $8,725. Among other services, UKG was to provide the following applications:

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

---

[11]Thousands Affected by Ransomware Attack on Hawaii Company.  https://www.govtech.com/security/thousands-affected-by-ransomware-attack-on-hawaii-company

- Workforce Timekeeper
- Workforce Manager
- Workforce Accruals
- Workforce Scheduler
- Workforce AR
- Workforce Payroll
- KSS Tool, Timecard Confirmation Tool
- Workforce Employee
- Workforce Administrator HR/PR

62.     According to the UKG Website, Kronos Workforce would "manage schedules, track time and attendance, administer absence and leave, and measure productivity."[12]

63.     Plaintiff purchased Kronos Workforce to manage schedules, track time and attendance, administer absence and leave (which is particularly complex and important in the healthcare industry), and measure productivity.

64.     According to the UKG Website, Kronos Timekeeper is guaranteed to "track, manage, and control employee time and attendance for **uncompromised** results."[13] UKG also promises that Kronos Timekeeper will "centrally enforce labor laws, union rules, and organization-specific policies."

65.     Plaintiff purchased Kronos Timekeeper from UKG to centrally enforce labor laws, union rules, and organization-specific policies, which are of utmost important in the healthcare industry.

66.     UKG's Terms and Conditions in the contract provide that the Applications, under normal operation as specified in the Documentation and when used as authorized, will perform substantially in accordance with such Documentation.

---

[12] https://www.kronos.co.uk/products/workforce-central-suite
[13] https://www.kronos.com/resource/download/8066

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

67.   The Statement of Work Contract provided that as part of the contracted for Services, UKG would provide administrative, physical, and technical safeguards for protection of the security, confidentiality, and integrity of customer data.

68.   UKG intended for Plaintiff to rely on the representation that it would provide administrative, physical, and technical safeguards.

69.   Plaintiff fundamentally relied on UKG's representations that the software would perform as described.

70.   Plaintiff fundamentally relied on UKG's representations UKG's software would drive accuracy, improve efficiency, ensure compliance, and create the "perfect paycheck every time."

71.   According to the Kronos Cloud Guidelines Webpage, which was incorporated into Plaintiff's contract, UKG was to maintain a hosting environment that underwent examinations from an independent auditor in accordance with the American Institute of Certified Public Accounts SSAE 16 (i.e., SOC 1) and the AICPA Trust Services Principles Section 100a, Trust Services for Security, Availability, Processing Integrity, Confidentiality and Privacy (i.e., SOC 2). The Kronos Private Cloud ("KPC") was also to be evaluated for the principles of Security, Availability and Confidentiality by the independent auditor.[14] The Kronos Cloud Guidelines Webpage as accessed and archived on June 18, 2019, is attached hereto as **Exhibit B**.

72.   According to the Kronos Cloud Guidelines Webpage, which was incorporated into Plaintiff's contract with UKG, all customer data in the Kronos Cloud was to be replicated to a secondary Kronos Cloud data center. Disaster Recovery Services provided for a Recovery Point Objective ("RPO") of 24 hours and Kronos was to restore application availability in a commercially reasonable

---

[14] Kronos Cloud Guidelines https://www.kronos.com/products/workforce-central-cloud/cloud-guideline (June 18, 2019).

timeframe.[15]

73.     Plaintiff purchased Kronos Timekeeper from UKG because Plaintiff fundamentally relied on UKG's assertions that UKG software would be maintained and independently evaluated to meet these high standards and would follow principles of Security Availability and Confidentiality.

74.     Plaintiff fundamentally relied on UKG's representation that in the event of a data breach it would restore application availability in a commercially reasonable timeframe.

75.     Plaintiff fundamentally relied on UKG's representations that it would provide administrative, physical, and technical safeguards for protection of the security, confidentiality, and integrity of customer data.

76.     UKG did not provide administrative, physical, and technical safeguards for protection of the security, confidentiality, and integrity of Plaintiff's data.

77.     At the time of the contract, UKG knew that it did not intend to provide administrative, physical, and technical safeguards for protection of the security, confidentiality, and integrity of Plaintiff's data.

78.     On December 13, 2021, UKG sent a communication to impacted KPC customers, including Plaintiff, informing them that UKG experienced a cybersecurity incident that rendered the KPC services unavailable. According to the communication, UKG became aware of unusual activity on December 11, 2021, and determined that the activity was a result of a ransomware attack.

79.     While UKG sent correspondence to its customers regarding the Attack, the vague correspondence failed to provide any remedy to access the critical payroll information.

80.     As a direct and foreseeable result of UKG's grossly negligent failure to implement and maintain critical data security procedures or continuity plans,

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

---

[15] *Id.*

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

Plaintiff's timekeeping and payroll systems were instantly unavailable as of approximately December 11, 2021, and remained inaccessible for use to Aegis employees until January 19, 2022, approximately five weeks following the initial breach. UKG lacked any back up or business continuity protocols, so all customers, including Plaintiff, were deprived of the software and services for which they had contracted and paid.

81.    Plaintiff attempted to have its employees accurately record their hours manually so that they could be paid accurately and efficiently while UKG's promised services were failing.

82.    Plaintiff operates in a fast-paced healthcare environment where the number one priority is resident care.

83.    Plaintiff's employees work complex shifts and require different regulatory breaks across different states.

84.    Prior to UKG's data breach, Plaintiff paid its employees consistently and accurately, and provided breaks in accordance with state and federal laws.

85.    Plaintiff relied on UKG's expertise to calculate nursing, care and other staff breaks, shift differentials, and other complex payroll solutions that Plaintiff paid for and UKG advertised. Plaintiff does not have the infrastructure to accurately record the hours of its employees without UKG's systems.

86.    Plaintiff maintained a leanly staffed payroll department because it fundamentally relied on UKG's representations that it would provide consistent and accurate payroll services.

87.    Plaintiff relied on UKG's expertise as a professional provider of payroll services, which included the services of administrative, physical, and technical safeguards for protection of the security, confidentiality, and integrity of Customer data.

88.    Plaintiff did not have any way protect itself or to inspect UKG's deficient technical practices prior to the Attack.

89.     Despite Plaintiff's best efforts, Plaintiff could not accurately keep and manage time worked for employees, and some employees received inaccurate pay.

90.     On March 18, 2022, Daniela Melgoza, an employee of Aegis, filed a putative collective action against Plaintiff on behalf of herself and other employees, due to the payment and break inaccuracies caused by the data breach which rendered UKG's payroll services unavailable to Plaintiff. (**Ex. C**)

91.     On May 5, 2022, Daniela Melgoza, an employee of Aegis, filed a Labor Code Private Attorneys General Act ("PAGA") enforcement action against Plaintiff on behalf of herself and other employees, due to the payment and break inaccuracies caused by the data breach which rendered UKG's payroll services unavailable to Plaintiff (the "Melgoza case").

92.     The Collective and PAGA actions filed by Daniela Melgoza alleged claims for violations of the Fair Labor Standards Act ("FLSA"), which directly stemmed from the data breach that rendered UKG's payroll services unavailable to Plaintiff.

93.     The alleged claims for violations of the FLSA were not alleged in prior actions against Plaintiff and were a direct result of the interruption of UKG's payroll services, which Plaintiff contracted and paid for. Specifically, the FLSA collective action filed by Melgoza:

- Was filed just months after the data breach;
- Alleged that Plaintiff received bi-weekly payments of $465.80 from Aegis despite working 40 hours per week at a pay-rate of $17.00 per hour, calculating to roughly $5.82 per hour, below the FLSA requirement; and
- Was filed on behalf of additional Aegis employees outside of California, including employees in Washington and Nevada.

94.     On November 3, 2023, Plaintiff filed a Motion for Preliminary Approval of Settlement for three million dollars ($3,000,000) to settle the claims

Baker & Hostetler llp
Attorneys at Law
Los Angeles

filed by Daniela Melgoza and the claims from a related case filed prior to the data breach, and unrelated to the data breach, titled Andrea Salonga v. Aegis Senior Communities LLC, case number 21CV003128 (the "Salonga case") (**Ex. D**). While the cases were deemed to be related, the Melgoza case was filed after the data breach, contained new allegations specific to the data breach, and alleged FLSA violations for class members outside of California whose payment and break inaccuracies were directly caused by the data breach.

95. In calculating the damages owed to Plaintiffs, the Parties to the Salonga and Melgoza cases agreed to settle a small portion of the putative Collective. Specifically, the settlement covered **only** the estimated 4,000 workweeks affected by the data breach.

96. As a direct result of UKG's breaches and failures, Plaintiff has incurred damages and additional costs including but not limited to:

- Outside contractors and consultants to assist in processing manual payroll;

- Overtime hours paid to employees tasked with manually recording working hours and breaks;

- Defending labor claims caused by inaccurate or untimely payments;

- Outside consultant to assist with getting the payroll system back online;

- Outside consultant to assist with exporting time information from timeclocks during the period of the outage;

- Overpayments to employees as a result of not being able to accurately capture their time;

- Shipping costs for shipping paper checks to employees via FedEx; and

- Costs associated with issuing amended W-2 forms.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

97.     Even after the Attack, UKG continues to make false representations to Plaintiff and other corporate clients that UKG is dedicated to and has implemented reasonable security measures to protect PII, when in fact UKG has not.

98.     For instance, on its new website, published after the Attack, and accessed by Aegis as early as June 25, 2022, UKG asserted, and continues to assert that it "takes matters of cybersecurity and compliance very seriously" and is "committed to preserving the confidentiality, integrity, and availability of all physical, electronic, and informational assets as they relate to [their] cloud solutions and services."[16]

99.     UKG further asserted that it was committed to protecting "its products and services from security threats, whether internal or external, deliberate or accidental" and announced that as a commitment to its customers it would evidence its safeguards by providing customers with "independent third-party audit reports, such as SOC 2, as well as certifications of ISO/IEC 27001, ISO/IEC 27017, and ISO/IEC 27018."[17]

100.    After the Attack, and as early as June 25, 2022, UKG assured current and potential customers that it was committed to "continually improving [its] incident response, staff training, and additional mechanisms to ensure the security of customer and user data"[18]

101.    Relying upon UKG'S false representations and assurances, and in dire need of payroll services, Aegis entered into a new contract with UKG for payroll services. Specifically, on October 1, 2022, Aegis entered into a new Statement of Work with UKG for certain services including the UKG Pro Pay and People Center and UKG Workforce Management Applications ("SaaS Applications").

102.    Aegis entered the contract reasonably believing UKG's representations that it would "take matters of cybersecurity and compliance very seriously" and that

---

[16] https://www.ukg.com/about-us/esg/governance/cybersecurity.
[17] *Id.*
[18] https://www.ukg.com/about-us/esg/governance/privacy-and-data-protection.

it would be "committed to preserving the confidentiality, integrity, and availability of all physical, electronic, and informational assets."

103. Thereafter, on July 3, 2023, UKG announced that it had recently agreed to a class action settlement of a case brought by employees of customers impacted by the Attack.[19]

104. In the announcement, UKG continued to make affirmative representations regarding its commitment to cybersecurity, and touted that it implemented new "Security Hardening Measures" including expanding the scanning and monitoring program using insights from its investigation; supplementing UKG's Security Operations Center monitoring with additional third-party managed service monitoring; deploying additional malware scanning tools across all products and UKG's corporate IT environment; and expanding cold storage backups.[20]

105. Upon information and belief, UKG did not implement these new "Security Hardening Measures."

106. UKG knew that it did not intend to implement these new "Security Hardening Measures."

107. As a result of UKG's continuing cavalier approach to PII security, more data breaches have occurred related to UKG's corporate clients. For example, as recently as on October 20, 2023, UKG conducted a training with Plaintiff's personnel in order to demonstrate UKG's new reporting feature that was purportedly going to provide a list of Plaintiff's new hires and recent terminations. During that training, when the trainer ran the report, it pulled a report for a different UKG client, which included PII.

108. During the training, the UKG trainer, remarked to Aegis's personnel that the reporting feature did not appear to be working correctly and was pulling the

---

[19] https://www.kronosprivatecloudsettlement.com/
[20] *Id.*

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

information of another UKG client. The trainer further remarked that she would raise the error with UKG's internal resources to have the issue remedied.

109.    Thereafter, on or about October 25, 2023, almost a week after the unintentional disclosure during the training, Plaintiff used UKG's software as instructed to pull a report for Plaintiff's own company, and instead UKG's software still provided the report for a different UKG client ("Disclosure Client")[21], containing information including social security numbers, addresses, banking and routing numbers, and other confidential information for tens of thousands of employees, including executives.

110.    On October 30, 2023, in-house counsel for Aegis sent in-house counsel for UKG an email detailing what happened during the training and informing UKG that while using UKG's software as instructed, Aegis was able to access information including social security numbers, addresses, banking and routing numbers, and other confidential information for the Disclosure Client. Surprisingly, in-house counsel for UKG did not exhibit a significant level of concern.

111.    Subsequently, in-house counsel for Aegis reached out to his outside counsel to detail what had occurred. In response, outside counsel for Aegis reached out to outside counsel for UKG to discuss and convey the severity of the disclosure.

112.    On October 31, 2023, eleven days after the initial unauthorized disclosure of PII, and apparently at the prodding of their outside counsel, in-house counsel for UKG requested additional information about the disclosure and provided a list questions for Aegis personnel. In-house counsel for UKG further confirmed that UKG's incident response team was now "investigating this issue."

113.    On the afternoon of November 1, 2023, UKG finally removed Plaintiff's access to the Business Intelligence software "out of an abundance of caution", and for the first time, requested that information be deleted.

---

[21] To protect the identity of the client and its employees, Aegis refrains from naming UKG's client.

114.   In an attempt to conceal its wrongdoings, UKG demanded that Plaintiff sign a non-disclosure agreement regarding the unauthorized disclosure of the PII, but Plaintiff refused. In a bizarre turn, UKG even threatened in-house counsel for Aegis with potential legal liability for possessing the PII which UKG's own software disclosed.

115.   Concerned regarding the severity of the disclosure, however, in house counsel for Aegis contacted counsel for the Disclosure Client to receive instruction on how to dispose of the sensitive data.

116.   Aegis disposed of the PII as instructed by the Disclosure Client.

117.   The Disclosure Client informed in-house counsel for Aegis that UKG used Disclosure Client's PII in the training feature for **multiple**  UKG clients on various dates, exposing the information including social security numbers, addresses, banking and routing numbers, and other confidential information for tens of thousands of employees to multiple individuals.

118.   Plaintiff did not intend to see the information of the Disclosure Client containing information including social security numbers, addresses, banking and routing numbers, and other confidential information for tens of thousands of employees, including executives.  But UKG's lack of internal security measures allowed for this breach of PII to occur, confirming UKG's gross negligence and continuing indifference in providing the data security measures it promises to provide on its website and marketing materials.

119.   Indeed, UKG's software does not contain adequate or competent safety measures, which allowed Plaintiff to view social security numbers, addresses, banking and routing numbers, and other confidential information for tens of thousands of employees of a UKG customer.

120.   UKG's gross negligence is highlighted by the fact that it disclosed the sensitive information including social security numbers, addresses, banking and routing numbers of one of its clients to **multiple** different clients, and despite being

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

on notice, did not remove Aegis's access to the sensitive information for **eleven days**.

121.   Despite UKG's assertions both in its original contract with Plaintiff and in its Settlement announcement regarding security measures, UKG has never had any intentions of maintaining adequate security practices.

122.   UKG's absolute failure to provide **any** reasonable security measures has caused Plaintiff damages.

123.   As a result of UKG's misrepresentations regarding its security measures, Plaintiff was misled into consenting to the contract and now seeks to rescind the contract between Plaintiff and UKG, and enter into a new contract with a different payroll service provider.

124.   As a result of the damages caused by UKG's misrepresentations and Plaintiff's justified reliance, Plaintiff is entitled to consequential damages relating to and/or arising out of Plaintiff's transition to a new payroll services provider.

## FIRST CAUSE OF ACTION
## GROSS NEGLIGENCE

125.   Plaintiff re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

126.   Given UKG's size and market share of payroll services, including processing data for millions of employees, and managing the processing of hundreds of millions of dollars, UKG owed a duty to customers to use reasonable measures to create a continuity plan in the event of a highly foreseeable data breach. This duty includes implementing and maintaining reasonable security procedures and practices appropriate to the nature of the PII that are compliant with and/or better than industry-standard practices. UKG's duties include a duty to design, maintain, and test its security systems to ensure that customer PII is adequately secured and protected, to implement processes that would detect a breach of its security system in a timely manner, to timely act upon warnings and

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

alerts, including those generated by its own security systems regarding intrusions to its networks, and to have a continuity plan in place to ensure that it can continue to provide its critical payroll services.

127.   UKG further owed a duty to Plaintiff to exercise reasonable care to avoid sudden disruption to its human resources services, including its timekeeping and payroll services. UKG was responsible for providing continuous and ongoing timekeeping and payroll services to Plaintiff, knowing that such services were for the benefit of making timely wage payments to employees, among other things, and that any disruption, particularly any sudden disruption, would cause Plaintiff and its employees harm.

128.   UKG's duty also arose from its unique position as one of the largest cloud computing companies in the world, and as an IT service provider whose services constitute a linchpin of the payroll services of a substantial fraction of the nation. Because of its crucial role within the payroll system, UKG was in a unique and superior position to protect against the harm suffered by Plaintiff and its employees as a result of the UKG data breach.

129.   The contract between Plaintiff and UKG for UKG to perform certain services gave rise to a duty of care which required that such services be performed in a competent and reasonable manner.

130.   Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect personal information by companies such as UKG. Various FTC publications and data security breach orders further form the basis of UKG's duty.

131.   The CCPA mandates that a business such as UKG that owns, licenses, or maintains personal information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access,

destruction, use, modification, or disclosure. Cal. Civ. Code § 1798.81.5. The CCPA further forms the basis of UKG's duty.

132.   UKG violated the CCPA and breached its duty by failing to implement and maintain reasonable security procedures and practices.

133.   It was foreseeable to UKG that a failure to follow state and federal guidelines to protect against data breaches would result in injury to its customers and their employees, including by exposing its customers to legal liability arising from, among other things, employee and wage-related litigation.  In fact, multiple UKG customers, including Aegis, have been sued by their employees as a result of UKG's failure to follow such guidelines.

134.   UKG violated Section 5 of the FTC Act by failing to use reasonable measures to protect personal information and by not complying with industry standards. UKG's conduct was particularly unreasonable given the nature and amount of personal information it obtained and stored and the foreseeable consequences of a data breach at one of the largest cloud computing companies in the world handling timekeeping and payroll data for thousands of companies and millions of employees, including Plaintiff and its employees.

135.   UKG breached its duty to Plaintiff by failing to design, maintain, and test its security systems to ensure that customer PII was adequately secured and protected, and that UKG had access to its payroll services.

136.   UKG breached the duties it owed to Plaintiff described above by, among other things, failing to: (a) exercise reasonable care and implement adequate security systems, protocols and practices sufficient to protect the personal information of Plaintiff's employees  (b) prevent the security breach; (c) detect the security breach while it was ongoing; (d) maintain security systems consistent with industry standards and necessary to avoid the disabling of payroll systems for thousands of companies and millions of workers; (e) avoid disruption and continued disruption of its timekeeping and payroll services; and (f) failing to

- 25 -

comply fully even with its own purported security practices.

137.  UKG further breached its duty to Plaintiff as professional servicer to perform the payroll and IT services in a competent and reasonable manner.

138.  UKG further breached its duty to Plaintiff to exercise reasonable care to avoid sudden disruption of their human resources services, including their timekeeping and payroll services, by allowing its systems to remain disabled for multiple months and failing to adequately and timely remedy its security vulnerabilities.

139.  UKG's unfair practices and deceptive acts affected commerce which directly violated Section 5 of the Federal Trade Commission Act.

140.  Moreover, the harm that has occurred is the type of harm that the FTC Act was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and its employees.

141.  UKG's conduct was an extreme departure from the ordinary standard of conduct in the industry, including the guidance from Federal Agencies and the FTC.

142.  Actual and attempted breaches of data security were reasonably foreseeable to UKG given that other payroll companies had suffered such attacks as well as the known frequency of data breaches and various warnings from industry experts.

143.  In connection with the conduct described above, UKG acted willfully, wantonly, and without even scant care in neglecting to adequately protect its software from a data breach.

144.  Such wanton conduct is evidenced by UKG's continued lack of even scant care such that Plaintiff was inadvertently able to access a report for a different UKG client containing information including social security numbers, addresses,

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

banking and routing numbers, and other confidential information for tens of thousands of employees, including executives.

145.   But for UKG's wrongful and grossly negligent breach of its duties owed to Plaintiff and its employees, Plaintiff's timekeeping and payroll services would not have been disabled and Plaintiff would have been able to accurately compensate its employees, avoiding injury, including from the employee class action suit filed against Plaintiff.

146.   As a direct and proximate result of UKG's gross negligence, Plaintiff and its employees have been injured as described herein, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### FRAUDULENT MISREPRESENTATION

147.   Plaintiff re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

148.   UKG induced Plaintiff into entering into a contract by representing that it would provide certain services including payroll services, and IT services including administrative, physical, and technical safeguards for protection of the security, confidentiality, and integrity of customer data.

149.   UKG intended to induce Plaintiff into entering into a contract by representing to Plaintiff (and the general public) both on its website and marketing materials in or around June 18, 2019, which statements were relied upon by Plaintiff when entering into the July 25, 2019 agreement, that UKG would provide certain services including payroll services, and IT services including administrative, physical, and technical safeguards for protection of the security, confidentiality, and integrity of customer data. UKG intended to induce Plaintiff into entering into a contract by representing to Plaintiff (and the general public) both on its website and

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

marketing materials in or around June 18, 2019, that UKG would provide and maintain a hosting environment that underwent examinations from an independent auditor in accordance with the American Institute of Certified Public Accounts SSAE 16 (i.e., SOC 1) and the AICPA Trust Services Principles Section 100a, Trust Services for Security, Availability, Processing Integrity, Confidentiality and Privacy (i.e., SOC 2). The Kronos Private Cloud ("KPC") was also to be evaluated for the principles of Security, Availability and Confidentiality by the independent auditor.[22]

150.   UKG intended to induce Plaintiff into entering into a contract by representing to Plaintiff (and the general public) on its website and marketing materials in or around June 18, 2019, that all customer data in the Kronos Cloud was to be replicated to a secondary Kronos Cloud data center, and that Disaster Recovery Services provided for a Recovery Point Objective ("RPO") of 24 hours and Kronos was to restore application availability in a commercially reasonable timeframe.

151.   UKG further intended to induce Plaintiff into entering into a subsequent contract by representing to Plaintiff (and the general public) both on its website and marketing materials in or around June 24, 2022, which statements were relied upon by Plaintiff when entering into the October 1, 2022 agreement, that UKG would provide certain services including payroll services, that it was committed to preserving the confidentiality, integrity, and availability of all physical, electronic, and informational assets, and that it would ensure the security of customer and user data.

152.   These representations were important to the transaction because Plaintiff would not have entered into the Statement of Work if Plaintiff had known that UKG did not intent to provide crucial safeguards for the protection of

---

[22] Kronos Cloud Guidelines https://www.kronos.com/products/workforce-central-cloud/cloud-guideline (June 18, 2019).

Plaintiff's data.

153.   UKG's fraudulent representation that it would provide certain services were made on or around June 18, 2019, on its website and in marketing materials, and were maintained by UKG as affirmative representations up through and including July 25, 2019, when Plaintiff entered into its agreement with UKG.

154.   UKG made additional misrepresentations that it would provide certain services and commitments to data security on or around June 24, 2022 on its website and in marketing materials, and were maintained by UKG as affirmative representations up through and including October 11, 2022, when Plaintiff entered into its subsequent agreement with UKG.

155.   UKG's assertions and representations were not true, UKG did not believe its assertions and representations to be true, and UKG made such representations recklessly and without regard for the truth.

156.   There has been a material failure in the consideration received by Plaintiff, in that Plaintiff did not receive certain payroll services and did not receive any of the administrative, physical, and technical safeguards promised by UKG.

157.   UKG did not provide certain cervices including payroll services, and IT services including administrative, physical, and technical safeguards for protection of the security, confidentiality, and integrity of customer data.

158.   UKG did not ensure the security of customer and user data.

159.   All of UKG's acts, representations, and communications with Plaintiff in regard to the potential contracting for Workforce Central Software as a Service (SAAS), and Kronos Private Cloud services were knowingly false and made with the intent that Plaintiff rely on these false representations in order to deceive Plaintiff into entering into the contract.

160.   Based on UKG's status as a leading service provider for payroll and IT services, Plaintiff justifiably and reasonably relied on the representations, promises, and assertions made by UKG in inducing Plaintiff to enter into the contracts.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

161.   Plaintiff's consent to the contracts was obtained through UKG's fraudulent misrepresentations, namely that UKG would provide certain services including payroll services, and IT services including administrative, physical, and technical safeguards, that all customer data in the Kronos Cloud would be replicated to a secondary Kronos Cloud data center, and that Disaster Recovery Services provided for a Recovery Point Objective ("RPO") of 24 hours and Kronos was to restore application availability in a commercially reasonable timeframe.

162.   Plaintiff has been deprived of its benefits to the bargain and has been damaged as a result of UKG's fraudulent and deceitful actions.

163.   As a result of UKG's fraudulent misrepresentations, Plaintiff was misled into consenting to each of the contracts and now seeks to rescind the current contract between Plaintiff and UKG, and enter into a new contract with a different payroll service provider.

164.   As a result of the damages caused by UKG's misrepresentations and Plaintiff's justified reliance, Plaintiff is entitled to consequential damages relating to and/or arising out of Plaintiff's transition to a new payroll services provider.

165.   As a direct and proximate result of UKG's fraudulent and deceitful actions, Plaintiff has been injured as described herein, and is entitled to recission of the contract, and damages, including compensatory, consequential, punitive, and nominal damages, in an amount to be proven at trial.

## THIRD CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

166.   Plaintiff re-alleges and incorporates by reference all preceding allegations as if fully set forth herein.

167.   UKG intended to induce Plaintiff into entering into a contract by representing to Plaintiff (and the general public) both on its website and marketing materials in or around June 18, 2019, which statements were relied upon by

[FIRST] AMENDED COMPLAINT
CASE NO.: 3:23-CV-01076-AMO

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

Plaintiff when entering into the July 25, 2019 agreement, that UKG would provide certain services including payroll services, and IT services including administrative, physical, and technical safeguards for protection of the security, confidentiality, and integrity of customer data.

168.   UKG intended to induce Plaintiff into entering into a contract by representing to Plaintiff (and the general public) both on its website and marketing materials in or around June 18, 2019, that UKG would provide and maintain a hosting environment that underwent examinations from an independent auditor in accordance with the American Institute of Certified Public Accounts SSAE 16 (i.e., SOC 1) and the AICPA Trust Services Principles Section 100a, Trust Services for Security, Availability, Processing Integrity, Confidentiality and Privacy (i.e., SOC 2). The Kronos Private Cloud ("KPC") was also to be evaluated for the principles of Security, Availability and Confidentiality by the independent auditor.[23]

169.   UKG intended to induce Plaintiff into entering into a contract by representing to Plaintiff (and the general public) both on its website and marketing materials in or around June 18, 2019, that all customer data in the Kronos Cloud was to be replicated to a secondary Kronos Cloud data center, and that Disaster Recovery Services provided for a Recovery Point Objective ("RPO") of 24 hours and Kronos was to restore application availability in a commercially reasonable timeframe.

170.   UKG further intended to induce Plaintiff into entering into a subsequent contract by representing to Plaintiff (and the general public) both on its website and marketing materials in or around June 24, 2022, which statements were relied upon by Plaintiff when entering into the October 1, 2022 agreement, that UKG would provide certain services including payroll services, that it was committed to preserving the confidentiality, integrity, and availability of all

---

[23] Kronos Cloud Guidelines https://www.kronos.com/products/workforce-central-cloud/cloud-guideline (June 18, 2019).

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

physical, electronic, and informational assets, and that it would ensure the security of customer and user data.

171.    These representations were important to the transaction because Plaintiff would not have entered into the Statement of Work on July 25, 2019 or on October 11, 2022 if Plaintiff had known that UKG did not intend to provide crucial safeguards for the protection of Plaintiff's data.

172.    UKG did not provide certain cervices including payroll services, and IT services including administrative, physical, and technical safeguards for protection of the security, confidentiality, and integrity of customer data.

173.    UKG did not provide and maintain a hosting environment that underwent examinations from an independent auditor in accordance with the American Institute of Certified Public Accounts SSAE 16 (i.e., SOC 1) and the AICPA Trust Services Principles Section 100a, Trust Services for Security, Availability, Processing Integrity, Confidentiality and Privacy (i.e., SOC 2). The Kronos Private Cloud ("KPC") was also to be evaluated for the principles of Security, Availability and Confidentiality by the independent auditor.

174.    None of the customer data in the Kronos Cloud was replicated to a secondary Kronos Cloud data center, and Kronos did not restore application availability in a commercially reasonable timeframe.

175.    UKG did not ensure the security of customer and user data.

176.    There has been a material failure in the consideration received by Plaintiff, in that Plaintiff did not receive certain payroll services and did not receive any of the administrative, physical, and technical safeguards promised by UKG.

177.    Although UKG may have believed the representations were true when they were made, UKG had no reasonable grounds for believing the representations were true.

1    178.   UKG intended that Plaintiff rely on the representations.

2    179.   Plaintiff reasonably relied on these representations and entered into the

3    contract with UKG.

4    180.   Plaintiff was harmed by UKG's representations and promises, and

5    Plaintiff's reliance on UKG's representations and promises was a substantial factor

6    in causing Plaintiff's harm.

7    181.   As a result of UKG's negligent misrepresentations, Plaintiff was

8    misled into consenting to each of the contracts and now seeks to rescind the

9    contract between Plaintiff and UKG, and enter into a new contract with a different

10   payroll service provider.

11   182.   As a result of the damages caused by UKG's misrepresentations and

12   Plaintiff's justified reliance, Plaintiff is entitled to consequential damages relating

13   to and/or arising out of Plaintiff's transition to a new payroll services provider.

14   183.   As a direct and proximate result of UKG's negligent misrepresentations,

15   Plaintiff has been injured as described herein, and is entitled to recission of the

16   contract and is entitled to damages, including compensatory, consequential, punitive,

17   and nominal damages, in an amount to be proven at trial.

18   **FOURTH CAUSE OF ACTION**

19   **VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION**

20   **LAW, CAL. BUS. &PROF. CODE § 17200, et seq.**

21

22   184.   Plaintiff re-alleges and incorporates by reference all preceding

23   allegations as if fully set forth herein.

24   185.   Defendant violated California's Unfair Competition Law ("UCL") Cal.

25   Bus. & Prof. Code § 17200, et seq., by engaging in unlawful, unfair, or fraudulent

26   business acts and practices, and unfair, deceptive, untrue, or misleading advertising

27   that constitute acts of unfair competition as defined in the UCL, including, but not

28   limited to, the following:

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

a.     By representing and advertising that it would maintain adequate data privacy and security practices using physical, technical, and administrative controls and procedures, when in actuality, UKG did not;

b.     By representing and advertising that it would track, manage, and control employee time and attendance for uncompromised results and that it would centrally enforce labor laws, union rules, and organization-specific policies, when in actuality, UKG did not; and

c.     By representing and advertising that its services would eliminate errors, ensure compliance, and create the "perfect paycheck every time[,]" when in actuality, UKG did not.

186.    These unfair acts and practices were immoral, unethical, oppressive, unconscionable, and substantially injurious to Plaintiff.

187.    As a result of UKG's unfair and unlawful practices, Plaintiff was, and continues to be injured and lost money or property, including but not limited to the fees paid to defend itself from the class action caused by UKG's unfair business practices, as well as the fees and premiums Plaintiff paid to UKG based on the false promises of the security, reliability, availability, and continuity of UKG's payroll software and services.

188.    UKG knew or should have known that its computer systems and data security systems were inadequate and that the risk of a data breach or theft was highly likely. UKG's actions in engaging in the above-named unfair practices and deceptive acts were negligent, knowing, and willful, and/or wanton and reckless.

189.    Plaintiff seeks relief under the UCL, including money or property that UKG may have acquired by means of Defendant's deceptive, unlawful, and unfair business practices, declaratory relief, attorney fees, costs and expenses.

1

2
## **PRAYER FOR RELIEF**

3    WHEREFORE, Plaintiff respectfully requests the Court grant Plaintiff the

4 following relief against Defendant:

5    a.    An award to Plaintiff of compensatory, consequential, nominal,

6        statutory, and treble damages as set forth above;

7    b.    Punitive damages;

8    c.    Permanently enjoin the Defendant from engaging in the

9        violations and other misconduct referred to above;

10    d.    Recission of the contract between Plaintiff and UKG and

11        consequential damages related to Plaintiff's transition to a new

12        provider;

13    e.    An award of attorneys' fees, costs, and expenses, as provided by

14        law or equity;

15    f.    An award of pre-judgment and post-judgment interest, as

16        provided by law or equity; and

17    g.    Such other relief as the Court may allow.

18 Dated:  January 26, 2024            Respectfully submitted,

19

20                        **BAKER & HOSTETLER LLP**

21

22                        By:  */s/ Shareef Farag*
                             Shareef Farag

23

24                        Attorneys for Plaintiff
                        AEGIS SENIOR COMMUNITIES LLC

25

26

27

28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
LOS ANGELES

# EXHIBIT A



**ORDER FORM**

| | |
|---|---|
| **Quote#: Q-27903** | **Order Type: Quote** |
| **Expires: 7/26/2019** | **Date: 7/25/2019** |
| **Sales Executive: Jennifer Ellis** | |

---

**Bill To Contact:**                                   **Ship To Contact:Amy Nelson**

**Bill To: AEGIS SENIOR COMMUNITIES, LLC**             **Ship To: AEGIS SENIOR COMMUNITIES, LLC**
**17602 NE UNION HILL RD**                             **17602 NE UNION HILL RD**
**REDMOND, WA 98052 USA**                              **REDMOND, WA 98052 USA**

                                                       **Ship to Phone:425-895-7614**
                                                       **Contact:AMY NELSON**
                                                       **Email:cloudservices-licensing@kronos.com**

---

| | |
|---|---|
| **Currency: USD** | **FOB: Shipping Point** |
| **Customer PO Number:** | **Ship Method:** |
| **Solution ID: 6072632** | **Freight Term: Prepay & Add** |
| **Initial Term:24 months** | **Renewal Term:12 months** |
| **Billing Start Date: 120 Days from Execution of Order Form** | **Payment Term: Net 30 Days** |
| **Data Center Location: USA** | |

---

**Order Notes:**

This order is made as part of a Kronos promotion. All pricing is discounted solely in connection with such promotion and will not be applied to future orders. In consideration of the foregoing and discounted pricing and other good and valuable considerations, the receipt and sufficiency of which is hereby acknowledged, Kronos shall provide Workforce Central Software as a Service (SaaS) applications to Customer, in exchange for Customer's existing perpetual licenses for same, as indicated on this Order Form. Customer's existing Software License Agreement, including Software Support services, and Cloud Hosting services, as applicable, shall continue to apply to the perpetual licenses for a period of ninety (90) days from execution of this Order Form, and shall terminate thereafter. Customer agrees and understands that they are giving up their right to use the existing Workforce Central perpetual software licenses upon termination of the existing Software License Agreement. Notwithstanding the foregoing, Customer may continue to access the Software for historical viewing purposes only. The Workforce Central Software as a Service Terms and Conditions, as agreed upon by Customer and Kronos, shall apply to the Workforce Central Applications set forth on this Order Form. Workforce Central SaaS Monthly Service Fees shall be invoiced at the Billing Frequency indicated on this Order Form, commencing on the Billing Start Date. As of the Billing Start Date, Kronos will credit any pre-paid but unused fees for Software Support and/or Cloud Hosting Services on the perpetual licenses, as applicable. Credits may be applied against any amounts owed to Kronos by Customer until such credit is expended. Customer shall pay for Software Support and Cloud Hosting services fees, as applicable, on the perpetual licenses until the Workforce Central SaaS Billing Start Date. Professional Services concessions valid only for the Workforce Central licenses included on this Order Form.

For a period of 2 years from the date of this Order Form, Customer may purchase additional employee capacity for the Applications set forth herein at the following prices: The costs of any individual Application(s) included in the Timekeeper Bundle (i.e., Workforce Manager) will be set forth on a mutually agreed upon Order Form based on Kronos' then current list price. The costs of any individual

---

Quote#: Q-27903

Page 2/5

Application(s) included in the HR Bundle (i.e., HR/Payroll Manager) will be set forth on a mutually agreed upon Order Form based on Kronos' then current list price.

| Applications | PEPM |
|---|---|
| Workforce Timekeeper | $3.40 |
| Workforce Manager | Included |
| Workforce Employee | Included |
| Workforce Integration Manager | Included |
| Workforce Mobile Employee | Included |
| Workforce Mobile Manager | Included |
| Workforce Scheduler | $1.00 |
| Workforce Accruals | $0.40 |
| Workforce Human Resources | $2.80 |
| Workforce HR/Payroll Employee | Included |
| Workforce HR/Payroll Manager | Included |
| Workforce HR/Payroll Administrator | Included |
| Workforce Payroll | $2.80 |
| KSS Tool Attestation Tool Kit | $0.20 |
| KSS Tool FT-PT Analysis Report | $250.00 |
| KSS Timecard Confirmation | $200.00 |

Future Capacity and Capacity Added above Converted license counts will be added via the Timekeeper bundle, which includes: Workforce Timekeeper; Workforce Manager 1:10 Ratio; Workforce Employee; Workforce Integration Manager; Workforce Mobile Employee; Workforce Mobile Manager. The costs of any individual Application(s) included in the Timekeeper Bundle (i.e., Workforce Manager) will be set forth on a mutually agreed upon Order Form based on Kronos' then current list price.

Future Capacity and Capacity Added above Converted license counts will be added via the Workforce HR Bundle which includes: Workforce HR; Workforce HR/Payroll Administrator 1:100 Ratio; Workforce HR/PR Manager 1:10 Ratio; Workforce HR/PR Employee. The costs of any individual Application(s) included in the HR Bundle (i.e., Workforce HR/PR Manager) will be set forth on a mutually agreed upon Order Form based on Kronos' then current list price.

### PERPETUAL TO SAAS CONVERSION TABLE
Billing Frequency: Monthly in Arrears

| Converted Applications | License Count | PEPM | Monthly Service Fee |
|---|---|---|---|
| Perpetual License to SaaS Conversion Monthly Service Fee | N/A | N/A | 8,725.00 |

| Converted Applications | License Count |
|---|---|
| WORKFORCE TIMEKEEPER V8 SAAS | 2,500 |
| WORKFORCE MANAGER V8 SAAS | 165 |
| WORKFORCE ACCRUALS V8 SAAS | 2,500 |
| WORKFORCE SCHEDULER V8 SAAS | 600 |
| WORKFORCE HR V8 SAAS | 2,500 |
| WORKFORCE PAYROLL V8 SAAS | 2,500 |
| KSS TOOL,ATTESTATION TOOL KIT V8 SAAS | 2,500 |
| KSS TOOL,FT-PT ANALYSIS REPORT V8 SAAS | 1 |
| KSS TOOL,TIMECARD CONFIRMATION TOOL V8 SAAS | 1 |
| WORKFORCE EMPLOYEE V8 SAAS | 650 |
| WORKFORCE INTEGRATION MANAGER V8 SAAS | 2,500 |

| Converted Applications | License Count |
|---|---|
| WORKFORCE ADMINISTRATOR HR/PR V8 SAAS | 20 |

**Education Services**
Billing Frequency: Invoiced Upon signature of the Order form

| Item | Quantity | Total Price |
|---|---|---|
| KNOWLEDGE PASS | 2,500 | USD 4,625.00 |
| **Total Price** | | **USD 4,625.00** |

**Bill As You Go Services**
Billing Frequency: Monthly as Delivered

| Item | Billing Role | Quantity | Unit Price | Total Price |
|---|---|---|---|---|
| PARAGON ONLINE REMOTE TEAM | Project Manager | 65 | USD 180.00 | USD 11,700.00 |
| PARAGON ONLINE REMOTE TEAM | Solution Consultant | 68 | USD 180.00 | USD 12,240.00 |
| PARAGON ONLINE HRMS REMOTE TEAM | Integration Consultant | 34 | USD 180.00 | USD 6,120.00 |
| PRO SVCS WFC UPGRADE TO CLOUD HOSTING/SAAS CONVERSION | Project Manager | 112 | USD 0.00 | USD 0.00 |
| PRO SVCS WFC UPGRADE TO CLOUD HOSTING/SAAS CONVERSION | Technology Consultant | 78 | USD 0.00 | USD 0.00 |
| PRO SVCS WFC UPGRADE TO CLOUD HOSTING/SAAS CONVERSION | Integration Consultant | 62 | USD 0.00 | USD 0.00 |
| PRO SVCS WFC UPGRADE TO CLOUD HOSTING/SAAS CONVERSION | Solution Consultant | 86 | USD 0.00 | USD 0.00 |
| | | | | **USD 30,060.00** |

**Bill As You Go Instructor Lead Training**
Billing Frequency: Monthly as Delivered

| Item | Points | Total Price |
|---|---|---|
| Bill-As-You-Go Instructor Lead Training | 7,750 | USD 7,750.00 |
| | | **USD 7,750.00** |

**Quote Summary**

| Item | Total Price |
|---|---|
| Total Monthly Service Fees | USD 8,725.00 |

| | Total Price |
|---|---|

| Purchased Training | USD 4,625.00 |
|---|---|

| | Total Price |
|---|---|
| Bill As You Go Instructor Led Training | USD 7,750.00 |

| | Total Price |
|---|---|
| Total Bill As You Go Services | USD 37,810.00 |

**AEGIS SENIOR COMMUNITIES, LLC**　　　　**Kronos Incorporated**

Signature: _Walter Jossart_ (signature)　　　　Signature:_____

Name: Walter Jossart　　　　Name:_____

Title: CFO　　　　Title:_____

Effective Date: 7/26/19　　　　Effective Date:_____

Invoice amount will reflect deposit received. All professional services are billed as delivered with a payment term of Net Upon Receipt. Unless otherwise indicated above, this order is subject to the attached terms and conditions which the customer acknowledges have been read. THIS ORDER IS SUBJECT TO APPLICABLE TAXES.  THE ACTUAL TAX AMOUNT TO BE PAID BY CUSTOMER WILL BE SHOWN ON CUSTOMER'S INVOICE. Shipping and handling charges will be reflected on the final invoice. The Monthly Price on this Order Form has been rounded to two decimal places for display purposes. As many as eight decimal places may be present in the actual price. Due to the rounding calculations, the actual price may not display as expected when displayed on your Order Form. Nonetheless, the actual price on your invoice is the true and binding total for this order for purposes of amounts owed for the term. If you are tax exempt; please provide a copy of your "Tax Exempt Certificate" with your signed quote.

 **KRONOS**

# Statement of Work for AEGIS SENIOR COMMUNITIES, LLC

## WFC SaaS Migration

| | |
|---|---|
| Sales Executive | Jennifer Ellis |
| Author | James Polachy |
| Expiration Date | 7/26/2019 |
| Quote Number | 2019-49380 |
| Revision # | 1 |
| Opportunity ID | Opp-261385 |
| Status | Approved |
| Customer SID | 6072632 |

(c) 2019, Kronos Incorporated and related companies. All rights reserved.
CONFIDENTIAL - Not to be disclosed to third parties without specific written consent from Kronos.

## Overview

This Statement of Work ("SOW") provides an overview of the project including scope, approach, costs, and how the project will be managed. To support a successful implementation, the customer will provide the required internal project resources.

## Project Objectives WFC SaaS

Ageis is installing ~~Workforce Dimensions~~ on the Kronos Professional Cloud to modernize their workforce management platform,  improve employee engagement, and reduce technological debt.

*No customs or customs reports included
*No additional interfaces included
*Additional services may require a change order and incurr fees

## Proposed Solution

| Module | Project Type |
|---|---|
| Workforce Timekeeper | Upgrade |
| Workforce Manager | Upgrade |
| Workforce Employee | Upgrade |
| Workforce Integration Manager | Upgrade |
| Workforce Scheduler | Upgrade |
| Workforce Accruals | Upgrade |
| Workforce HR | Upgrade |
| Workforce Payroll | Upgrade |
| Workforce HR/Payroll Administrator | Upgrade |
| KSS Tool Attestation Tool Kit | Upgrade |

Project duration is expected to be 12 working weeks, based upon our experience with our customers and products. Depending upon the preparation and engagement of your organization, there may be opportunity to complete the project in a compressed duration.  However, if project resources are unprepared or unavailable, the duration of the project may need to be extended, increasing the budget required to successfully complete this scope of work.  Requests for additional scope or activities outside of this planned project scope may be accommodated through the change process. In this circumstance, Kronos may issue a change order to ensure the appropriate budget is available.

Kronos will deliver the scope of this project utilizing a remote approach.



## KnowledgePass

KnowledgePass™ is a subscription to an online educational portal. It provides enterprise access to tutorials, task simulations, job aids, sandboxes, webinars, and additional educational documents to help your team succeed.

KnowledgePass provides tools that allow you to build role specific learning paths and assign them to your users. Kronos will guide you on the creation of 2 user roles, including title selection and learning path assignments. The offering is delivered by a KnowledgePass Mentor via a remote interactive workshop.

## Instructor Led Training

Kronos Instructor Led Training is purchased as Training Points. Training Points allow you to budget for training with the flexibility to adjust your plan during implementation.

**Core Team** training will help your key functional and technical users to make informed solution design, configuration decisions and provide core product knowledge.

| Module | Description |
|---|---|
| Workforce Timekeeper | Public instructor led training for 2 |

**Train-the-Trainer Programs** prepares internal training teams to deliver user training to managers, supervisors and employees.

| Module | Description |
|---|---|
| Workforce Timekeeper | Public instructor led training for 1 |
| Workforce Scheduler for HC | Public instructor led training for 1 |



# Project Approach

The project team will collaborate to establish a project plan with tasks, responsibilities, and milestone dates and provide the foundation for project control. Kronos will complete an environment readiness review with your project team resources to ensure the server environment is available and pre-requisites have been installed. Kronos will perform test upgrade, deploy interfaces and complete validation testing of upgraded environment. Upon completion of customer user acceptance testing, Kronos will complete the upgrade to production.

## Project Leadership

Kronos will provide guidance through the life cycle of the project and provide best practices to implement the solution. As the main point of contact, the Kronos Project Manager will partner with the customer project leadership to develop the project plan to ensure objectives are achieved. The Kronos Project Manager will also deliver a collaborative workspace, which will serve as the dashboard for all aspects of the progress of the implementation.

# Solution Assumptions

## Workforce Central

- 2 Workforce Central environment(s) included in this deployment
- Customer has SQL Database
- The Authentication method will be Standard
- 3 existing interface(s) included

## Workforce Timekeeper

- 5 Standard Timeclocks will be upgraded
- 5 Timeclocks with TouchID will be upgraded

## Workforce HR

- 5 HR/PR Custom Reports
- 10 HR/PR Interfaces

## Workforce Payroll

- 1 Custom check(s)



## Services Investment Summary

This SOW represents a time and materials engagement.  Travel expenses are not included and will be invoiced separately as incurred.

| Service Type | |
|---|---|
| Professional Services | $30,060.00 |
| Educational Services | $12,375.00 |
| | $42,435.00 |



## Signatures and Approvals

SUBMITTED AND APPROVED BY KRONOS REPRESENTATIVE

By: _____     Date:_____

Title: _____

This Statement of Work is subject to the AEGIS SENIOR COMMUNITIES, LLC's Workforce Central SaaS or perpetual license agreement with Kronos governing Professional and Education Services. By signing below, the authorized AEGIS SENIOR COMMUNITIES, LLC's representative agrees to purchase the services described herein.

ACCEPTED AND AGREED
AEGIS SENIOR COMMUNITIES, LLC

By: _____     Date: 7/26/19

Title: _____CFO_____

AEGIS SENIOR COMMUNITIES, LLC may make necessary copies of this document for the sole purpose of facilitating internal evaluation and/or execution of proposed project. Otherwise, the document or any part thereof may not be reproduced in any form without the written permission of Kronos Incorporated. All rights reserved. Copyright 2019.

## WORKFORCE CENTRAL - SOFTWARE AS A SERVICE
## TERMS AND CONDITIONS

Customer and Kronos Incorporated ("Kronos") agree that the terms and conditions set forth below shall apply to the Kronos supply of the commercially available version of the Workforce Central SaaS Applications in Kronos' hosting environment, the services related thereto, and the sale or rental of Equipment (if any) specified on a Kronos Order Form. The Applications described on the Order Form shall be delivered by means of Customer's permitted access to the Kronos infrastructure hosting such Applications.

Kronos and Customer hereby further agree that Kronos and/or its direct and indirect majority owned subsidiaries may enter into orders with Customer and/or its direct and indirect majority owned subsidiaries subject to the terms and conditions of this Agreement. By signing and entering into an Order Form that expressly references this Agreement, each such subsidiary of Kronos and/or Customer will be deemed to have agreed to be bound by the terms and conditions of this Agreement and all references in this Agreement to "Kronos" shall be references to the applicable Kronos entity entering into the order, and all references in this Agreement to "Customer" shall be references to the applicable Customer entity entering into the order.

## 1. DEFINITIONS

**"Acceptable Use Policy"** means the Kronos policy describing prohibited uses of the Services as further described at: https://www.kronos.com/policies/acceptable-use

**"Agreement"** means these terms and conditions and the Order Form(s).

**"Application(s)"** or **"SaaS Application(s)"** means those Kronos software application programs set forth on an Order Form which are made accessible for Customer to use under the terms of this Agreement.

**"Billing Start Date"** means the date the billing of the Monthly Service Fees begin to accrue as indicated on the applicable Order Form. Notwithstanding, Implementation Services provided on a time and material basis are billed monthly as delivered. The Billing Start Date of the Monthly Service Fees for any Services ordered by Customer after the date of this Agreement which are incremental to Customer's then-existing Services shall be the date the applicable Order Form is executed by Kronos and Customer.

**"Cloud Services"** means those services related to Customer's cloud environment as further described at: http://www.kronos.com/products/workforce-central-cloud/cloud-guidelines.aspx

**"Confidential Information"** means any non-public information of a party or its Suppliers relating to such entity's business activities, financial affairs, technology, marketing or sales plans that is disclosed pursuant to this Agreement and reasonably should have been understood by the receiving party, because of (i) legends or other markings, (ii) the circumstances of disclosure or (iii) the nature of the information itself, to be proprietary or confidential to the disclosing party or its Suppliers.

**"Customer Content"** means all content Customer, or others acting on behalf of or through Customer, posts or otherwise inputs into the Services.

**"Documentation"** means user manuals published by Kronos relating to the features and functionality of the Applications.

**"Equipment"** means the Kronos equipment specified on an Order Form.

**"Implementation Services"** means those professional and educational services provided by Kronos to set up the cloud environment and configure the Applications. Unless otherwise set forth on an Order Form as "a la carte" services (supplemental fixed fee, fixed scope services) or "bill as you go" services (time and material services described in a Statement of Work), Kronos will provide, as part of the Monthly Service Fee for the Applications, the fixed fee, fixed scope Implementation Services described in the Services Implementation Detail set forth at: https://www.kronos.com/wfc-saas-implementation-guideline-details-flat-fee

**"Initial Term"** means the initial billing term of the Services as indicated on the Order Form. The Initial Term commences on the Billing Start Date. Customer may have access to the Services prior to the commencement of the Initial Term.

**"KnowledgePass Content"/"KnowledgePass Education Subscription"** have the meanings ascribed in Section 7.5.

**"Monthly Service Fee(s)"** means the monthly fees described in an Order Form. Monthly Service Fees include fees for usage of the Applications and the Services, Cloud Services as applicable, and Equipment rental, if any. Billing of the Monthly Service Fee(s) commences on the Billing Start Date.

Rev. 07182019

**"Order Form"** means an order form mutually agreed upon by Kronos and Customer setting forth the items ordered by Customer and to be provided by Kronos, including without limitation the prices and fees to be paid by Customer.

**"Personally Identifiable Data"** means information concerning individually identifiable employees of Customer that is protected against disclosure under applicable law or regulation.

**"Renewal Term"** means the renewal billing term of the Services as indicated on the Order Form.

**"Services"** means (i) the Cloud Services, (ii) accessibility to the commercially available version of the Applications by means of access to the password protected customer area of a Kronos website, and all such services, items and offerings accessed by Customer therein, and (ii) the Equipment rented hereunder, if any.

**"Statement of Work"**, **"SOW"**, **"Services Scope Statement"** and **"SSS"** are interchangeable terms referring to a written description of the Implementation Services mutually agreed upon by Kronos and Customer and set forth as "bill as you go" services on the Order Form.

**"Supplier"** means any contractor, subcontractor or licensor of Kronos providing software, equipment and/or services to Kronos which are incorporated into or otherwise related to the Services. Kronos may at its sole discretion replace a Supplier, provided that a change to Supplier will not have a materially adverse effect on the Services delivered by Kronos under this Agreement.

**"Term"** means the Initial Term and any Renewal Terms thereafter.

**"Training Points"** has the meaning ascribed to it in Section 7.6 below.

## 2. TERM

**2.1**   Billing for the Services commences on the Billing Start Date, and continues for the Initial Term or until terminated in accordance with the provisions hereof.  At the expiration of the Initial Term and each Renewal Term as applicable, the Services shall automatically renew each year for an additional Renewal Term until terminated in accordance with the provisions hereof.

**2.2**   Either party may terminate the Services and this Agreement to be effective at the expiration of the then current Term upon no less than sixty (60) days prior written notice.

**2.3**   Either party may terminate the Services and the Agreement upon a material breach of the Agreement by the other party if such breach is not cured within thirty (30) days after receipt of written notice.

**2.4**   In the event that either party becomes insolvent, makes a general assignment for the benefit of creditors, is adjudicated a bankrupt or insolvent, commences a case under applicable bankruptcy laws, or files a petition seeking reorganization, the other party may request adequate assurances of future performance.  Failure to provide adequate assurances, in the requesting party's reasonable discretion, within ten (10) days of delivery of the request shall entitle the requesting party to terminate the Agreement immediately upon written notice to the other party.

**2.5**   If the Agreement is terminated for any reason:

**(a)** Customer shall pay Kronos within thirty (30) days of such termination, all fees accrued and unpaid under this Agreement prior to the effective date of such termination, provided however, if Customer terminates for material breach of the Agreement by Kronos, Kronos shall refund Customer any pre-paid fees for Services not delivered by Kronos;

**(b)** Customer's right to access and use the Applications shall be revoked and be of no further force or effect and return rented Equipment as provided in Section 9.1 below;

**(c)** Customer agrees to timely return all Kronos-provided materials related to the Services to Kronos at Customer's expense or, alternatively, destroy such materials and provide Kronos with an officer's certification of the destruction thereof; and

**(d)** All provisions in the Agreement, which by their nature are intended to survive termination, shall so survive.

**2.6**   Customer Content shall be available to Customer to retrieve at any time and at no additional charge throughout the Term and for no more than thirty (30) days after expiration or termination of the Agreement for any reason.  After such time period, Kronos shall have no further obligation to store or make available the Customer Content and will securely delete all Customer Content without liability of any kind.

## 3. FEES AND PAYMENT

**3.1**   Customer shall pay Kronos the Monthly Service Fees, the fees for the Implementation Services and any additional one time or recurring fees for Equipment, Training Points, KnowledgePass Education Subscription and such other Kronos offerings, all as set forth on the Order Form.  The Monthly Service Fees will be invoiced on the frequency set forth on the Order Form ("**Billing Frequency**").  If Customer and Kronos

Rev. 07182019

have signed a Statement of Work for the Implementation Services, Implementation Services will be invoiced monthly as delivered unless otherwise indicated on the Order Form. If Kronos is providing Implementation Services in accordance with the Services Implementation Guideline or as "a la carte" services on the Order Form, Kronos will invoice Customer for Implementation Services in advance of providing such Implementation Services unless otherwise indicated on the Order Form. All other Kronos offerings will be invoiced upon execution of the applicable Order Form by Kronos and Customer. Unless otherwise indicated on an Order Form, payment for all items shall be due 30 days following date of invoice. All payments shall be sent to the attention of Kronos as specified on the invoice. Except as expressly set forth in this Agreement, all amounts paid to Kronos are non-refundable. Customer is responsible for all applicable federal, state, country, provincial or local taxes relating to the goods and services provided by Kronos hereunder (including without limitation GST and/or VAT if applicable), excluding taxes based on Kronos' income or business privilege.

**3.2**  If any amount owing under this or any other agreement between the parties is thirty (30) days or more overdue, Kronos may, without limiting Kronos' rights or remedies, suspend Services until such amounts are paid in full. Kronos will provide at least seven (7) days prior written notice that Customer's account is overdue before suspending Services.

**3.3**  At the later of (i) one (1) year after the effective date of this Agreement, or (ii) expiration of the Initial Term, and at each annual anniversary of that date thereafter, Kronos may increase the Monthly Service Fee rates in an amount not to exceed four percent (4%). The increased Monthly Service Fees will be reflected in the monthly invoice following the effective date of such increase without additional notice.

## 4. RIGHTS TO USE

**4.1**  Subject to the terms and conditions of the Agreement, Kronos hereby grants Customer a limited, revocable, non-exclusive, non-transferable, non-assignable right to use during the Term and for internal business purposes only: a) the Applications and related services, including the Documentation; b) training materials and KnowledgePass Content; and, c) any embedded third party software, libraries, or other components, which form a part of the Services. The Services contain proprietary trade secret technology of Kronos and its Suppliers. Unauthorized use and/or copying of such technology are prohibited by law, including United States and foreign copyright law. Customer shall not reverse compile, disassemble or otherwise convert the Applications or other software comprising the Services into uncompiled or unassembled code. Customer shall not use any of the third party software programs (or the data models therein) included in the Services except solely as part of and in connection with the Services. The JBoss® Enterprise Middleware components of the Service are subject to the end user license agreement found at http://www.redhat.com/licenses/jboss_eula.html  Customer acknowledges that execution of separate third party agreements may be required in order for Customer to use certain add-on features or functionality, including without limitation tax filing services.

**4.2**  Customer acknowledges and agrees that the right to use the Applications is limited based upon the amount of the Monthly Service Fees paid by Customer. Customer agrees to use only the modules and/or features for the number of employees and users as described on the Order Form. Customer agrees not to use any other modules or features nor increase the number of employees and users unless Customer pays for such additional modules, features, employees or users, as the case may be. Customer may not license, relicense or sublicense the Services, or otherwise permit use of the Services (including timesharing or networking use) by any third party. Customer may not provide service bureau or other data processing services that make use of the Services without the express prior written consent of Kronos. No license, right, or interest in any Kronos trademark, trade name, or service mark, or those of Kronos' licensors or Suppliers, is granted hereunder.

**4.3**  Customer may authorize its third party contractors and consultants to access the Services through Customer's administrative access privileges on an as needed basis, provided Customer: a) abides by its obligations to protect Confidential Information as set forth in this Agreement; b) remains responsible for all such third party usage and compliance with the Agreement; and c) does not provide such access to a competitor of Kronos who provides workforce management services.

**4.4**  Customer acknowledges and agrees that, as between Customer and Kronos, Kronos retains ownership of all right, title and interest to the Services, all of which are protected by copyright and other intellectual property rights, and that, other than the express rights granted herein and under any other agreement in writing with Customer, Customer shall not obtain or claim any rights in or ownership interest to the Services or Applications or any associated intellectual property rights in any of the foregoing. Customer agrees to

Rev. 07182019

comply with all copyright and other intellectual property rights notices contained on or in any information obtained or accessed by Customer through the Services.

**4.5**  When using and applying the information generated by the Services, Customer is responsible for ensuring that Customer complies with applicable laws and regulations.  If the Services include the Workforce Payroll Applications or Workforce Absence Management Applications:  (i) Customer is solely responsible for the content and accuracy of all reports and documents prepared in whole or in part by using these Applications, (ii) using these Applications does not release Customer of any professional obligation concerning the preparation and review of any reports and documents, (iii) Customer does not rely upon Kronos, Best Software, Inc. or these Applications for any advice or guidance regarding compliance with federal and state laws or the appropriate tax treatment of items reflected on such reports or documents, and (iv) Customer will review any calculations made by using these Applications and satisfy itself that those calculations are correct.

## 5.  ACCEPTABLE USE

**5.1**  Customer shall take all reasonable steps to ensure that no unauthorized persons have access to the Services, and to ensure that no persons authorized to have such access shall take any action that would be in violation of this Agreement.  Customer is responsible for all activities undertaken under the auspices of its passwords and other login credentials to use the Services.

**5.2**  Customer represents and warrants to Kronos that Customer has the right to publish and disclose the Customer Content in connection with the Services.  Customer represents and warrants to Kronos that the Customer Content will comply with the Acceptable Use Policy.

**5.3** Customer will not (a) use, or allow the use of, the Services in contravention of the Acceptable Use Policy.

**5.4**  Kronos may suspend the Services immediately upon written notice in the event of any security risk, negative impact on infrastructure or Acceptable Use Policy violation.

## 6.  CONNECTIVITY AND ACCESS

Customer acknowledges that Customer shall (a) be responsible for securing, paying for, and maintaining connectivity to the Services (including any and all related hardware, software, networking, internet access, third party services and related equipment and components); and (b) provide Kronos and Kronos' representatives with such physical or remote access to Customer's computer and network environment as Kronos deems reasonably necessary in order for Kronos to perform its obligations under the Agreement. Customer will make all necessary arrangements as may be required to provide access to Customer's computer and network environment if necessary for Kronos to perform its obligations under the Agreement.

## 7.  IMPLEMENTATION AND SUPPORT

**7.1**  *Implementation Services.*  Kronos will provide the Implementation Services to Customer. Implementation Services described in an SOW are provided on a time and materials basis, billed monthly as delivered unless otherwise indicated on the Order Form.  Implementation Services described in the Services Implementation Guideline are provided on a flat fee basis.  If Customer requests additional Implementation Services beyond those described in the Services Implementation Guideline, Kronos will create a change order for Customer's review and approval and any additional Implementation Services to be provided by Kronos will be billed as delivered at the then-current Kronos professional services rates.  Kronos' configuration of the Applications will be based on information and work flows that Kronos obtains from Customer during the discovery portion of the implementation.  Customer shall provide Kronos with all necessary and accurate configuration-related information in a timely manner to ensure that mutually agreed implementation schedules are met.  In the event that Kronos is required to travel to Customer's location during the implementation, Customer agrees to pay any travel expenses, such as airfare, lodging, meals and local transportation, plus an administrative fee of ten percent (10%) of the amount of such travel expenses, incurred by Kronos in accordance with the then-current standard Kronos travel and expense policies, which Kronos will provide to Customer upon request.  Kronos shall invoice Customer for such travel expenses and payment thereof shall be due net thirty (30) days from date of invoice.  Kronos' then-current Professional/Educational Services Policies shall apply to all Implementation Services provided by Kronos and may be accessed at: http://www.kronos.com/Support/ProfessionalServicesEngagementPolicies.htm  ("Professional  Services Policies").  In the event of a conflict between the Professional Services Policies and this Agreement, the terms of this Agreement shall prevail.

**7.2**  *Additional Services.*  Customer may engage Kronos to provide other services which may be fixed by activity ("a la carte") or provided on a time and materials basis ("bill as you go") as indicated on the applicable Order Form.

Rev. 07182019

**7.3**  *Support*.  Kronos will provide 24x7 support for the cloud infrastructure, the availability to the cloud environment, and telephone support for the logging of functional problems and user problems.  Customer may log questions online via the Kronos Customer Portal.  As part of such support, Kronos will make updates to the Services available to Customer at no charge as such updates are released generally to Kronos' customers.  Customer agrees that Kronos may install critical security patches and infrastructure updates automatically as part of the Services.  Kronos' then-current Support Services Policies shall apply to all Support Services provided by Kronos and may be accessed at: http://www.kronos.com/Support/SupportServicesPolicies.htm ("**Support Policies**"). In the event of a conflict between the Support Policies and this Agreement, the terms of this Agreement shall prevail.

**7.4**  *Support Services for Equipment*.  Provided Customer has purchased support services for the Equipment, the following terms shall apply (Depot Exchange support services for rented Equipment are included in the rental fees for such Equipment):

(a)  Customer may select, as indicated on an Order Form, an Equipment Support Services option offered by the local Kronos entity responsible for supporting the Equipment if and as such offerings are available within the Kronos territory corresponding to the Equipment's location.  Kronos shall provide each Equipment Support Services offering as specified herein.

(i)  Depot Exchange and Depot Repair.  If Customer has selected Depot Exchange or Depot Repair Equipment Support Services, the following provisions shall apply:  Upon the failure of installed Equipment, Customer shall notify Kronos of such failure and Kronos will provide remote fault isolation at the FRU (Field Replacement Unit) or subassembly level and attempt to resolve the problem. Those failures determined by Kronos to be Equipment related shall be dispatched to a Kronos Depot Repair Center, and Customer will be provided with a Return Material Authorization Number (RMA) for the failed Equipment if Customer is to return the failed Equipment to Kronos, as reasonably determined by Kronos. Customer must return the failed Equipment with the supplied RMA number. Hours of operation, locations and other information related to Kronos' Depot Repair Centers are available upon request and are subject to change. Return and repair procedures for failed Equipment shall be provided based on the Depot option - Depot Exchange or Depot Repair - selected by Customer on the applicable Order Form and as specified herein and in Kronos' then-current Support Services Policies.  Service packs for the Equipment (as described in subsection (ii) below) are included in both Depot Exchange and Depot Repair Support Services.

*Depot Exchange*: Kronos will provide a replacement for the failed Equipment at the FRU or subassembly level on an "advanced exchange" basis, utilizing a carrier of Kronos' choice. Replacement Equipment will be shipped for delivery to Customer's location as further described in the Support Policies. REPLACEMENT EQUIPMENT MAY BE NEW OR RECONDITIONED. Customer shall specify the address to which the Equipment is to be shipped. All shipments will include the Kronos provided RMA designating the applicable Kronos Depot Repair Center, as the recipient. Customer, upon receipt of the replacement Equipment from Kronos, shall package the defective Equipment in the materials provided by Kronos, with the RMA supplied and promptly return failed Equipment directly to Kronos.

*Depot Repair*: Upon failure of installed Equipment, Customer shall install a Spare Product (as defined below) to replace the failed Equipment. Customer shall then return the failed Equipment, with the required RMA, to the applicable Kronos Depot Repair Center. Customer shall make reasonable efforts to return the failed Equipment using the same or substantially similar packing materials in which the original Equipment was sent. Customer shall also specify the address to which the repaired Equipment should be return shipped.  Upon receipt of the failed Equipment, Kronos shall repair the failed Equipment and ship it, within ten (10) business days after receipt, to Customer. Kronos shall ship the repaired Equipment by regular surface transportation to Customer.

(ii)  Device Software Updates Only.  If Customer has selected Device Software Equipment Support Services, Customer shall be entitled to receive:
(A) Service packs for the Equipment (which may contain system software updates, firmware updates, security updates, and feature enhancements) available for download at Kronos' customer portal.  Service packs for the Equipment are not installed by the Kronos Depot Repair Center but are available for download at Kronos' customer portal, provided Customer is maintaining the Equipment under an annual Equipment Support Services plan with Kronos.; and

5

(B) Access to the Kronos Support Services Center for the logging of requests for assistance downloading service packs for the Equipment.

(b) *Warranty*. Kronos warrants that all service packs and firmware updates provided under this Agreement shall perform in accordance with the Kronos published specifications in all material respects for a period of ninety (90) days after download by Customer. In the event of a breach of this warranty, Customer's exclusive remedy shall be Kronos' repair or replacement of the deficient service pack(s) or firmware update(s), at Kronos' option, provided that Customer's use, installation and maintenance thereof have conformed to the specifications.

(c) *Responsibilities of Customer*. It is Customer's responsibility to purchase and retain, at Customer's location and at Customer's sole risk and expense, a sufficient number of spare products (**"Spare Products"**) to allow Customer to replace failed Equipment at Customer's locations in order for Customer to continue its operations while repairs are being performed and replacement Equipment is being shipped to Customer. For each of the Depot Exchange and Depot Repair Equipment Support Services options, Customer agrees that it shall return failed Equipment promptly as the failures occur and that it shall not hold failed Equipment and send failed Equipment to Kronos in "batches" which shall result in a longer turnaround time to Customer. In addition, Customer agrees to:

(i) Maintain the Equipment in an environment conforming to the Kronos published specifications for such Equipment;
(ii) Not perform self-repairs on the Equipment (i.e., replacing components) without prior written authorization from Kronos;
(iii) De-install all failed Equipment and install all replacement Equipment in accordance with Kronos' written installation guidelines;
(iv) Ensure that the Equipment is returned to Kronos properly packaged; and
(v) Obtain an RMA before returning any Equipment to Kronos and place the RMA clearly and conspicuously on the outside of the shipping package. Customer may only return the specific Equipment authorized by Kronos when issuing the RMA.

(d) *Delivery*. All domestic shipments within the United States are FOB Destination to/from Customer and Kronos with the shipping party bearing all costs and risks of loss, and with title passing upon delivery to the identified destination. All international shipments from Kronos to Customer are DAP (Incoterms 2010) to the applicable Customer location, and are DDP (Incoterms 2010) to the applicable Kronos Depot Repair Center when Customer is shipping to Kronos, and with title passing upon delivery to the identified destination. Customer is responsible for all duties and taxes when sending Equipment to Kronos.

**7.5** *KnowledgePass Education Subscription*. When KnowledgePass Education Subscription is purchased on an Order Form (i.e., not indicated as "Included" in the Monthly Service Fees), Kronos will provide Customer with the KnowledgePass Education Subscription for a period of one (1) year from execution of the Order Form. Kronos will send Customer a renewal invoice for renewal of the KnowledgePass Education Subscription, and the KnowledgePass Education Subscription shall renew for an additional one (1) year term if Customer pays such invoice before the end of the then-current term for the KnowledgePass Education Subscription. The KnowledgePass Education Subscription provides access to certain educational offerings provided by Kronos (the "**KnowledgePass Content**"). Customer recognizes and agrees that the KnowledgePass Content is copyrighted by Kronos. Customer is permitted to make copies of the KnowledgePass Content provided in *pdf form solely for Customer's internal use. Customer may not disclose such KnowledgePass Content to any third party other than Customer's employees. Customer may not edit, modify, revise, amend, change, alter, customize or vary the KnowledgePass Content without the written consent of Kronos, provided that Customer may download and modify contents of training kits solely for Customer's internal use.

**7.6** *Training Points*. "**Training Points**" are points which are purchased by Customer that may be redeemed for an equivalent value of instructor-led training sessions offered by Kronos. Training Points may be redeemed only during the Term but only prior to the date which is no more than twelve (12) months after the date of the Order Form pursuant to which the Training Points were acquired, after which time such Training Points shall expire and be of no value. Training Points may not be exchanged for other Kronos products or services.

**7.7** *Training Courses*. When Training Points or training sessions are set forth in an SSS, the SSS applies. When Training Points or training sessions are not set forth in an SSS, as part of the Services, for each SaaS application module included in the Services purchased by Customer, Customer's employees shall be entitled

6

to attend, in the quantity indicated, the corresponding training courses set forth at: www.kronos.com/products/workforce-central-saas/training-guidlines.aspx
Participation in such training courses is limited to the number of seats indicated for the courses corresponding to the modules forming a part of the Services purchased by Customer.

**7.8** *Technical Account Manager.* Customers purchasing a Kronos Technical Account Manager ("**TAM**") as indicated on the Order Form shall receive the services of a dedicated, but not exclusive, TAM for one production instance of the Software. Customer will designate up to two primary and three secondary backup technical contacts ("**Technical Contacts**") to be the sole contacts with the TAM. Upon request, Customer may designate a reasonable number of additional and/or backup Technical Contacts. Customer is required to place all primary Technical Contacts through Kronos training for the Applications covered under this Agreement at Customer's expense.

## 8. CUSTOMER CONTENT

Customer shall own all Customer Content. Kronos acknowledges that all of the Customer Content is deemed to be the Confidential Information of Customer. Customer will ensure that all Customer Content conforms with the terms of this Agreement and applicable law. Kronos and its Suppliers may, but shall have no obligation to, access and monitor Customer Content from time to time to provide the Services and to ensure compliance with this Agreement and applicable law. Customer is solely responsible for any claims related to Customer Content and for properly handling and processing notices that are sent to Customer regarding Customer Content.

## 9. EQUIPMENT

If Customer purchases or rents Equipment from Kronos, a description of such Equipment (model and quantity), the applicable pricing, and delivery terms shall be listed on the Order Form.

**9.1** *Rented Equipment.* The following terms apply only to Equipment Customer rents from Kronos:
(a)      <u>Rental Term and Warranty Period</u>. The term of the Equipment rental and the "Warranty Period" for such Equipment shall run coterminously with the Term of the other Services provided under the Agreement.
(b)      <u>Insurance</u>. Customer shall insure the Equipment for an amount equal to the replacement value of the Equipment for loss or damage by fire, theft, and all normal extended coverage at all times. No loss, theft or damage after shipment of the Equipment to Customer shall relieve Customer from Customer's obligations under the Agreement.
(c)      <u>Location/Replacement</u>. Customer shall not make any alterations or remove the Equipment from the place of original installation without Kronos' prior written consent. Kronos shall have the right to enter Customer's premises to inspect the Equipment during normal business hours. Kronos reserves the right, at its sole discretion and at no additional cost to Customer, to replace any Equipment with newer or alternative technology Equipment as long as the replacement Equipment at least provides the same level of functionality as that being replaced.
(d)      <u>Ownership</u>. All Equipment shall remain the property of Kronos. All Equipment is, and at all times shall remain, separate items of personal property, notwithstanding such Equipment's attachment to other equipment or real property. Customer shall not sell or otherwise encumber the Equipment. Customer shall furnish any assurances, written or otherwise, reasonably requested by Kronos to give full effect to the intent of terms of this paragraph (d).
(e)      <u>Equipment Support</u>. Kronos shall provide to Customer the Equipment support services described in Section 7.
(f)      <u>Return of Equipment</u>. Upon termination of the Agreement or the applicable Order Form, Customer shall return, within thirty (30) days of the effective date of termination and at Customer's expense, the Equipment subject to this Section 9.1. Equipment will be returned to Kronos in the same condition as and when received, reasonable wear and tear excepted. If Customer fails to return Equipment within this time period, upon receiving an invoice from Kronos, Customer shall pay Kronos the then list price of the unreturned Equipment.

**9.2** *Purchased Equipment.* The following terms apply only to Equipment Customer purchases from Kronos:
(a)      <u>Title and Warranty Period</u>. When the Order Form indicates FOB – Shipping Point, title to the Equipment passes to Customer upon delivery to the carrier; for all other shipping terms, title passes upon delivery to Customer. The "**Warranty Period**" for the Equipment shall be for a period of 90 days  from such delivery (unless otherwise required by law).

7

(b)      Kronos shall provide to Customer the Equipment support services described in this Agreement if purchased separately by Customer as indicated on the applicable Order Form.  If purchased, Equipment support services have a term of one (1) year commencing upon expiration of the Warranty Period. Equipment support services will be automatically extended for additional one (1) year terms on the anniversary of its commencement date ("Renewal Date"), unless either party has given the other thirty (30) days written notification of its intent not to renew. Kronos may change the annual support charges for Equipment support services effective at the end of the initial one (1) year term or effective on the Renewal Date, by giving Customer at least thirty (30) days prior written notification.

**9.3** *Equipment with Finger Scan Sensor Technology.* The following terms apply only to any Equipment with finger scan sensor technology purchased by Customer from Kronos or a Kronos reseller ("Finger Scan Equipment"):

(a)  To the extent that any biometric privacy laws may apply to Customer's use of the Finger Scan Equipment, Customer warrants that they will comply with any such laws prior to commencing use of the Finger Scan Equipment and will remain in compliance at all times.   Customer further warrants that, if required by law, prior to such use it will (i) obtain signed releases from employees consenting to the use of the Finger Scan Equipment for employee timekeeping purposes and (ii) issue policies made available to their employees and the public regarding its retention and destruction of the Finger Scan data.  Customer further warrants that it will ensure that any releases, consents, or policies, as required by applicable law, will by their terms expressly apply to Kronos and its authorized subcontractors.

(b) Customer agrees to defend, hold harmless and indemnify Kronos, its employees, directors, parent, subsidiaries and authorized partners and subcontractors (collectively, "Kronos Indemnitees") for any claims, damages, penalties or fines asserted or awarded against a Kronos Indemnitee arising out of or relating to Customer's breach of any of the foregoing warranties in Section 9.3(a) above.  Upon receipt of such notice, the Customer shall assume sole control of the defense and settlement of such claim; provided that (i) Kronos will be entitled to participate in the defense of such claim and to employ counsel at its own expense to assist in the handling of such claim, on a monitoring and a non-controlling basis; (ii) Customer shall not settle any claim on any terms or in any manner that adversely affects the rights of Kronos without its prior written consent; and (iii) Kronos will provide reasonable cooperation and assistance at Customer's sole cost and expense.

## 10.  SERVICE LEVEL AGREEMENT

Kronos shall provide the service levels and associated credits, when applicable, in accordance with the Service Level Agreement attached hereto as Exhibit A and which is hereby incorporated herein by reference. CUSTOMER'S SOLE AND EXCLUSIVE REMEDY IN THE EVENT OF ANY SERVICE OUTAGE OR INTERRUPTION OF THE SERVICES OR FAILURE BY KRONOS TO MEET THE TERMS OF THE APPLICABLE SERVICE LEVEL AGREEMENT, SHALL BE THE REMEDIES PROVIDED IN EXHIBIT A.

## 11.  LIMITED WARRANTY; DISCLAIMERS OF WARRANTY

**11.1**  Kronos represents and warrants to Customer that the Applications, under normal operation as specified in the Documentation and when used as authorized herein, will perform substantially in accordance with such Documentation during the Term.

**11.2**  Kronos' sole obligation and Customer's sole and exclusive remedy for any breach of the foregoing warranty is limited to Kronos' reasonable commercial efforts to correct the non-conforming Applications at no additional charge to Customer. In the event that Kronos is unable to correct material deficiencies in the Services arising during the Warranty Period, after using Kronos' commercially reasonable efforts to do so, Customer shall be entitled to terminate the then remaining Term of the Agreement as Customer's sole and exclusive remedy.  Kronos' obligations hereunder for breach of warranty are conditioned upon Customer notifying Kronos of the material breach in writing, and providing Kronos with sufficient evidence of such non-conformity to enable Kronos to reproduce or verify the same.

**11.3**  Kronos warrants to Customer that each item of Equipment shall be free from defects in materials and workmanship during the Warranty Period.  In the event of a breach of this warranty, Customer's sole and exclusive remedy shall be Kronos' repair or replacement of the deficient Equipment, at Kronos' option, provided that Customer's use, installation and maintenance thereof have conformed to the Documentation for such Equipment. This warranty is extended to Customer only and shall not apply to any Equipment (or parts thereof) in the event of:

Rev. 07182019

(a)      damage, defects or malfunctions resulting from misuse, accident, neglect, tampering, (including without limitation modification or replacement of any Kronos components on any boards supplied with the Equipment), unusual physical or electrical stress or causes other than normal and intended use;

(b)      failure of Customer to provide and maintain a suitable installation environment, as specified in the published specifications for such Equipment; or

(c)      malfunctions resulting from the use of badges or supplies not approved by Kronos.

EXCEPT AS PROVIDED FOR IN THIS SECTION 11, KRONOS HEREBY DISCLAIMS ALL WARRANTIES, CONDITIONS, GUARANTIES AND REPRESENTATIONS RELATING TO THE SERVICES, EXPRESS OR IMPLIED, ORAL OR IN WRITING, INCLUDING WITHOUT LIMITATION THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE AND NON-INFRINGEMENT, AND WHETHER OR NOT ARISING THROUGH A COURSE OF DEALING, INCLUDING, WITHOUT  LIMITATION, ANY WARRANTY THAT MAY OTHERWISE ARISE PURSUANT TO ANY STATUTE, CODE, COMMON LAW OR JUDICIAL DECISION.  THE SERVICES ARE NOT GUARANTEED TO BE ERROR-FREE OR UNINTERRUPTED.  EXCEPT AS SPECIFICALLY PROVIDED IN THIS AGREEMENT, KRONOS MAKES NO WARRANTIES OR REPRESENTATIONS CONCERNING THE COMPATIBILITY OF THE SERVICES, THE SAAS APPLICATIONS OR THE EQUIPMENT NOR ANY RESULTS TO BE ACHIEVED THEREFROM.

**12. DATA SECURITY**

**12.1** As part of the Services, Kronos shall provide those administrative, physical, and technical safeguards for protection of the security, confidentiality and integrity of Customer data as described at: http://www.kronos.com/products/workforce-central-cloud/cloud-guidelines.aspx

**12.2** As between Customer and Kronos, all Personally Identifiable Data is Customer's Confidential Information and will remain the property of Customer.  Customer represents that to the best of Customer's knowledge such Personally Identifiable Data supplied to Kronos is accurate.  Customer hereby consents to the use, processing or disclosure of Personally Identifiable Data by Kronos and Kronos' Suppliers wherever located only for the purposes described herein and only to the extent such use or processing is necessary for Kronos to carry out Kronos' duties and responsibilities under the Agreement or as required by law.

**12.3** Prior to initiation of the Services under the Agreement and on an ongoing basis thereafter, Customer agrees to provide notice to Kronos of any extraordinary privacy or data protection statutes, rules, or regulations which are or become applicable to Customer's industry and which could be imposed on Kronos as a result of provision of the Services.  Customer will ensure that: (a) the transfer to Kronos and storage of any Personally Identifiable Data by Kronos or Kronos' Supplier's data center is permitted under applicable data protection laws and regulations; and, (b) Customer will obtain consents from individuals for such transfer and storage to the extent required under applicable laws and regulations.

**13. INDEMNIFICATION**

**13.1**   Kronos shall defend Customer and its respective directors, officers, and employees (collectively, the "**Customer Indemnified Parties**"), from and against any and all notices, charges, claims, proceedings, actions, causes of action and suits, brought by a third party (each a "**Claim**") alleging that the permitted uses of the Services infringe or misappropriate any United States or Canadian copyright or patent, and Kronos will indemnify and hold harmless the Customer Indemnified Parties against any liabilities, obligations, costs or expenses (including without limitation reasonable attorneys' fees) actually awarded to a third party as a result of such Claim by a court of applicable jurisdiction or as a result of Kronos' settlement of such a Claim. In the event that a final injunction is obtained against Customer's use of the Services by reason of infringement or misappropriation of such copyright or patent, or if in Kronos' opinion, the Services are likely to become the subject of a successful claim of such infringement or misappropriation, Kronos, at Kronos' option and expense, will use commercially reasonable efforts to (a) procure for Customer the right to continue using the Services as provided in the Agreement,  (b) replace or modify the Services so that the Services become non-infringing but remain substantively similar to the affected Services, and if neither (a) or (b) is commercially feasible, to (c) terminate the Agreement and the rights granted hereunder after provision of a refund to Customer of the Monthly Service Fees paid by Customer for the infringing elements of the Services covering the period of their unavailability.

**13.2**  Kronos shall have no liability to indemnify or defend Customer to the extent the alleged infringement is based on:  (a) a modification of the Services by anyone other than Kronos; (b) use of the Applications other than in accordance with the Documentation for such Service or as authorized by the Agreement; (c) use of

Rev. 07182019

the Services in conjunction with any data, equipment, service or software not provided by Kronos, where the Services would not otherwise itself be infringing or the subject of the claim; or (d) use of the Services by Customer other than in accordance with the terms of the Agreement. Notwithstanding the foregoing, with regard to infringement claims based upon software created or provided by a licensor to Kronos or Suppliers, Kronos' maximum liability will be to assign to Customer Kronos' or Supplier's recovery rights with respect to such infringement claims, provided that Kronos or Kronos' Supplier shall use commercially reasonable efforts at Customer's cost to assist Customer in seeking such recovery from such licensor.

**13.3** Customer shall defend Kronos, its Suppliers and their respective directors, officers, employees, agents and independent contractors (collectively, the "**Kronos Indemnified Parties**") from and against any and all Claims, and will indemnify and hold harmless the Kronos Indemnified Parties against liabilities, obligations, costs or expenses (including without limitation reasonable attorneys' fees), arising out of: (a) employment-related claims arising out of Customer's configuration of the Services; (b) Customer's modification or combination of the Services with other services, software or equipment not furnished by Kronos, provided that such Customer modification or combination is the cause of such infringement and was not authorized by Kronos; or, (c) a claim that the Customer Content infringes in any manner any intellectual property right of any third party, or any of the Customer Content contains any material or information that is obscene, defamatory, libelous, or slanderous violates any person's right of publicity, privacy or personality, or has otherwise caused or resulted in any tort, injury, damage or harm to any other person. Customer will have sole control of the defense of any such action and all negotiations for its settlement or compromise. Kronos will cooperate fully at Customer's expense with Customer in the defense, settlement or compromise of any such action.

**13.4** The Indemnified Party(ies) shall provide written notice to the indemnifying party promptly after receiving notice of such Claim. If the defense of such Claim is materially prejudiced by a delay in providing such notice, the purported indemnifying party shall be relieved from providing such indemnity to the extent of the delay's impact on the defense. The indemnifying party shall have sole control of the defense of any indemnified Claim and all negotiations for its settlement or compromise, provided that such indemnifying party shall not enter into any settlement which imposes any obligations or restrictions on the applicable Indemnified Parties without the prior written consent of the other party. The Indemnified Parties shall cooperate fully, at the indemnifying party's request and expense, with the indemnifying party in the defense, settlement or compromise of any such action. The indemnified party may retain its own counsel at its own expense, subject to the indemnifying party's rights above.

## 14. LIMITATION OF LIABILITY

**14.1** EXCEPT AS SPECIFICALLY PROVIDED IN THIS AGREEMENT, KRONOS AND ITS SUPPLIERS WILL NOT BE LIABLE FOR ANY DAMAGES OR INJURIES CAUSED BY THE USE OF THE SERVICES OR BY ANY ERRORS, DELAYS, INTERRUPTIONS IN TRANSMISSION, OR FAILURES OF THE SERVICES.

**14.2** EXCEPT FOR KRONOS' INDEMNIFICATION OBLIGATIONS SET FORTH IN SECTION 13 ABOVE, THE TOTAL AGGREGATE LIABILITY OF KRONOS OR KRONOS' SUPPLIERS TO CUSTOMER AND/OR ANY THIRD PARTY IN CONNECTION WITH THE AGREEMENT SHALL BE LIMITED TO DIRECT DAMAGES PROVEN BY CUSTOMER, SUCH DIRECT DAMAGES NOT TO EXCEED AN AMOUNT EQUAL TO THE TOTAL NET PAYMENTS RECEIVED BY KRONOS FOR THE SERVICES IN THE TWELVE (12) MONTH PERIOD IMMEDIATELY PRECEDING THE DATE IN WHICH SUCH CLAIM ARISES.

**14.3** EXCEPT FOR KRONOS' INDEMNIFICATION OBLIGATIONS SET FORTH IN SECTION 13 ABOVE, IN NO EVENT SHALL KRONOS OR KRONOS' SUPPLIERS, THEIR RESPECTIVE AFFILIATES, SERVICE PROVIDERS, OR AGENTS BE LIABLE TO CUSTOMER OR ANY THIRD PARTY FOR ANY INCIDENTAL, SPECIAL, PUNITIVE, CONSEQUENTIAL OR OTHER INDIRECT DAMAGES OR FOR ANY LOST OR IMPUTED PROFITS OR REVENUES, LOST DATA OR COST OF PROCUREMENT OF SUBSTITUTE SERVICES RESULTING FROM DELAYS, NONDELIVERIES, MISDELIVERIES OR SERVICES INTERRUPTION, HOWEVER CAUSED, ARISING FROM OR RELATED TO THE SERVICES OR THE AGREEMENT, REGARDLESS OF THE LEGAL THEORY UNDER WHICH SUCH LIABILITY IS ASSERTED, WHETHER BREACH OF WARRANTY, INDEMNIFICATION, NEGLIGENCE, STRICT LIABILITY OR OTHERWISE, AND WHETHER LIABILITY IS ASSERTED IN CONTRACT, TORT OR OTHERWISE, AND REGARDLESS OF WHETHER KRONOS OR SUPPLIER HAS BEEN ADVISED OF THE POSSIBILITY OF ANY SUCH LIABILITY, LOSS OR DAMAGE.

Rev. 07182019

**14.4** EXCEPT WITH RESPECT TO LIABILITY ARISING FROM KRONOS' GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, KRONOS DISCLAIMS ANY AND ALL LIABILITY, INCLUDING WITHOUT LIMITATION LIABILITY RELATED TO A BREACH OF DATA SECURITY AND CONFIDENTIALITY OBLIGATIONS, RESULTING FROM ANY EXTERNALLY INTRODUCED HARMFUL PROGRAM (INCLUDING WITHOUT LIMITATION VIRUSES, TROJAN HORSES, AND WORMS), CUSTOMER'S CONTENT OR APPLICATIONS, THIRD PARTY UNAUTHORIZED ACCESS OF EQUIPMENT, SAAS APPLICATIONS OR SYSTEMS, OR MACHINE ERROR.

### 15. CONFIDENTIAL INFORMATION

**15.1** Each Party shall protect the Confidential Information of the other Party with at least the same degree of care and confidentiality, but not less than a reasonable standard of care, which such Party utilizes for its own information of similar character that it does not wish disclosed to the public. Neither Party shall disclose to third parties the other Party's Confidential Information, or use it for any purpose not explicitly authorized herein, without the prior written consent of the other Party. The obligation of confidentiality shall survive for five (5) years after the return of such Confidential Information to the disclosing party or five (5) years after the expiration or termination of the Agreement, whichever is later, as applicable. Notwithstanding anything herein to the contrary, each party acknowledges and agrees that all trade secrets shall be safeguarded by a receiving party as required by this Agreement for so long as such information remains a trade secret pursuant to applicable law.

**15.2** Notwithstanding the foregoing, a party may disclose Confidential Information to the extent required: (a) to any subsidiary or affiliate of such Party, or (b) to any consultants, contractors, and counsel who have a need to know in connection with the Agreement and have executed a non-disclosure agreement with obligations at least as stringent as this Section 15, or (c) by law, or by a court or governmental agency, or if necessary in any proceeding to establish rights or obligations under the Agreement; provided, the receiving party shall, unless legally prohibited, provide the disclosing party with reasonable prior written notice sufficient to permit the disclosing party an opportunity to contest such disclosure. If a party commits, or threatens to commit, a breach of this Section 15, the other party shall have the right to seek injunctive relief from a court of competent jurisdiction.

**15.3** This Agreement imposes no obligation upon either Party with respect to the other Party's Confidential Information which the receiving Party can establish: (a) is or becomes generally known through no breach of the Agreement by the receiving party, or (b) is already known or is independently developed by the receiving party without use of or reference to the Confidential Information.

### 16. EXPORT

Customer understands that any export of the Equipment may require an export license and Customer assumes full responsibility for obtaining such license. Customer must obtain Kronos' prior written consent before exporting the Equipment.

### 17. GENERAL

**17.1** This Agreement shall be governed by and construed in accordance with the laws of the state, province and country in which Kronos is incorporated without regard to any conflict of law provisions. The parties waive the application of the United Nations Commission on International Trade Law and United Nations Convention on Contracts for the International Sale of Goods as to the interpretation or enforcement of the Agreement and waive and "opt out" of the Uniform Computer Information Transactions Act (UCITA), or such other similar law.

**17.2** The invalidity or illegality of any provision of the Agreement shall not affect the validity of any other provision. The parties intend for the remaining unaffected provisions to remain in full force and effect.

**17.3** Customer shall not assign the Agreement or the rights to use the Services without the prior written consent of Kronos and any purported assignment, without such consent, shall be void.

**17.4** Neither Party shall be responsible for any failure to perform or delay in performing any of its obligations under this Agreement (other than a failure to comply with payment obligations) where and to the extent that such failure or delay results from an unforeseeable event beyond a party's reasonable control, including but not limited to, acts of war; acts of nature; earthquake; flood; embargo; riot; sabotage; labor shortage or dispute; changes in government codes, ordinances, laws, rules, regulations or restrictions; failure of the Internet; terrorist acts; failure of data, products or services controlled by any third party, including the providers of communications or network services; utility power failure; material shortages or unavailability or other delay in delivery not resulting from the responsible party's failure to timely place orders therefor, or

Rev. 07182019

lack of or delay in transportation (each a "**Force Majeure Event**").

**17.5** All notices given under the Agreement shall be in writing and sent postage pre-paid, if to Kronos, to the Kronos address on the Order Form, or if to Customer, to the billing address on the Order Form.

**17.6** No action, regardless of form, may be brought by either party more than two (2) years after the cause of action has arisen.

**17.7** The section headings herein are provided for convenience only and have no substantive effect on the construction of the Agreement.

**17.8** The parties agree that if the Agreement is accepted by the parties and that acceptance is delivered via fax or electronically delivered via email or the internet it shall constitute a valid and enforceable agreement.

**17.9** This Agreement and any information expressly incorporated by reference herein, together with the applicable Order Form, constitute the entire agreement between the parties for the Services described herein and supersede all prior or contemporaneous representations, negotiations, or other communications between the parties relating to the subject matter of this Agreement. This Agreement may be amended only in writing signed by authorized representatives of both parties. Customer understands and acknowledges that while Kronos may disclose to customers certain confidential information regarding general Service or product development direction, potential future Services, products or product enhancements under consideration, Customer is not entitled to any Services, products or product enhancements other than those contained on the Order Form. Customer has not relied on the availability of any future version of the Services (including SaaS Applications or equipment) identified on an Order Form, nor any other future product in executing the Agreement.

CUSTOMER AGREES TO THESE TERMS AND CONDITIONS FOR ALL ORDER FORMS FOR THE SERVICES. THE INDIVIDUAL ACCEPTING THESE TERMS AND CONDITIONS ON BEHALF OF CUSTOMER REPRESENTS THAT HE/SHE HAS THE AUTHORITY TO CONTRACTUALLY BIND CUSTOMER.

| Customer |
| --- |
| AEGIS SENIOR COMMUNITIES, LLC |
| Dated: 7/26/19 |
| By: |
| Name: Walter Jossart |
| Title: CFO |

| Kronos Incorporated |
| --- |
| Dated: |
| By: |
| Name: |
| Title: |

Rev. 07182019

**EXHIBIT A**

**SERVICE LEVEL AGREEMENT (SLA)**

**Service Level Agreement**:  The Services, in a production environment, are provided with the service levels described in this Exhibit A.  SLAs are only applicable to production environments.  SLAs will be available upon Customer's signature of Kronos' Go Live Acceptance Form for Customer's production environment.

**99.75% Application Availability**

**Actual Application Availability %** = (Monthly Minutes (MM) minus Total Minutes Not Available (TM)) multiplied by 100) and divided by Monthly Minutes (MM), but not including Excluded Events

**Service Credit Calculation**:  An Outage will be deemed to commence when the Applications are unavailable to Customer in Customer's production environment hosted by Kronos and end when Kronos has restored availability of the Applications.  Failure to meet the 99.75% Application Availability SLA, other than for reasons due to an Excluded Event, will entitle Customer to a credit as follows:

| Actual Application Availability % (as measured in a calendar month) | Service Credit to be applied to Customer's monthly invoice for the affected month |
|---|---|
| <99.75% to 98.75% | 10% |
| <98.75% to 98.25% | 15% |
| <98.25% to 97.75% | 25% |
| <97.75 to 96.75% | 35% |
| <96.75 | 50% |

**"Outage"** means the accumulated time, measured in minutes, during which Customer is unable to access the Applications for reasons other than an Excluded Event.

**"Excluded Event"** means any event that results in an Outage and is caused by (a) the acts or omissions of Customer, its employees, customers, contractors or agents; (b) the failure or malfunction of equipment, applications or systems not owned or controlled by Kronos, including without limitation Customer Content, failures or malfunctions resulting from circuits provided by Customer, any inconsistencies or changes in Customer's source environment, including either intentional or accidental connections or disconnections to the environment; (c) Force Majeure events; (d) expected downtime during the Maintenance Periods described below; (e) any suspension of the Services in accordance with the terms of the Agreement to which this Exhibit A is attached; (f) the unavailability of required Customer personnel, including as a result of failure to provide Kronos with accurate, current contact information; or (g) using an Application in a manner inconsistent with the Documentation for such Application.

**"Maintenance Period"** means scheduled maintenance periods established by Kronos to maintain and update the Services, when downtime may be necessary, as further described below.  The Maintenance Period is used for purposes of the Service Credit Calculation; Kronos continuously maintains the production environment on a 24x7 basis to reduce disruptions.

**Customer Specific Maintenance Period**

1.  Customer will choose one of the following time zones for their Maintenance Period:
    a.  United States Eastern Standard Time,
    b.  GMT/UTC,
    c.  Central European Time (CET) or
    d.  Australian Eastern Standard Time (AEST).

Rev. 07182019

2. Customer will choose one of the following days of the week for their Maintenance Period: Saturday, Sunday, Wednesday or Thursday.

3. Kronos will use up to six (6) hours in any two (2) consecutive rolling months (specifically: January and February; March and April; May and June; July and August; September and October; November and December) to perform Customer Specific Maintenance, excluding any customer requested Application updates. Downtime in excess of these six (6) hours will be deemed to be an Outage.

4. Customer Specific Maintenance will occur between 12am-6am during Customer's selected time zone.

5. Excluding any customer requested Application updates, Kronos will provide notice for planned downtime via an email notice to the primary Customer contact at least seven (7) days in advance of any known downtime so planning can be facilitated by Customer.

6. Customer Specific Maintenance Windows also include additional maintenance windows mutually agreed upon by Customer and Kronos.

7. In absence of instruction from Customer, Kronos will by default perform Maintenance in the time zone where the Data Center is located.

**Non-Customer Specific Maintenance Period**

Kronos anticipates non-Customer Specific Maintenance to be performed with no or little (less than three hours per month) Customer downtime. If for any reason non-Customer Specific Maintenance requires downtime, Kronos will provide as much notice as reasonably possible of the expected window in which this will occur. Downtime in excess of three (3) hours per month for Non-Customer Specific Maintenance will be deemed to be an Outage.

"**Monthly Minutes (MM)**" means the total time, measured in minutes, of a calendar month commencing at 12:00 am of the first day of such calendar month and ending at 11:59 pm of the last day of such calendar month.

"**Total Minutes Not Available (TM)**" means the total number of minutes during the calendar month that the Services are unavailable as the result of an Outage.

**Reporting and Claims Process**: Service Credits will not be provided if: (a) Customer is in breach or default under the Agreement at the time the Outage occurred; or (b) the Outage results from an Excluded Event.

Kronos will provide Customer with an Application Availability report on a monthly basis for each prior calendar month. Within sixty (60) days of receipt of such report, Customer must request the applicable Service Credit by written notice to Kronos. Customer waives any right to Service Credits not requested within this time period. All performance calculations and applicable Service Credits are based on Kronos records and data unless Customer can provide Kronos with clear and convincing evidence to the contrary.

The Service Level Agreements in this Exhibit, and the related Service Credits, apply on a per production environment basis. For the avoidance of doubt, Outages in one production environment may not be added to Outages in any other production environment for purposes of calculating Service Credits.

Customer acknowledges that Kronos manages its network traffic in part on the basis of Customer's utilization of the Services and that changes in such utilization may impact Kronos' ability to manage network traffic. Therefore, notwithstanding anything else to the contrary, if Customer significantly changes its utilization of the Services than what is contracted with Kronos and such change creates a material and adverse impact on the traffic balance of the Kronos network, as reasonably determined by Kronos, the parties agree to co-operate, in good faith, to resolve the issue.

Rev. 07182019

# EXHIBIT B

11/20/23, 10:16 AM
Case 3:23-cv-01076-AMO   Document 57   Filed 01/26/24   Page 63 of 131
Kronos Workforce Central and Workforce TeleStaff deployed in the...

The Wayback Machine - https://web.archive.org/web/20190618225247/https://www.kronos.com/products/workforce-central-cloud/cloud-...

 



# Kronos Workforce Central & Workforce TeleStaff

Cloud Guidelines

The following guidelines and services apply to Workforce Central and Workforce Telestaff applications that are deployed in the Kronos Cloud:

**Cloud Services**

| | |
|---|---|
| **Environments:** | Included. |
| One standard Production and one Non-Production (Development) environment. | Additional non-production environments are available for additional fees. |
| **Environment restoration:** | Included. |
| Services to restore Production environment to one Non-Production environment up to one time per week, if requested. | More frequent restores or additional environments will be subject to additional time and material fees. |
| Customer is responsible for requesting data to be moved from the Production environment to the Non-Production environment and for the contents of the data moved from the Production environment to the Non-Production environment. | |
| **Connectivity to Service:** | Included |
| Customer's users connect to application via secure SSL/TLS connection over the internet. Cooperative efforts with customer IT staff may be required to enable access. Kronos will assist with validating site connectivity but assumes no responsibility for customer internet connection or ISP relationships. Kronos related Internet traffic cannot be filtered by proxy or caching devices on the client network. Exclusions must be added for the fully qualified domain names and public IP addresses assigned to the environments in the Kronos Cloud. | |
| **Device Initiated Terminal Connectivity:** | Included |
| All terminals that are compatible with Device Initiated communication mode must use this mode of communication. With the Device Initiated mode of communication, the Kronos terminal initiates all communications with the Device Manager Server at the Kronos Cloud over the internet. In cases where | |

## Cloud Services

Network Address Translation is required for terminals, the customer is responsible for applying the translations on their network. Kronos Cloud does not support terminals prior to Kronos 4500 series and does support certain models released thereafter. Please see product documentation support matrix for details.

Note: Server Initiated terminal communication, if permitted, requires a VPN and is not the preferred communication method when connecting terminals to the Kronos Cloud.

| | |
|---|---|
| **Remote Access to Non-Web Kronos Applications:** | 2 named users included |

Remote access to non-web Applications (e.g. Kronos Workforce Integration Manager) using a remote access tool such a Citrix® Receiver. Limited Kronos Applications require the use of these remote access accounts.

| | |
|---|---|
| **SFTP Accounts:** | 2 logins included |

SFTP accounts are provided to customers to push files to the Kronos Cloud and to pull files from the Kronos Cloud for designated integration points (e.g. Kronos Workforce Integration Manager input/output folders). The Kronos SFTP folder location is not designed for long-term storage and files stored longer than 30 days may be deleted. Kronos Cloud SFTP does not initiate connections, thus SFTP file transfers must be a customer initiated process.

| | |
|---|---|
| **Operating System and Database Software Management:** | Included |

Includes the required O/S and SQL Server licenses, as well as services for Kronos to apply critical security patches, service packs and hot-fixes for the software running in Kronos Cloud.

| | |
|---|---|
| **Server Maintenance:** | Included |

All server maintenance, including repair and replacement of defective or failed hardware and the installation of hardware upgrades for the software running in Kronos Cloud.

| | |
|---|---|
| **Kronos Application Updates:** | Included |

Services to perform technical tasks required to apply application service packs, legislative updates (if applicable), point releases and version upgrades.

| | |
|---|---|
| **Backup:** | Included |

Customer data is backed up daily. Database backups are replicated via encrypted connections to a second Kronos Cloud datacenter. Backups are retained for the prior 28 days on a rotating basis. All historical employee and configuration data is stored in the rotating backups.

| | |
|---|---|
| **Security:** | Included |

For customers that choose datacenters in the United States of America or continental Europe:

Kronos maintains a hosting environment that undergoes examinations from an independent auditor in accordance with the American Institute of Certified Public Accounts SSAE 16 (i.e. SOC 1) and the AICPA Trust Services Principles Section 100a, Trust Services for Security, Availability, Processing Integrity, Confidentiality and Privacy (i.e. SOC 2). The Kronos Private Cloud (KPC) is evaluated for the principles of Security, Availability and Confidentiality by the independent auditor. The Kronos Private

**Cloud Services**

Cloud is located in data centers that undergo SSAE 16 examinations. Management access to the KPC is limited to authorized Kronos support staff and customer authorized integrations. The security architecture has been designed to control appropriate logical access to the KPC to meet the Trust Services Principles of Security, Availability and Confidentiality. The Applications provide the customer with the ability to configure application security and logical access per the customer's business processes.

In the event the customer identifies a security issue, the customer agrees to notify Kronos.

For security purposes customers are restricted from directly accessing the desktop, file systems, databases and operating system of the environments. Thus, WIM integrations cannot initiate connections to push or pull data from on premise or other cloud based data sources including but not limited to external databases, and remote file shares.

Customer agrees not to upload payment card information, as the service is not certified for PCI DSS.

Customer agrees not to upload health information that falls under the United States HIPAA law.

<u>For customers that choose in datacenters outside the United States of America or continental Europe:</u>

For any outsourced (subcontracted) infrastructure (e.g. co-location provider, public cloud provider) Kronos will provide Customer a copy of its subcontractor's AICPA SSAE 16 SOC 1 Type II and/or AT101 SOC 2 Type II reports, published and attested to by an independent third party auditing firm, if applicable. Kronos is not required to utilize any outsourced (subcontracted) infrastructure (e.g. co-location provider, public cloud provider) as part of this agreement to deliver services. If Kronos does not use outsourced (subcontracted) infrastructure (e.g. co-location provider, public cloud provider) customer will be entitled to receive a copy, if made available from Kronos at a future date, of a Kronos published AICPA SSAE 16 SOC 1 Type II and AT101 SOC 2 Type II reports published and attested to by an independent third party auditing firm, if made available.

The Kronos applications provide the customer with the ability to configure application security and logical access per the customer's business processes.

In the event the customer identifies a security issue, the customer agrees to notify Kronos.

For security purposes customers are restricted from directly accessing the desktop, file systems, databases and operating system of the environments. Thus, WIM integrations cannot initiate connections to push or pull data from on premise or other cloud based data sources including but not limited to external databases, and remote file shares.

Customer agrees not to upload payment card information as the service is not certified for PCI DSS.

Customer agrees not to upload health information that falls under the United States HIPAA law.

**Read-Only ODBC Access:**                                                        If selected on Order Form

Kronos will provide customer with read-only ODBC access into customer's Production and Non-Production databases for Timekeeper/HRMS and/or TeleStaff over secure connection (e.g. VPN). Customer is responsible for establishing this secure connection to the Kronos Cloud and for any additional fees for that connection that may apply. Kronos may, but is not obligated to, limit or block

Cloud Services

customer's database read-only ODBC queries in order to prevent failure of the database due to
overload. Kronos will not pay SLA credits for any Outage that is the result of overloading the database
during read-only ODBC access. Customer understands that overall performance may be reduced
during peak processing periods, and customer may need to limit resource intensive read-only ODBC
queries to off-peak periods. Customer acknowledges that read-only ODBC access over a long distance
secure connection is not a reliable protocol, as it does not have built-in retry logic to handle
connectivity issues. Kronos is not responsible for any changes that may be required to customer's
internal systems due to read-only OBDC access.

**Disaster Recovery Services:**                                                                    Included

Basic Disaster Recovery services are provided to all hosted customers at no additional fee and include:

Customer environment and all customer data in the Kronos Cloud are replicated to a secondary Kronos
Cloud data center. Disaster Recovery Services provide for a Recovery Point Objective (RPO) of 24 hours
and Kronos strives to restore application availability in a commercially reasonable timeframe. The
customer will be down until the Production environment is restored in the primary or secondary data
center, if needed, as an application environment is not readily available at the alternate site to process
data. Customers are expected to use fully qualified domain names (FQDNs) to access the service given
that IP address of the service may change.

Any issues arising out of the disaster recovery event due to customer configuration/customization
and/or customer third party software outside of the Kronos Cloud is the responsibility of the customer
to resolve.

**Disaster Recovery Services (fee-based):**                                          If selected on Order Form

Kronos offers enhanced Disaster Recovery services at an additional fee, as they provide for a secondary
environment at a secondary Kronos datacenter to be used for customer recovery. With this offering the
Customer environment and all customer data in the Kronos Cloud are replicated to a secondary Kronos
Cloud datacenter. This service provides for a RPO (Recovery Point Objective) of 24 hours and a RTO
(Recovery Time Objective) of 72 hours.

In the unlikely event that Kronos declares a disaster in the primary datacenter, Kronos will notify the
customer and activate the Disaster Recovery steps necessary to restore application availability within
the RTO defined. As part of this enhanced service, Kronos will conduct an annual Disaster Recovery
Process test, which has the objectives to 1) test backups 2) train Kronos employees 3) verify and
improve internal Kronos procedures. The annual Disaster Recovery Process test may be live or
simulated. Customers are expected to use fully qualified domain names (FQDNs) to access the service
given that IP address of the service may change.

Any issues arising out of the disaster recovery event due to customer configuration/customization
and/or customer third party software outside of the Kronos Cloud is the responsibility of the customer
to resolve.

The following services are not included in this service, but they may be purchased from Kronos on a
time and material basis, and are subject to additional fees: a customer specific DR plan with annual
review.

*Note that Workforce Analytics, Workforce Record Manager, Enterprise Archive, Workforce TeleStaff,

**Cloud Services**

Workforce Planner, Workforce TeleTime IP and all non-Production environments are excluded from the RTO, unless otherwise set forth on the Order Form.

**Temporary Environments:**                                                          If selected on Order Form

Temporary Environments are designed for classroom training for no more than 40 people and/or functional application testing for approximately five to ten simultaneous users. Temporary environments are only available to those customers whose Production environment is hosted in the Kronos Cloud in a United States datacenter or continental Europe datacenter.

**Third Parties:**                                                                   If Customer uses 3rd
                                                                                     party resources to
If Customer uses a third party to configure and/or implement Customer's applications, the following    configure/implement
applies:                                                                             Kronos applications

The third party must be authorized by Kronos as part of the Kronos Connect Partner Program prior to accessing Customer's development and testing environments in the Kronos Cloud. Third parties will not be granted access to Customer's Production environment for purposes of configuring the applications. Customer understands that although Kronos Connect Partners are subject to Kronos policies and procedures, such Partners are not subject to SOC audits by Kronos or its representatives. As such, Kronos' SSAE16 SOC 1 and AT101 SOC 2 reports are applicable to the Production environment only and are not applicable to third parties' activities.

*Applicable to customers that choose datacenters in the United States or continental Europe.*

**Encryption at rest of Customer Content at storage level**                          If selected on Order Form

For each of the customer's production and non-production environments in a data center in the United States or continental Europe, Customer Content will be encrypted at rest at the storage level. Encryption at rest is defined as Customer Content is made unreadable on disk via encryption technology when the Kronos Cloud computing environment hardware is powered off.

**Guidelines and Assumptions:**

**Category**                                      **Assumption**

Estimated availability of production server hardware is approximately 30 days after the Order Form is processed.

Customer agrees to receive automatic updates to the applications.

Use of the Workforce Central translation toolkit requires a Kronos Professional Services engagement to import/export the translation file(s) into a test environment and into the Production environment.

Connecting modem clocks to the Kronos Cloud is not supported.

Applications will support English only unless stated on the Order Form.

| Category | Assumption |
|---|---|

Customer agrees not to conduct security testing, which includes, but is not limited to penetration testing and vulnerability scanning.

Customer agrees not to conduct any sort of automated or manual performance testing of the Service.

Offering includes system resources to process the equivalent of five WIM interfaces every five minutes using up to 10 links with a maximum of five megabytes of data per link. In addition, systems resources for the integration between Workforce Central and Workforce TeleStaff for People, Punch, and Accrual interfaces are included assuming product documentation is followed for setup and run-time scheduling. Additional processing requirements may incur additional fees associated with corresponding system resources. Custom developed functionally outside of WIM that runs in the Kronos Cloud may incur additional fees.

Retention policies must be configured in the application(s). Setting retention policies will ensure that unnecessary system data (e.g. temp files, deleted records, empty rows, etc.) is routinely purged from the system and will help in managing database growth. Retention policies do not apply to configuration and/or historical data. Historical employee data can be maintained for the duration of the agreement and renewal periods, per customer business requirements.

Sizing considerations are based on a three year growth projection of the Production database environment. After three years, an archiving strategy may be reviewed with the customer for Service performance.

Custom reports for Workforce Central are created using Microsoft Visual Studio. HR/Payroll reports are created using Crystal Reports. If made available from the vendors, the free versions of these tools will be made available to the customer in their development environment. Customer will have read-only ODBC access to their development database for modifying and/or creating reports. Customer is limited to two named users for report creation, as access requires the use of one of the two included user licenses for remote access to non-web applications (e.g. Citrix Receiver). Note that Customer created reports for Workforce HR and Payroll may have reduced functionally from Kronos product documentation due to security restrictions in Kronos Cloud.

Customer will be required to sign a go live milestone document confirming customer has completed their testing and is ready to go live with the Workforce Central application(s) and/or TeleStaff.

Workforce TeleStaff Bulk Data Extract is an add-on offering which includes system resources to process four sequential bulk data extract tasks running no more than once per day for 20,000 employees per task, during off-peak hours. Supported date ranges for schedule data is from 30 days in the past to 15 days in the future. If additional processing requirements are needed, additional fees may apply commensurate with corresponding system resources required.

**Product Specific Considerations**

Workforce Record Manager/ Kronos Enterprise Archive (if included on order form):

If Workforce Record Manager or Kronos Enterprise Archive is included, note that Setup Data Manager will only support import and export of configurations via XML file transfers between Production and Non-Production environments, as a direct connection between Production and Non-Production environments is not provided.

If an environment is available for the use of archiving functionality, compared to the used of just Setup Data Manager, this additional environment for archiving will be noted on the order form if it is included.

Workforce TeleTime IP:

Customer is responsible for procuring the phone lines (SIP trunks) required for their Workforce TeleTime IP system. Customer should work with their ISP/telco provider to procure a private circuit (specifically MPLS) with adequate

| Category | Assumption |
|---|---|

bandwidth to support the number of SIP trunks (phone lines) needed for their use case, SIP calls per second required, along with a router and cross-connects to terminate the circuit in the Kronos Cloud. Kronos will provide detailed information to Customer on Kronos Cloud connectivity requirements. Cross-connects can be also purchased directly from Kronos, and would be indicated on order form if included.

This offering is only available to customers who chose Kronos datacenters in the United States.

## Upgrade Services

The Service includes services for Kronos to execute tasks to apply point releases and version upgrades to customer's Kronos Applications in the Kronos Cloud. Services are limited to those tasks which apply these updates to the Applications.

The table below reflects the included upgrade tasks.

| | |
|---|---|
| **Project Coordination:** | Included |
| • Project Manager to coordinate the upgrade project. | |
| • Up to eight 30-minute weekly status calls (one per week) | |
| • Coordinate Kronos resources | |
| • Send meeting invites | |
| • Provide Project Timeline and expected customer commitment at the start of the project | |
| • Provide initial Project Schedule and communicates progress during weekly status calls | |
| • Provide Communication Plan and Contact List | |
| **Planning Phase** | |
| Customer/ Kronos Introduction Call — up to one hour | Included |
| Technical readiness & architecture review — Kronos Cloud Environment | Included |
| **Assessment Phase** | |
| Assessment of WIM interfaces to be upgraded | Included |
| Assessment of new features or changes to configurations | Not included |
| Assessment of customs and custom reports and development activities related thereto | Not included |
| **Solution Upgrade / Build Phase** | |
| One (1) restore of Production database to NON-Production environment for the purpose of upgrade testing. Additional restores, if requested, shall be subject to additional time and material fees. | Included |
| Upgrade Non-Production and Production environments to new point release or version. | Included |
| Upgrade of Workforce Integration Manager (WIM) interfaces due to product changes introduced as part of the technical upgrade, as defined in product documentation. For Workforce Central this includes XML export/imports | Included |

and database views as defined in the "Workforce Central Import User Guide" and "Workforce Central Data View Reference Guide".

| | |
|---|---|
| Upgrade of non-WIM interfaces in Non-Production environment and Production environment. | Not Included |
| Upgrade of customs and custom reports. This includes upgrade of Workforce Integration Manager (WIM) interfaces that use table import batch functionality, read/write directly to database tables or require changes due to new/changed customer requirements. | Not Included |
| Upgrade of interfaces and reports created or provided by customer | Not Included |
| Update of terminal firmware managed by Kronos | Not Included |
| Configuration of new features or functionality or changes to existing configuration | Available for Purchase |

**Test & Certify Phase**

| | |
|---|---|
| System test upgraded environments by verifying a user can log in | Included |
| User acceptance testing (UAT) of upgraded environments, interfaces, custom reports, new features, etc. | Not Included |
| Develop customer-specific test cases | Not Included |
| Sign-off on upgraded Non-Production and Production Environments | Customer |

**Deploy & Support Phase**

| | |
|---|---|
| Deployment Readiness Call — up to one hour | Included |

*Note that new feature configuration, project management services, other Professional, Managed and Educational Services and training are not included as part of Upgrade Services, but may be purchased independently, if desired.*

*Project coordination lasts for no more than eight weeks. At the end of this time, Kronos will complete the production upgrade. If for any reason Kronos cannot complete the technical upgrade steps within eight weeks due to a Kronos caused delay, project coordination will continue proportionally to cover the Kronos caused delay. For example if Kronos causes a two week delay due to Kronos resource unavailability, project coordination will last no more than 10 weeks.*

*If not specifically noted, the customer should assume responsibility of the task and/or deliverable.*

**Additional Polices:**

https://www.kronos.com/policies/legal-hold

https://www.kronos.com/policies/acceptable-use

Rev 2018-05-10

English
Français





Security   |  Terms of Use   |  Trademarks   |  Privacy Policy

Workforce Ready suite and services are provided by Kronos SaaShr, a Kronos Company.© 2003-2019, Kronos Incorporated. All rights reserved.

# EXHIBIT C

1   Carolyn Hunt Cottrell (SBN 166977)
    Samantha A. Smith (SBN 233331)
2   **SCHNEIDER WALLACE**
    **COTTRELL KONECKY LLP**
3   2000 Powell Street, Suite 1400
    Emeryville, California 94608
4   Tel: (415) 421-7100; Fax: (415) 421-7105
    ccottrell@schneiderwallace.com
5   sasmith@schneiderwallace.com

    *Attorneys for Plaintiff,*
6   *on behalf of the putative Class*

7                   **UNITED STATES DISTRICT COURT**

8                 **NORTHERN DISTRICT OF CALIFORNIA**

9   DANIELA MELGOZA, on behalf of          Case No. _____
    herself and all others similarly situated,
10                                          **CLASS AND COLLECTIVE ACTION**
                                            **COMPLAINT**
11            *Plaintiff,*                    1. **Violations of the Fair Labor Standards Act (29**
                                                 **U.S.C. §§ 201** *et seq.***);**
            vs.                               2. **Failure to Pay for All Hours Worked (Cal. Lab.**
12                                               **Code § 204)**
    AEGIS SENIOR COMMUNITIES LLC            3. **Failure to Pay Minimum Wage for All Hours**
13  d/b/a AEGIS LIVING,                        **Worked (Cal. Lab. Code §§ 204, 1194, 1197, and**
                                               **1198);**
14            *Defendant.*                    4. **Failure to Pay Overtime Wages (Cal. Lab. Code**
                                                 **§ 510);**
15                                            5. **Failure to Authorize and Permit and/or Make**
                                                 **Available Meal and Rest Periods (Cal. Lab.**
16                                               **Code §§ 226.7 and 512);**
                                              6. **Failure to Provide Timely and Accurate**
17                                               **Itemized Wage Statements (Cal. Lab. Code §**
                                                 **226);**
18                                            7. **Waiting Time Penalties (Cal. Lab. Code §§ 201-**
                                                 **203)**
19                                            8. **Unlawful Business Practices (Cal. Bus. & Prof.**
                                                 **Code §§ 17200** *et seq.***);**
20

21                                                   **DEMAND FOR JURY TRIAL**

22

23

24

25

26

27

28

**INTRODUCTION**

1.      Plaintiff Daniela Melgoza ("Plaintiff"), individually and on behalf of all other similarly situated individuals, brings this class and collective action against Aegis Senior Communities LLC d/b/a Aegis Living ("Defendant") for violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.* ("FLSA") and California wage and hour laws.

2.      This action stems from Defendant's policies and practices of: (1) failing to properly compensate Plaintiff and putative Class and Collective members for all hours worked; (2) failing to pay minimum wage for all hours worked; (3) failing to pay all overtime wages owed; (4) failing to make available, authorize, and/or permit Plaintiff and putative Class members to take timely and compliant meal and/or rest periods to which they are entitled by law and failing to make premium payments for those non-compliant meal and rest periods; (5) failing to provide accurate, itemized wage statements, and (6) failing to timely pay all wages due upon separation from employment.

3.      Plaintiff seeks damages, penalties, and interest to the full extent permitted by the FLSA, California Labor Code, and Industrial Welfare Commission ("IWC") Wage Orders, as well as other relief requested herein.

**SUBJECT MATTER JURISDICTION AND VENUE**

4.      The FLSA authorizes private rights of action to recover damages for violation of the FLSA's wage and hour provisions. 29 U.S.C. § 216(b). This Court has original federal question jurisdiction under 28 U.S.C. § 1331. This Court has supplemental jurisdiction over the California state law claims under 28 U.S.C. § 1367(a) because they are so related to this action that they form part of the same case or controversy.

5.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b). Plaintiff was employed in this District and the claims asserted arose in this District. At all material times Defendant has been actively conducting business in the State of California and within the geographic area encompassing the Northern District of the State of California.

**PARTIES**

6.      Plaintiff Daniela Melgoza is an individual over the age of eighteen, and at all times

2

relevant to this Complaint was a resident of the State of California, County of Santa Cruz.  Plaintiff was employed as a caregiver by Defendant in Aptos, California from approximately November 2021 until January 2022.

7.      The Collective members are people who are or who have been employed by Defendant as hourly, non-exempt employees in the United States at any time within the three years preceding the filing of this Complaint.

8.      The Class members are all people who are or who have been employed by Defendant as hourly, non-exempt employees in California within the four years preceding the filing of this Complaint.

9.      Plaintiff is informed, believes, and thereon alleges that Defendant Aegis Senior Communities LLC, doing business as Aegis Living, is a Washington corporation with its principal place of business located in Bellevue, WA. Defendant is registered to do business in the State of California and does business in the State of California. Defendant may be served with process by serving its registered agent, Corporation Service Company, 2710 Gateway Oaks Drive, Suite 150N, Sacramento, California 95833.

10.     Upon information and belief, Defendant is part of the residential care facilities industry. Defendant operates assisted living and memory care facilities that provide care to elder residents suffering from physical and cognitive impairments. Defendant operates facilities throughout the United States, including in the State of California. Defendant employs hundreds of hourly, non-exempt workers similarly situated to Plaintiff throughout the United States, including in the State of California.

11.     Plaintiff is informed, believes, and thereon alleges that Defendant exercises control over Plaintiff and putative Class and Collective members with respect to their employment.

12.     Plaintiff and Class and Collective members were and are employees of Defendant within the meaning of 29 U.S.C. § 203(e).

13.     At all material times, Defendant has been an enterprise in commerce or in the production of goods for commerce within the meaning of section 3(s)(1) of the FLSA because Defendant has had and continues to have employees engaged in commerce. 29 U.S.C. § 203(s)(1).

14.     Plaintiff is informed, believes, and thereon alleges that Defendant has had, and continues to have, an annual gross business volume of not less than $500,000, thereby exceeding the statutory standard. 29 U.S.C. § 203(s)(1)(A)(ii).

15.     In addition to Plaintiff, Defendant has employed numerous other employees who, like Plaintiff, are hourly, non-exempt employees engaged in interstate commerce.  Further, Defendant is engaged in interstate commerce since it orders supplies across state lines, conducts business deals with merchants across state lines, and processes patient credit cards with banks in other states.

16.     At all material times, Plaintiff and Collective and Class members were employees who engaged in commerce or in the production of goods for commerce as required by 29 U.S.C. § 207.

17.     At all material times, Defendant has done business under the laws of California, has places of business in the State of California, including in this judicial district, and has employed putative Class members in this judicial district. Defendant is a "person" as defined in California Labor Code § 18 and California Business and Professions Code § 17201. Defendant is also an "employer" as that term is used in the FLSA, California Labor Code, and the IWC Wage Orders.

## FACTUAL ALLEGATIONS

18.     Upon information and belief, Defendant Aegis Senior Communities LLC, doing business as Aegis Living is part of the residential care facilities industry. Defendant owns and operates assisted living and memory care facilities across the United States, including in California. Defendant provides a continuum of care to elder residents suffering from physical and cognitive impairments.

19.     Plaintiff worked for Defendant as a caregiver in Aptos, California from approximately November 2021 until January 2022. Her duties included, but were not limited to, assisting residents with activities of daily living; aiding residents in eating, dressing, and washing; providing other care as needed; and reporting resident status. Excluding time worked off the clock, Ms. Melgoza typically worked eight hours per shift and five shifts per week, for a total of 40 hours per week, earning $17.00 per hour.

20.     Like Ms. Melgoza, the putative Class and Collective members are current and former non-exempt employees of Defendant throughout the United States, including in the State of California.

4

As a result of such uncompensated time worked off the clock, Plaintiff and putative Class and Collective members worked over eight hours in a day and/or over 40 hours in a week without receiving pay at the appropriate overtime rate for such work.

21. Plaintiff is informed, believes, and thereon alleges that Defendant employs and has employed hundreds of non-managerial employees throughout the United States, including in the State of California and uniformly classifies them as hourly, non-exempt employees under the FLSA and California law.

22. Plaintiff is informed, believes, and based thereon, alleges that putative Class and Collective members are employed by Defendant in a similar manner throughout the United States, including in this judicial district, and perform work materially similar to Plaintiff.

23. Non-exempt, hourly workers employed by Defendant have a variety of responsibilities. These responsibilities include: cleaning resident rooms, communicating with doctors, administering medicine, recording medical history and symptoms, performing diagnostic tests, checking residents' vital signs, feeding and washing residents, documenting information, and assisting with medical procedures, among other tasks.

24. Defendant requires Plaintiff and putative Class and Collective members to perform work-related activities for Defendant's benefit without adequate compensation. In particular, Defendant required Plaintiff and putative Class members to work 40-hour weeks while vastly underpaying them for the number of hours worked. For example, throughout Plaintiff's tenure working for Defendant, Plaintiff received bi-weekly payments of $465.80 from Defendant, despite working 40 hours per week at a pay-rate of $17.00 per hour. These wage payments calculate to roughly $5.82 per hour – well below the requirements of the FLSA and State of California. Putative Class and Collective members suffer similar underpayments from Defendant. Upon Plaintiff and putative Class and Collective members' complaints to Defendant regarding the severe underpayments, Defendant blamed the underpayments on a breach in the Kronos payroll system that Defendant used to record hours and wages. Despite it being Defendant's responsibility, not the responsibility of Kronos, to make sure Plaintiff and putative Class and Collective members are

properly compensated, Defendant has failed to timely and accurately issue Plaintiff and putative Class and Collective members the correct payment for the hours of work that they have labored for the benefit of Defendant.

25.     As a result of these policies and/or practices, Plaintiff and putative Class and Collective members are denied compensation for all hours worked, including minimum wages and overtime, which they are lawfully owed resulting from the additional off-the-clock work in excess of eight (8) hours per day and forty (40) hours per week.

26.     Plaintiff is informed, believes, and thereon alleges that Defendant utilizes the same or substantially similar timekeeping and payroll mechanisms throughout all its facilities in the United States, including in the State of California.

27.     Plaintiff and putative Class members are routinely denied rest breaks because Defendant does not authorize permit, and/or make available timely rest breaks periods. Specifically, pursuant to uniform, companywide policies and practices, Defendant requires Plaintiff and putative Class members to remain on duty throughout their scheduled shifts, including during rest break periods. Additionally, Plaintiff and putative Class members are either too busy with work during the day to have time to take bona fide rest breaks or get called back to work mid-break to assist with a resident. Plaintiff, for example, was unable to take a compliant rest break an average of four times per week.

28.     Despite these recurring violations, Defendant does not provide Plaintiff and putative Class members premium pay for missed rest periods.

29.     Plaintiff is informed, believes, and thereon alleges that the same rest break polices are used across all Defendant's facilities throughout California.

30.     Defendant also does not permit Plaintiff and putative Class and Collective members to take compliant meal break periods. Specifically, Plaintiff and putative Class and Collective members are routinely denied timely meal breaks because Defendant does not make available timely meal break periods. Plaintiff and putative Class and Collective members are too busy with work during the day to have time to take bona fide meal breaks before the fifth hour of work

31.     Despite these recurring violations, Defendant does not provide Plaintiff and putative

Class members with premium pay for missed or untimely meal breaks.

32.     Plaintiff is informed, believes, and thereon alleges that the same meal break policies are used across all Defendant's facilities.

33.     Defendant's common course of wage-and-hour abuse includes routinely failing to maintain true and accurate records of the hours worked by Collective and putative Class members.

34.     Defendant fails to provide Plaintiff and putative Class members with accurate and itemized wage statements as required by the State of California. Defendant has provided Plaintiff and putative Class members with statements that show only the total amount paid on each paycheck. The statements do not indicate the rate of pay or the number of hours that Plaintiff and putative Class members worked.

35.     Defendant's failure to compensate employees for all hours worked, including missed rest and meal breaks, further results in a failure to provide putative Class members, including Plaintiff, accurate itemized wage statements. The wage statements are inaccurate because they do not include off-the-clock work and premium pay for missed or untimely meal breaks. Moreover, as discussed above, Defendant issues wages statements for wage payments that are vastly less than what is owed to Plaintiff and putative Class members.

36.     Further, Defendant does not provide putative Class members, including Plaintiff, whose employment has ended, with full payment of all wages owed at the end of their employment. As these workers are owed for Defendant's vast underpayments, premium pay, and reimbursements for all business expenses when their employment ends, and these amounts remain unpaid under Defendant's policies and practices, Defendant fails to pay all wages due upon termination. As a consequence, Defendant is subject to waiting time penalties.

37.     Defendant has employed hundreds of people similarly situated to Plaintiff during the four-year period prior to the filing of this Complaint.

38.     Defendant's method of paying Plaintiff and putative Class members was willful and was not based on a good faith and reasonable belief that their conduct complied with California law.

39.     Defendant's conduct was willful, carried out in bad faith, and caused significant

7

_____
CLASS AND COLLECTIVE ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
*Melgoza v. Aegis Senior Communities LLC*

damages to non-exempt hourly employees in an amount to be determined at trial.

## **COLLECTIVE ALLEGATIONS UNDER THE FLSA**

40.    Plaintiff re-alleges and incorporates the foregoing paragraphs as though fully set forth herein.

41.    Plaintiff brings this Complaint as a collective action pursuant to 29 U.S.C. § 216(b) on behalf of the following collective of individuals:

**All current and former hourly, non-exempt employees employed by Defendant Aegis Senior Communities LLC d/b/a Aegis Living in the United States any time starting three years prior to the filing of this Complaint until resolution of this action.**

42.    Defendant has not compensated these employees for all hours worked, including minimum wage and overtime compensation for all hours worked over 40 hours per week, liquidated damages, and attorneys' fees and costs under the FLSA.

43.    Plaintiff's claims for violations of the FLSA may be brought and maintained as an "opt-in" collective action pursuant to Section 216(b) of the FLSA because Plaintiff's FLSA claims are similar to the claims of the Collective members.

44.    Plaintiff is informed, believes, and thereon alleges that Collective members have been denied compensation, including overtime compensation for time worked "off-the-clock," and would therefore likely join this collective action if provided a notice of their rights to do.

45.    Plaintiff and the Collective members are similarly situated. Collective Members have substantially similar job duties and requirements. Like Plaintiff, Defendant subjected Collective members to Defendant's common practices, policies, or plans that requires them to perform work without compensation in clear violation of the FLSA. Collective Members work, or have worked, for Defendant but were not paid overtime at the rate of one and one-half times their regular hourly rate when those hours exceeded forty per workweek. Collective Members also performed compensable work while "off-the-clock" which, when included with their recorded hours, results in additional overtime hours worked that were not compensated at the rate of one and one-half times their regular hourly in violation of the FLSA.

46.    Although Defendant permitted and/or required Collective members to work in excess

_____

1  of forty hours per workweek, Defendant has denied them full compensation for their hours worked

2  over forty as a result of meal breaks that were interrupted due to work demands and "off-the-clock"

3  work.

4      47.    Collective members regularly work or have worked in excess of forty hours during a

5  workweek.

6      48.    Collective members are not exempt from receiving overtime compensation under the

7  FLSA.

8      49.    Defendant's failure to pay overtime compensation as required by the FLSA resulted

9  from generally applicable policies and practices and did not depend on the personal circumstances of

10 FLSA Collective members.

11     50.    This action may be properly maintained as a collective action on behalf of the defined

12 Collective because, throughout the relevant time period:

13          a.  Defendant maintained common scheduling systems and policies with respect to

14              Plaintiff and Collective members, controlled the scheduling systems and policies

15              implemented throughout their facilities and retained authority to review and revise

16              or approve the schedules assigned to Plaintiff and Collective members;

17          b.  Defendant maintained common timekeeping systems and policies with respect to

18              Plaintiff and Collective members; and

19          c.  Defendant maintained common payroll systems and policies with respect to

20              Plaintiff and Collective members, controlled the payroll systems and policies

21              applied to Plaintiff and Collective members, and set the pay rates assigned to

22              Plaintiff and Collective members.

23     51.    Plaintiff and Collective members' claims arise from a common nucleus of operative

24 facts; namely, the continued and willful failure of Defendant to comply with its obligation to legally

25 compensate its employees. Liability is based on a systematic course of wrongful conduct by Defendant

26 that caused harm to all Collective members. Defendant had a plan, policy or practice that resulted in

27 inaccurately recording Plaintiff and Collective members' workhours, causing vast underpayments for

28

9

the amount of hours Plaintiff and Collective members worked. These underpayments caused Plaintiff and Collective members to receive wages below the federal minimum wage. Further, Defendant had a plan, policy or practice of not recording or paying Plaintiff and Collective members for interrupted, interruptible, or missed meal and rest breaks. These unpaid hours are typically worked in excess of 40 hours per week, and therefore the failure to track these hours results in a violation of the FLSA.

52.     The similarly situated Collective members are known to Defendant, are readily identifiable, and may be located through Defendant's records.  These similarly situated employees may readily be notified of this action, and allowed to "opt-in" to this case pursuant to 29 U.S.C. § 216(b) for the purpose of collectively adjudicating their claims for unpaid wages, liquidated damages (or, alternatively, interest), and attorneys' fees and costs under the FLSA.

## **RULE 23 CLASS ACTION ALLEGATIONS**

53.     Plaintiff brings causes of action as a class action on behalf of herself and all others similarly situated pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3). The California Class that Plaintiff seeks to represent is defined as follows:

> **All current and former hourly, non-exempt employees employed by Defendant Aegis Senior Communities LLC d/b/a Aegis Living in California any time starting four years prior to the filing of this Complaint until resolution of this action.**

54.     This action has been brought and may properly be maintained as a class action because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

55.     <u>Numerosity</u>:  The potential members of the class are so numerous that joinder of all the members of the Class is impracticable. Plaintiff is informed and believes that the number of California Class members exceeds 40. This volume makes bringing the claims of each individual member of the class before this Court impracticable. Likewise, joining each individual member of the California Class as a plaintiff in this action is impracticable. Furthermore, the identities of the California Class will be determined from Defendant's records, as will the compensation paid to each of them. As such, a class action is a reasonable and practical means of resolving these claims. To require individual

10

actions would prejudice the California Class and Defendant.

56.  <u>Commonality</u>:  There are questions of law and fact common to Plaintiff and the California Class that predominate over any questions affecting only individual members of the Class. These common questions of law and fact include, but are not limited to:

a.  Whether Defendant fails to pay putative Class members for all hours worked, including at minimum wage and as overtime compensation, in violation of the Labor Code and Wage Orders;

b.  Whether Defendant fails to authorize and permit, make available, and/or provide putative Class members with timely meal and/or rest periods to which they are entitled in violation of the Labor Code and Wage Orders;

c.  Whether Defendant fails to provide putative Class members with timely, accurate itemized wage statements in violation of the Labor Code and Wage Orders;

d.  Whether Defendant fails to provide putative Class members with all owed wages upon separation from employment in violation of the Labor Code and Wage Orders;

e.  Whether Defendant violates Business and Professions Code §§ 17200 *et seq.*, by:

(a)  failing to pay putative Class members for all hours worked, including at minimum wage and as overtime compensation;

(b)  failing to authorize and permit, make available, and/or provide Class members with timely meal and/or rest periods to which they are entitled;

(c)  failing to provide putative Class members with timely, accurate itemized wage statements; and

(d)  failing to pay putative Class members for all wages owed upon separation of employment;

f.  The proper formula for calculating restitution, damages and penalties owed to Plaintiff and the putative Class as alleged herein.

57.  <u>Typicality</u>:  Plaintiff's claims are typical of the claims of the California Class. Defendant's common course of conduct in violation of law as alleged herein caused Plaintiff and

putative Class members to sustain the same or similar injuries and damages. Plaintiff's claims are thereby representative of and co-extensive with the claims of the putative Class.

58.    Adequacy of Representation:  Plaintiff seeks relief for state law violations perpetrated by Defendant. In that sense, Plaintiff does not have any conflicts of interest with other putative Class members and will prosecute the case vigorously on behalf of the putative Class. Counsel representing Plaintiff is competent and experienced in litigating complex cases and large class actions, including wage and hour cases. Plaintiff will fairly and adequately represent and protect the interests of the putative Class members.

59.    Superiority of Class Action:  A class action is superior to other available means for the fair and efficient adjudication of this controversy. Individual joinder of all proposed Class members is not practicable, and questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class. Each proposed Class member has been damaged and is entitled to recovery by reason of Defendant's illegal policies and/or practices. Class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system.

60.    In the alternative, the putative Class may be certified because the prosecution of separate actions by the individual members of the putative Class would create a risk of inconsistent or varying adjudication with respect to individual members of the putative Class which would establish incompatible standards of conduct for Defendant.

61.    If each individual putative Class member were required to file an individual lawsuit, Defendant would necessarily gain an unconscionable advantage because Defendant would be able to exploit and overwhelm the limited resources of each member of the putative Class with Defendant's vastly superior financial legal resources.

62.    Requiring each individual putative Class member to pursue an individual remedy would also discourage the assertion of lawful claims by the putative Class members who would be disinclined to pursue these claims against Defendant because of an appreciable and justifiable fear of retaliation and permanent damage to their lives, careers and well-being.

CLASS AND COLLECTIVE ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
*Melgoza v. Aegis Senior Communities LLC*

**FIRST CAUSE OF ACTION**
**Violation of the Fair Labor Standards Act**
**Pursuant to 29 U.S.C. §§ 201, et seq.**
**(On Behalf of the Collective)**

63.     Plaintiff re-alleges and incorporates the foregoing paragraphs as though fully set forth herein.

64.     The FLSA requires that covered employees receive compensation for all hours worked and overtime compensation of not less than one and one-half times the regular rate of pay for all hours worked in excess of forty hours in a workweek.  29 U.S.C. §§ 206(a)(1), 207(a)(1).

65.     At all times material herein, Plaintiff and the Collective are covered employees entitled to the rights, protections, and benefits provided under the FLSA. 29 U.S.C. §§ 203(e) and 207(a).

66.     Defendant is a covered employer required to comply with the FLSA's mandates.

67.     Defendant has violated the FLSA with respect to Plaintiff and the Collective, by, inter alia, failing to compensate Plaintiff and the Collective for all hours worked and, with respect to such hours, failing to pay the legally mandated overtime premium for such work and/or minimum wage. Defendant has also violated the FLSA by failing to keep required, accurate records of all hours worked by Plaintiff and the Collective. 29 U.S.C. § 211(c).

68.     Plaintiff and the Collective are victims of a uniform and company-wide compensation policy that has been applied to current and former non-exempt, hourly employees of Defendant, working throughout the United States.

69.     Plaintiff and the Collective are entitled to damages equal to the mandated pay, including minimum wage, straight time, and overtime premium pay within the three years preceding the filing of the complaint, plus periods of equitable tolling, because Defendant has acted willfully and knew or showed reckless disregard for whether the alleged conduct was prohibited by the FLSA.

70.     Defendant has acted neither in good faith nor with reasonable grounds to believe that its actions and omissions were not a violation of the FLSA, and as a result thereof, Plaintiff and the Collective are entitled to recover an award of liquidated damages in an amount equal to the amount of unpaid overtime pay and/or prejudgment interest at the applicable rate.  29 U.S.C. § 216(b).

71.     Pay, including minimum wage, straight time, and overtime compensation, has been

13

unlawfully withheld by Defendant from Plaintiff and the Collective as a result of Defendant's violations of the FLSA. Accordingly, Defendant is liable for unpaid wages, together with an amount equal as liquidated damages, attorneys' fees, and costs of this action.

72. Wherefore, Plaintiff and the Collective request relief as hereinafter provided.

**SECOND CAUSE OF ACTION**
**Failure to Pay for All Hours Worked**
**Pursuant to California Labor Code § 204**
**(On Behalf of the Class)**

73. Plaintiff realleges and incorporates the foregoing paragraphs as though fully set forth herein.

74. Labor Code § 200(a) defines wages as "all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis or other method of calculation."

75. Labor Code § 204 provides that employers must compensate employees for all hours worked "twice during each calendar month, on days designated in advance by the employer as the regular paydays."

76. Labor Code §§ 221-223 prohibit employers from withholding and deducting wages, or otherwise artificially lowering the wage scale of an employee.

77. Labor Code § 1194(a) provides as follows:

Notwithstanding any agreement to work for a lesser wage, any employee receiving less than the legal minimum wage or the legal overtime compensation applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage or overtime compensation, including interest thereon, reasonable attorneys' fees, and costs of suit.

78. Labor Code § 1198 makes it unlawful for employers to employ employees under conditions that violate the Wage Orders.

79. IWC Wage 5-2001(2)(K) define hours worked as "the time during which an employee is subject to the control of an employer and includes all the time the employee is suffered or permitted to work, whether or not required to do so."

80. Defendant willfully engaged in and continues to engage in a policy and practice of not

compensating Plaintiff and putative Class members for all hours worked or spent in Defendant's control.

81.     Defendant routinely denies Plaintiff and putative Class members compensation for all hours worked. In particular, Defendant has required Plaintiff and putative Class members to work 40-hour weeks while vastly underpaying them for the number of hours worked. For example, at Plaintiff's payrate of $17.00 per hour, her bi-weekly paycheck for working 80 hours should have added up to roughly $1,360. Instead, throughout Plaintiff's tenure working for Defendant, Plaintiff received bi-weekly payments of $465.80 from Defendant, a figure that covers only 27.4 hours of pay. In essence, Plaintiff worked more than 52 hours per week that she did not get paid for. Putative Class members suffer similar underpayments from Defendant. Upon Plaintiff and putative Class members' complaints regarding the severe underpayments, Defendant blamed the underpayments on a breach in the Kronos payroll system that Defendant used to record hours and wages. Despite it being Defendant's responsibility, not the responsibility of Kronos, to make sure Plaintiff and putative Class members are properly compensated, Defendant has failed to timely and accurately issue Plaintiff and putative Class members the correct payment for the hours of work that they have labored for the benefit of Defendant.

82.     In violation of California law, Defendant knowingly and willfully refuses to perform its obligations to provide Plaintiff and putative Class members with compensation for all time worked. Defendant regularly fails to track the time Plaintiff and putative Class members actually worked and fail to compensate them for all hours worked.

83.     Therefore, Defendant has committed, and continues to commit, the acts alleged herein knowingly and willfully, and in conscious disregard of the Plaintiff and putative Class members' rights. Plaintiff and putative Class members are thus entitled to recover nominal, actual, and compensatory damages, plus interest, attorneys' fees, expenses, and costs of suit.

84.     As a proximate result of the aforementioned violations, Plaintiff and putative Class members have been damaged in an amount according to proof at time of trial.

85.     Wherefore, Plaintiff and the putative Class request relief as hereinafter provided.

### **THIRD CAUSE OF ACTION**

15

**Failure to Pay Minimum Wage for All Hours Worked**
**Pursuant to the California Labor Code §§ 204, 1194, 1197 & 1198**
**(On Behalf of the Class)**

86. Plaintiff realleges and incorporates the foregoing paragraphs as though fully set forth herein.

87. Labor Code § 200(a) defines wages as "all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation."

88. Labor Code § 204 provides that employers must compensate employees for all hours worked "twice during each calendar month, on days designated in advance by the employer as the regular paydays."

89. Labor Code §§ 221-223 prohibit employers from withholding and deducting wages, or otherwise artificially lowering the wage scale of an employee.

90. Labor Code § 1194(a) provides as follows:

> Notwithstanding any agreement to work for a lesser wage, any employee receiving less than the legal minimum wage or the legal overtime compensation applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage or overtime compensation, including interest thereon, reasonable attorneys' fees, and costs of suit.

91. Labor Code § 1198 makes it unlawful for employers to employ employees under conditions that violate the Wage Orders.

92. IWC Wage Order 5-2001(2)(K) defines hours worked as "the time during which an employee is subject to the control of an employer and includes all the time the employee is suffered or permitted to work, whether or not required to do so."

93. During the applicable statutory period, California Labor Code §§ 1182.12 and 1197, and the Minimum Wage Order were in full force and effect and required that Defendant's hourly employees receive the minimum wage for all hours worked at the rate of eleven dollars ($11.00) per hour commencing on January 1, 2018, twelve dollars ($12.00) per hour commencing on January 1, 2019, thirteen dollars ($13.00) per hour commencing on January 1, 2020, fourteen dollars ($14.00) per hour commencing January 1, 2021, and fifteen dollars ($15.00) per hour commencing January 1,

16

1    2022.

2          94.     Defendant has maintained policies and procedures which created a working

3    environment where Plaintiff and putative Class members are routinely compensated at a rate that is

4    less than the statutory minimum wage.

5          95.     Defendant routinely denies Plaintiff and putative Class members compensation for all

6    hours worked, including minimum wage. Plaintiff and putative Class members are regularly

7    compensated for less than the total amount of hours they actually work. For example, as explained

8    above, during Plaintiff's tenure working for Defendant, Plaintiff received bi-weekly payments of

9    $465.80 from Defendant, despite working 40 hours per week at a pay-rate of $17.00 per hour. These

10   wage payments calculate to roughly $5.82 per hour – well below the State of California's minimum

11   wage requirements. Putative Class members suffer similar underpayments from Defendant. Thus,

12   Defendant underpays Plaintiff and putative Class members by routinely refusing to compensate all

13   time worked resulting in minimum wage violations.

14         96.     In violation of California law, Defendant knowingly and willfully refuses to perform

15   their obligations to pay minimum wage to Plaintiff and putative Class members for all time worked.

16         97.     Therefore, Defendant committed, and continues to commit the acts alleged herein

17   knowingly and willfully, and in conscious disregard of Plaintiff's and putative Class members' rights.

18   Plaintiff and the putative Class are thus entitled to recover nominal, actual, and compensatory

19   damages, plus interest, attorneys' fees, expenses, and costs of suit.

20         98.     As a proximate result of the aforementioned violations, Plaintiff and the putative Class

21   have been damaged in an amount according to proof at time of trial.

22         99.     Wherefore, Plaintiff and the putative Class request relief as hereinafter provided.

23                          **FOURTH CAUSE OF ACTION**
                             **Failure to Pay Overtime Wages**
24                       **Pursuant to California Labor Code § 510**
                                  **(On Behalf of the Class)**
25

26         100.    Plaintiff realleges and incorporates the foregoing paragraphs as though fully set forth

27   herein.

28
                                           17
     _____
              CLASS AND COLLECTIVE ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
                             *Melgoza v. Aegis Senior Communities LLC*

101.    Defendant does not compensate Plaintiff and Class members with appropriate overtime, including time and a half, as required by California law.

102.    Labor Code § 510 provides as follows:

Eight hours of labor constitutes a day's work.  Any work in excess of eight hours in one workday and any work in excess of 40 hours in any one workweek and the first eight hours worked on the seventh day of work in any one workweek shall be compensated at the rate of no less than one and one-half times the regular rate of pay for an employee. Any work in excess of 12 hours in one day shall be compensated at the rate of no less than twice the regular rate of pay for an employee. In addition, any work in excess of eight hours on any seventh day of a workweek shall be compensated at the rate of no less than twice the regular rate of pay of an employee.

103.    The IWC Wage Order 5-2001(3)(A)(1) states:

The following overtime provisions are applicable to employees 18 years of age or over and to employees 16 or 17 years of age who are not required by law to attend school and are not otherwise prohibited by law from engaging in the subject work. Such employees shall not be employed more than eight (8) hours in any workday or more than 40 hours in any workweek unless the employee receives one and one-half (1 ½) times such employee's regular rate of pay for all hours worked over 40 hours in the workweek. Eight (8) hours of labor constitutes a day's work. Employment beyond eight (8) hours in any workday or more than six (6) days in any workweek is permissible provided the employee is compensated for such overtime at not less than: . . . One and one-half (1 ½) times the employee's regular rate of pay for all hours worked in excess of eight (8) hours up to and including 12 hours in any workday, and for the first eight (8) hours worked on the seventh (7th) consecutive day of work in a workweek; and … [d]ouble the employee's regular rate of pay for all hours worked in excess of 12 hours in any workday and for all hours worked in excess of eight (8) hours on the seventh (7th) consecutive day of work in a workweek.

104.    Labor Code § 1194(a) provides as follows:

Notwithstanding any agreement to work for a lesser wage, any employee receiving less than the legal minimum wage or the legal overtime compensation applicable to the employee is entitled to recover in a civil action the unpaid balance of the full amount of this minimum wage or overtime compensation, including interest thereon, reasonable attorneys' fees, and costs of suit.

105.    Labor Code § 200 defines wages as "all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis or other method of calculation."  All such wages are subject to California's overtime requirements, including those set forth above.

106.    Defendant routinely denies Plaintiff and putative Class members compensation for all hours worked, including overtime. Plaintiff and putative Class members are regularly compensated for less than the total amount of hours they actually work. Plaintiff and putative Class members receive

18

bi-weekly payments for the hours that they work, however, the amount of pay issued to Plaintiff and putative Class members is often insufficient and grossly less than what is owed, *i.e.*, Plaintiff's and putative Class members' pay does not reflect the total amount of hours they actually work. Thus, Defendant underpays Plaintiff and putative Class members by routinely refusing to compensate all time worked, including at overtime.

107.    As a result, Plaintiff and putative Class members have worked overtime hours for Defendant without being paid overtime premiums in violation of the Labor Code, applicable IWC Wage Orders, and other applicable law.

108.    Defendant knowingly and willfully refuses to perform its obligations to provide Plaintiff and the Class members with premium wages for all overtime work. As a proximate result of the aforementioned violations, Defendant has damaged Plaintiff and the Class members in amounts to be determined according to proof at time of trial.

109.    Defendant is liable to Plaintiff and the putative Class alleged herein for the unpaid overtime and civil penalties, with interest thereon. Furthermore, Plaintiff is entitled to an award of attorneys' fees and costs as set forth below.

110.    Wherefore, Plaintiff and the Class request relief as hereinafter provided.

**FIFTH CAUSE OF ACTION**
**Failure to Authorize and Permit and/or Make Available Meal and/or Rest Periods**
**Pursuant to California Labor Code §§ 226.7 & 512**
**(On Behalf of the Class)**

111.    Plaintiff realleges and incorporates the foregoing paragraphs as though fully set forth herein.

112.    Defendant routinely fails to authorize, permit and/or make available compliant meal periods to Plaintiff and putative Class members. Plaintiff's and putative Class members' schedules regularly prevent them from taking compliant meal periods. Plaintiff and putative Class members are routinely denied meal breaks for three reasons: (i) Plaintiff and putative class members are often called away from their meal breaks to provide care to a resident; (ii) Defendant does not authorize, permit, and/or make available timely meal breaks to Plaintiff and putative Class members; and (iii) Plaintiff

1  and putative Class members are often too busy with work during the day to have time to take bona

2  fide meal breaks.

3     113.   When Plaintiff and putative Class members attempt a meal break, such is often

4  interrupted and/or untimely, *i.e.*, Defendant does not provide Plaintiff and putative Class members

5  with duty-free, uninterrupted, and timely thirty-minute meal periods during which Plaintiff and

6  putative Class members should be completely relieved of any duty, by the end of the fifth hour of

7  work.

8     114.   Plaintiff and putative Class members are not provided with one (1) hour of premium

9  pay for each day they do not receive a complaint meal break.

10    115.   Similarly, Defendant regularly fails to make rest periods available to Plaintiff and

11  putative Class members. Plaintiff and putative Class members' schedules regularly prevent them from

12  taking *bona fide* rest breaks throughout the day. When available, if ever, such are often untimely and/or

13  interrupted, *i.e.*, Defendant does not provide Plaintiff and putative Class members with duty-free,

14  uninterrupted, and timely ten-minute rest periods during which Plaintiff and putative Class members

15  should be completely relieved of any duty, by the end of the fourth hour of work, and again by the end

16  of the eighth hour of work.

17    116.   Plaintiff and putative Class members are not provided with one (1) hour of premium

18  pay for each day they do not receive a complaint rest break.

19    117.   Labor Code § 226.7 and the applicable Wage Order require Defendant to authorize and

20  permit meal and rest periods to its employees. Labor Code §§ 226.7 and 512 and the Wage Orders

21  prohibit employers from employing an employee for more than five (5) hours without a meal period

22  of not less than thirty minutes, and from employing an employee more than ten (10) hours per day

23  without providing the employee with a second meal period of not less than thirty minutes.

24    118.   Labor Code § 226.7 and the applicable Wage Order also require employers to authorize

25  and permit employees to take ten (10) minutes of net rest time per (4) four hours or major fraction

26  thereof of work, and to pay employees their full wages during those rest periods. Unless the employee

27  is relieved of all duty during the thirty-minute meal period, the employee is considered "on duty" and

28

_____

CLASS AND COLLECTIVE ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
*Melgoza v. Aegis Senior Communities LLC*

the meal period is counted as time worked under the applicable Wage Order.

119. Under Labor Code § 226.7(b) and the applicable Wage Order, an employer who fails to authorize, permit, and/or make available a required meal period must, as compensation, pay the employee one (1) hour of pay at the employee's regular rate of compensation for each workday that the meal period was not authorized and permitted. Similarly, an employer must pay an employee denied a required rest period one (1) hour of pay at the employee's regular rate of compensation for each workday that the rest period was not authorized and permitted and/or not made available.

120. Despite these requirements, Defendant has often knowingly and willfully refused to perform its obligations to authorize and permit and/or make available to Plaintiff and putative Class members the ability to take the meal and/or rest periods to which they are entitled.

121. Defendant has also failed to pay Plaintiff and putative Class one hour of pay for each day an off-duty meal and/or rest period was denied. Defendant's conduct described herein violates Labor Code § 226.7 and 512. Therefore, pursuant to Labor Code § 226.7(b), Plaintiff and putative Class members are entitled to compensation for the failure to authorize and permit and/or make available meal and rest periods, plus interest, attorneys' fees, expenses and costs of suit.

122. As a proximate result of the aforementioned violations, Plaintiff and the putative Class have been damaged in an amount according to proof at time of trial.

123. Wherefore, Plaintiff and the putative Class request relief as hereinafter provided.

### SIXTH CAUSE OF ACTION
**Failure to Provide Accurate Itemized Wage Statements
Pursuant to California Labor Code § 226
(On Behalf of the Class)**

124. Plaintiff realleges and incorporates the foregoing paragraphs as though fully set forth herein.

125. Defendant does not provide Plaintiff and putative Class members with accurate itemized wage statements as required by California law.

126. Labor Code § 226(a) provides:

An employer, semimonthly or at the time of each payment of wages, shall furnish to his or her employees, either as a detachable part of the check, draft, or voucher paying the employee's wages, or separately if wages are paid by personal check or cash, an

21

accurate itemized statement in writing showing: (1) gross wages earned, (2) total hours worked by the employee, except as provided in subdivision (j), (3) the number of piece-rate units earned and any applicable piece rate if the employee is paid on a piece-rate basis, (4) all deductions, provided that all deductions made on written orders of the employee may be aggregated and shown as one item, (5) net wages earned, (6) the inclusive dates of the period for which the employee is paid, (7) the name of the employee and only the last four digits of his or her social security number, (8) the name and address of the legal entity that is the employer and, if the employer is a farm labor contractor, as defined in subdivision (b) of Section 1682, the name and address of the legal entity that secured the services of the employer, and (9) all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee …. The deductions made from payments of wages shall be recorded in ink or other indelible form, properly dated, showing the month, day, and year, and a copy of the statement or a record of the deductions shall be kept on file by the employer for at least three years at the place of employment or at a central location within the State of California.

127. IWC Wage Order 5-2001(7) establishes similar wage statement requirements.

128. Labor Code § 226(e) provides:

An employee suffering injury as a result of a knowing and intentional failure by an employer to comply with subdivision (a) is entitled to recover the greater of all actual damages or fifty dollars ($50) for the initial pay period in which a violation occurs and one hundred dollars ($100) per employee for each violation in a subsequent pay period, not exceeding an aggregate penalty of four thousand dollars ($4,000), and is entitled to an award of costs and reasonable attorney's fees.

129. Plaintiff seeks to recover actual damages, costs, and attorneys' fees under this section.

130. Defendant does not provide timely, accurate itemized wage statements to Plaintiff and putative Class members in accordance with Labor Code § 226(a) and the IWC Wage Orders. The wage statements Defendant provides its employees, including Plaintiff and putative Class members, do not accurately reflect all hours worked, including minimum wages and overtime. In addition, Defendant's wage statements do not include premium pay for missed meal and rest period.

131. Defendant is liable to Plaintiff and the putative Class alleged herein for the amounts described above in addition to the civil penalties set forth below, with interest thereon. Furthermore, Plaintiff is entitled to an award of attorneys' fees and costs as set forth below, pursuant to Labor Code § 226(e).

132. Wherefore, Plaintiff and the putative Class request relief as hereinafter provided.

**SEVENTH CAUSE OF ACTION**
**Waiting Time Penalties Pursuant to California Labor Code §§ 201-203**
**(On Behalf of the Class)**

133.     Plaintiff re-alleges and incorporates the foregoing paragraphs as though fully set forth herein.

134.     Defendant does not provide putative Class members with their wages when due under California law after their employment with Defendant ends.

135.     Labor Code § 201 provides:

>     If an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately.

136.     Labor Code § 202 provides:

>     If an employee not having a written contract for a definite period quits his or her employment, his or her wages shall become due and payable not later than 72 hours thereafter, unless the employee has given 72 hours previous notice of his or her intention to quit, in which case the employee is entitled to his or her wages at the time of quitting.

137.     Labor Code § 203 provides, in relevant part:

>     If an employer willfully fails to pay, without abatement or reduction, in accordance with Sections 201, 201.5, 202, and 205.5, any wages of an employee who is discharged or who quits, the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days.

138.     Some of the putative Class members, including Plaintiff, left their employment with Defendant during the statutory period, at which time Defendant owed them unpaid wages. These earned, but unpaid, wages derive from time spent working for the benefit of Defendant, which went unrecorded and/or uncompensated. In addition, Plaintiff and putative Class members who left their employment during the statutory period were owed premium pay for missed, interrupted and/or untimely meal and rest periods.

139.     Defendant willfully refused and continues to refuse to pay putative Class members all the wages that are due and owing to them, in the form of uncompensated time worked, upon the end of their employment as a result of Defendant's willful failure to provide Plaintiff and the putative Class members with payment for all hours worked, including minimum wage and overtime.  In addition, Defendant willfully refused and continues to refuse to pay Plaintiff and putative Class members premium pay for missed, interrupted and/or untimely meal and rest periods. As a result of

23

Defendant's actions, Plaintiff and putative Class members have suffered and continue to suffer substantial losses, including lost earnings, and interest.

140. Defendant's willful failure to pay Plaintiff and putative Class members the wages due and owing them constitutes a violation of Labor Code §§ 201-202. As a result, Defendant is liable to Plaintiff and proposed Class members for all penalties owing pursuant to Labor Code §§ 201-203.

141. In addition, Labor Code § 203 provides that an employee's wages will continue as a penalty up to thirty(30) days from the time the wages were due. Therefore, the Plaintiff and putative Class members are entitled to penalties pursuant to Labor Code § 203, plus interest.

142. Wherefore, Plaintiff and the Class request relief as hereinafter provided.

## EIGHTH CAUSE OF ACTION
**Violation of California Business and Professions Code §§ 17200, *et seq*.**
**(On Behalf of the Class)**

143. Plaintiff realleges and incorporates the foregoing paragraphs as though fully set forth herein.

144. California Business and Professions Code § 17200, *et seq*., prohibits unfair competition in the form of any unlawful, unfair, or fraudulent business acts or practices.

145. Business and Professions Code § 17204 allows a person injured by the unfair business acts or practices to prosecute a civil action for violation of the UCL.

146. Labor Code § 90.5(a) states it is the public policy of California to vigorously enforce minimum labor standards in order to ensure employees are not required to work under substandard and unlawful conditions, and to protect employers who comply with the law from those who attempt to gain competitive advantage at the expense of their workers by failing to comply with minimum labor standards.

147. Beginning at an exact date unknown to Plaintiff, but at least since the date four years prior to the filing of this suit, Defendant has committed acts of unfair competition as defined by the UCL, by engaging in the unlawful, unfair, and fraudulent business acts and practices described in this Complaint, including, but not limited to:

a. Violations of Labor Code § 1194 and IWC Wage Order 5-2001 pertaining to payment of wages, including minimum wage, for all hours worked;

b. violations of Labor Code § 510 and Wage Order 5-2001 pertaining to overtime;

c. violations of Labor Code §§ 226.7, 512 and Wage Order 5-2001 pertaining to meal periods and rest breaks;

d. violations of Labor Code § 226 regarding accurate, timely itemized wage statements; and

e. violations of Labor Code §§ 201-302 pertaining to payment of all due wages upon separation from employment.

148. The violations of these laws and regulations, as well as of the fundamental California public policies protecting wages, serve as unlawful predicate acts and practices for purposes of Business and Professions Code §§ 17200 *et seq.*

149. The acts and practices described above constitute unfair, unlawful and fraudulent business practices, and unfair competition, within the meaning of Business and Professions Code §§ 17200 *et seq.* Among other things, the acts and practices have taken from Plaintiff and the Class wages rightfully earned by them, while enabling Defendant to gain an unfair competitive advantage over law-abiding employers and competitors.

150. Business and Professions Code § 17203 provides that a court may make such orders or judgments as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition. Injunctive relief is necessary and appropriate to prevent Defendant from repeating the unlawful, unfair, and fraudulent business acts and practices alleged above.

151. As a direct and proximate result of the aforementioned acts and practices, Plaintiff and the Class members have suffered a loss of money and property, in the form of unpaid wages which are due and payable to them.

152. Business and Professions Code § 17203 provides that the Court may restore to any person in interest any money or property which may have been acquired by means of such unfair competition. Plaintiff and the Class are entitled to restitution pursuant to Business and Professions Code § 17203 for all wages and payments unlawfully withheld from employees during the four-year

CLASS AND COLLECTIVE ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
*Melgoza v. Aegis Senior Communities LLC*

period prior to the filing of this Complaint. Plaintiff's success in this action will enforce important rights affecting the public interest and, in that regard, Plaintiff sues on behalf of herself as well as others similarly situated. Plaintiff and putative Class members seek and are entitled to gratuity payments retained by Defendant, unpaid wages, declaratory and injunctive relief, and all other equitable remedies owing to them.

153.    Plaintiff herein takes upon herself enforcement of these laws and lawful claims. There is a financial burden involved in pursuing this action, the action is seeking to vindicate a public right, and it would be against the interests of justice to penalize Plaintiff by forcing her to pay attorneys' fees from the recovery in this action. Attorneys' fees are appropriate pursuant to Code of Civil Procedure §1021.5 and otherwise.

154.    Wherefore, Plaintiff and the putative Class request relief as hereinafter provided.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of the Class and Collective members, requests the following relief:

1.    For an order certifying that the First Cause of Action in this Complaint may be maintained as a collective action pursuant to 29 U.S.C. § 216(b) and that prompt notice of this action be issued to potential members of the Collective, apprising them of the pendency of this action, and permitting them to assert their FLSA claims;

2.    For an order equitably tolling the statute of limitations for the potential members of the Collective;

3.    Damages and restitution according to proof at trial for all unpaid gratuities, wages and other injuries, as provided by the FLSA, California Labor Code, and California Business and Professions Code;

4.    For a declaratory judgment that Defendant violated the FLSA, California Labor Code, California law, and public policy as alleged herein;

5.    For a declaratory judgment that Defendant violated California Business and Professions Code §§ 17200 *et seq*. as a result of the aforementioned violations of the

California Labor Code;

6.     For preliminary, permanent, and mandatory injunctive relief prohibiting Defendant, its officers, agents, and all those acting in concert with them from committing in the future those violations of law herein alleged;

7.     For an equitable accounting to identify, locate, and restore to all current and former employees the wages they are due, with interest thereon;

8.     For an equitable accounting to identify, locate, and restore to all current and former employees the wages they are due, with interest thereon;

9.     For an order awarding Plaintiff and putative Class and Collective members compensatory damages, including gratuities owed, lost wages, earnings, liquidated damages, and other employee benefits, restitution, recovery of all money/property, actual damages, and all other sums of money owed to Plaintiff and putative Class and Collective members, together with interest on these amounts according to proof;

10.     For an order awarding Plaintiff and putative Class and Collective members civil penalties pursuant to the FLSA, California Labor Code, and the laws of the State of California, with interest thereon;

11.     For an order awarding reasonable attorneys' fees as provided by the FLSA, California Labor Code, California Code of Civil Procedure § 1021.5, the laws of the State of California, and/or other applicable law;

12.     For all costs of suit;

13.     For interest on any penalties awarded, as provided by applicable law;

14.     For injunctive relief requiring Defendant to correct its unlawful practices; and

15.     For such other and further relief as this Court deems just and proper.

CLASS AND COLLECTIVE ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
*Melgoza v. Aegis Senior Communities LLC*

1                                          Respectfully Submitted,

2   Date: March 18, 2022

3

4                                          Carolyn H. Cottrell

                                          Samantha A. Smith

5                                          **SCHNEIDER WALLACE**

                                          **COTTRELL KONECKY LLP**

6

7                                          *Attorneys for Plaintiff,*

                                          *on behalf of the putative Class and Collective*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS AND COLLECTIVE ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

*Melgoza v. Aegis Senior Communities LLC*

1

### DEMAND FOR JURY TRIAL

2        Plaintiff hereby demands a jury trial on all claims and issues for which Plaintiff is entitled to

3    a jury.

4                                          Respectfully Submitted,

5    Date: March 18, 2022

6

7                                          Carolyn H. Cottrell
                                           Samantha A. Smith
8                                          **SCHNEIDER WALLACE**
                                           **COTTRELL KONECKY LLP**
9

10                                         *Attorneys for Plaintiff,*
                                           *on behalf of the putative Class and Collective*
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS AND COLLECTIVE ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
*Melgoza v. Aegis Senior Communities LLC*

# EXHIBIT D

Samuel A. Wong (SBN 217104)
Kashif Haque (SBN 218672)
Jessica L. Campbell (SBN 280626)
Fawn F. Bekam (SBN 307312)
**AEGIS LAW FIRM, PC**
9811 Irvine Center Drive, Suite 100
Irvine, CA 92618
Telephone: 949.379.6250
Facsimile: 949.379.6251
swong@aegislawfirm.com
khaque@aegislawfirm.com
jcampbell@aegislawfirm.com
fbekam@aegislawfirm.com

Carolyn H. Cottrell (SBN 166977)
David C. Leimbach (SBN 265409)
Michelle S. Lim (SBN 315691)
**SCHNEIDER WALLACE
COTTRELL KONECKY LLP**
2000 Powell Street, Suite 1400
Emeryville, California 94608
Telephone: (415) 421-7100
Facsimile: (415) 421-7105
ccottrell@schneiderwallace.com
dleimbach@schneiderwallace.com
mlim@schneiderwallace.com

*Attorneys for Plaintiffs, the Putative Collective,
the Putative Class, Aggrieved Employees,
and on behalf of the State of California*

## SUPERIOR COURT OF CALIFORNIA
## COUNTY OF ALAMEDA

| | |
|---|---|
| ANDREA SALONGA and DANIELA MELGOZA, individually and on behalf of all others similarly situated and the State of California, <br><br> *Plaintiffs,* <br><br> v. <br><br> AEGIS SENIOR COMMUNITIES, LLC, d/b/a AEGIS LIVING; and DOES 1 through 100, inclusive, <br><br> *Defendants.* | Case No.: 22CV007450 <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT** <br><br> Date: January 25, 2024 <br> Time: 3:00 p.m. <br> Dept: 514 <br> Judge: Hon. Noël Wise <br><br> **Reservation ID: 106613794847** |

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... 2

TABLE OF AUTHORITIES .............................................................................................. 4

I.    INTRODUCTION ..................................................................................................... 1

II.   BACKGROUND ........................................................................................................ 2

      A.   Factual and Procedural History ...................................................................... 2

      B.   Discovery ......................................................................................................... 3

      C.   Mediation and Settlement ............................................................................... 4

III.  TERMS OF THE SETTLEMENT .......................................................................... 4

      A.   Basic Terms of the Settlement ........................................................................ 4

      B.   Scope of Releases ............................................................................................ 5

      C.   Allocations of Individual Settlement Awards ................................................ 6

      D.   Settlement Administration, Notice, and Requests for Exclusions and Objections ................ 7

IV.   THE COURT SHOULD PRELIMINARilY APPROVE THE SETTLEMENT ...................... 7

      A.   Class Action Settlement Approval Procedure ............................................... 7

      B.   Preliminary Approval of the Class Portion of the Settlement is Appropriate ...................... 8

            1.   The Settlement Was Reached After Extensive Litigation, Discovery, and Analysis of the Class Claims .............. 9

            2.   Strength of Plaintiffs' Case, Amount Offered in Settlement, and Litigation Risks .......... 10

            3.   Litigation of this Action Not Only Would Delay Recovery, But Would Be Expensive, Time-Consuming, and Would Involve Substantial Risk ............. 11

            4.   The Proposed Individual Service Awards are Reasonable ................................ 13

            5.   The Proposed Attorneys' Fees and Costs are Reasonable ............................ 13

V.    THE COURT SHOULD CERTIFY THE PROPOSED CLASS FOR SETTLEMENT PURPOSES ....................... 15

      A.   The Class is Sufficiently Ascertainable and Numerous ................................ 16

      B.   The Class Members Share a Well-Defined Community of Interest ................ 16

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY APPROVAL OF SETTLEMENT
*Salonga, et al. v. Aegis Senior Communities LLC,* Case No. 22CV007450

C.      Typicality Is Satisfied ........................................................................ 17

D.      Adequacy Is Satisfied ........................................................................ 17

VI.   THE COURT SHOULD CERTIFY THE PROPOSED FLSA COLLECTIVE FOR

SETTLEMENT PURPOSES ........................................................................ 17

VII. THE COURT SHOULD APPROVE THE SETTLEMENT NOTICE .................................... 18

VIII.    CONCLUSION ........................................................................ 19

iii

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY APPROVAL OF SETTLEMENT
*Salonga, et al. v. Aegis Senior Communities LLC,* Case No. 22CV007450

# TABLE OF AUTHORITIES

**Cases**

*7-Eleven Owners for Fair Franchising v. Southland Corp.*

(2000) 85 Cal.App.4th 1135 ...................................................................................11

*Amaro v. Anaheim Arena Mgmt., LLC*

(2021) 69 Cal.App.5th 521 .......................................................................................5

*Balderas v. Massage Envy Franchising, LLP*

 (N.D. Cal. 2014) 2014 WL 3610945 ......................................................................11

*Capitol People First v. Dep't of Developmental Servs.*

(2007) 155 Cal.App.4th 676 ...................................................................................16

*Cellphone Termination Fee Cases*

(2010) 186 Cal.App.4th 1380 .................................................................................13

*Chavez v. Netflix, Inc.*

(2008) 162 Cal.App.4th 43 .....................................................................................14

*Churchill Village LLC v. General Electric*

(9th Cir. 2004) 361 F.3d 566...................................................................................18

*Clark v. Am. Residential Servs. LLC*

(2009) 175 Cal.App.4th 785 .....................................................................................9

*Classen v. Weller*

(1983) 145 Cal.App.3d 27 .......................................................................................17

*Conlin v. Aegis Senior Living Communities LLC,*

(N.D. Cal. Nov. 29, 2018) Case No. 17-CV-05534-LHK ........................................10

*Cruz v. Sky Chefs, Inc.*

(N.D. Cal. Dec. 19, 2014) 2014 WL 7247065 .........................................................11

*Dunk v. Ford Motor Co.*

(1996) 48 Cal.App.4th 1794 .....................................................................................8

iv

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY APPROVAL OF SETTLEMENT
*Salonga, et al. v. Aegis Senior Communities LLC,* Case No. 22CV007450

*Evans v. Jeff D.*

(1986) 475 U.S. 717 ............................................................................................................19

*Ferguson v. Lieff, Cabraser, Heimann & Bernstein*

(2003) 30 Cal.4th 1037 .......................................................................................................8

*Garcia v. Pep Boys,*

(Orange County Super. Ct.)Case No. 30-2014-00720574-CU-OE-CJC .......................15

*Garcia v. Save Mart Supermarkets*

(Stanislaus Super. Ct., Aug. 3, 2004) No. 312026 ..........................................................15

*Green v. Obledo*

(Cal. 1981) 29 Cal.3d 126...................................................................................................8

*Hanlon v. Chrysler Corp.* (9th Cir. 1998)

150 F.3d 1011...................................................................................................................18

*Hurtado v. Esperer Holdings*

(Los Angeles Cty. 2021) 2021 Cal. Super. LEXIS 137529 .............................................11

*In re Cellphone Termination Fee Cases*

(2009) 180 Cal.App.4th 1110..............................................................................................7

*In Re Mego Fin. Corp. Sec. Litig.*

(9th Cir. 2000) 213 F.3d 454 ............................................................................................11

*In re Omnivision Techs. Inc.*

(N.D. Cal. 2008) 559 F.Supp.2d 1036..............................................................................11

*In re Uber FCRA Litig.*

(N.D. Cal. June 29, 2017) 2017 U.S. Dist. LEXIS 101552 ..............................................11

*Jaimez v. Daiohs USA, Inc.*

(2010) 181 Cal.App.4th 1286 ...........................................................................................16

*Johnson v. Dispensaries*

(Super. Ct. L.A. Cnty. Nov. 1, 2022) 2022 Cal. Super. LEXIS 76537 ..........................11

v

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY APPROVAL OF SETTLEMENT
*Salonga, et al. v. Aegis Senior Communities LLC,* Case No. 22CV007450

*Johnson v. GlaxoSmithKline, Inc.*

(2008) 166 Cal.App.4th 1497 .................................................................17

*Jones v. Alliance Imaging, Inc.*

(Alameda Super. Ct., Nov. 27, 2006) No. RG05210418..........................15

*Kullar v. Foot Locker Retail Inc. (2008)*

168 Cal. App. 4th 116...........................................................................9, 10

*Laffitte v. Robert Half Int'l Inc.*

(2016) 1 Cal. 5th 480..............................................................................14

*Lewis v. Wells Fargo & Co.*

(N.D. Cal. 2009) 669 F.Supp.2d 1124....................................................18

*Linder v. Thrifty Oil Co*

(2000) 23 Cal.4th 429.............................................................................17

*Linney v. Cellular Alaska P'ship*

(9th Cir. 1998) 151 F.3d 1234................................................................11

*Lynn's Food Stores, Inc. v. United States*

(11th Cir. 1982) 679 F.2d 1350..............................................................18

*Mendoza v. United States*

(9th Cir. 1980), 623 F.2d 1338...............................................................19

*Moniz v. Adecco U.S., Inc.*

(2021) 72 Cal.App.5th 56 .......................................................................11

*North County Contractor's Assn., Inc. v. Touchstone Ins. Svcs.*

(1994) 27 Cal.App.4th 1085 .....................................................................8

*O'Connor v. Uber Techs. Inc.*

(N.D. Cal. 2016)201 F.Supp.3d 1110......................................................11

*Ochoa v. Haralambos Beverage Co.*

(Los Angeles Super. Ct., Feb. 1, 2007) No. BC319588 ..........................14

*Officers for Justice v. Civil Serv. Com.*

(9th Cir. 1982) 688 F.2d 615............................................................................................11

*Otey v. CrowdFlower, Inc.*

(N.D. Cal. 2015) 2015 WL 6091741 ..............................................................................18

*Perez v. Staffmark Investment, LLC,*

(Riverside Super. Ct.) Case No. MCC1401137 ..............................................................15

*Ramirez v. Benito Valley Farms, LLC*

(N.D. Cal. Aug. 25, 2017) 2017 U.S. Dist. LEXIS 137272 ...........................................11

*Reyes v. Bd. of Supervisors*

(1987) 196 Cal.App.3d 1263............................................................................................16

*Rider v. County of San Diego*

(1992) 11 Cal.App.4th 1410 ............................................................................................15

*Robinson v. Southern Counties Oil*

(2020) 53 Cal.App.5th 476. ...............................................................................................5

*Ryan v. Cal. Interscholastic Fed'n*

(2001) 94 Cal.App.4th 1048 ............................................................................................18

*Sav-on Drug Stores, Inc. v. Superior Court*

(2004) 34 Cal.4th 319................................................................................................15, 16

*Schiller v. David's Bridal, Inc.*

(E.D. Cal. 2012) 2012 U.S. Dist. LEXIS 80776 ............................................................11

*Serrano v. Priest*

(1977) 20 Cal.3d 25..........................................................................................................15

*Terrell v. Ocean's 11 Casino, Inc.*

(San Diego Super. Ct., Feb. 10, 2004) No. GIC795732..................................................15

*Thames v. Cent. Transp. LLC*

(Sac. Cty. 2021) 2021 Cal. Super. LEXIS 33424 ...........................................................11

*Uribe v. Crown Bldg. Maint. Co.*

(2021) 70 Cal.App.5th 986 ...................................................................................5

*Viceral v. Mistras Grp., Inc.*

(N.D. Cal. 2016) 2016 U.S. Dist. LEXIS 140759 ...................................................11

*Vorise v. 24 Hour Fitness USA, Inc*.,

(Contra Costa Super. Ct.) Case No. C 15-02051 ....................................................15

*Wershba v. Apple Computer, Inc.*

(2001) 91 Cal.App.4th 224 ...............................................................................8, 9

**Statutes**

29 U.S.C. § 201 .............................................................................................1

29 U.S.C. § 216(b) ....................................................................................17, 18

Cal. Bus. & Prof. Code § 17200 .........................................................................1

Cal. Code Civ. Proc. § 1781(f) ...........................................................................8

Cal. Code Civ. Proc. § 382 .............................................................................1, 15

Cal. Code Civ. Proc. § 542 ...............................................................................5

Cal. Code Regs. tit. 8, § 13520 .........................................................................12

Cal. Lab. Code § 1174....................................................................................1

Cal. Lab. Code § 1174.5..................................................................................1

Cal. Lab. Code § 1182.12................................................................................1

Cal. Lab. Code § 1194...................................................................................1

Cal. Lab. Code § 1194.2.................................................................................1

Cal. Lab. Code § 1197...................................................................................1

Cal. Lab. Code § 1197.1.................................................................................1

Cal. Lab. Code § 1198...................................................................................1

Cal. Lab. Code § 201....................................................................................1

Cal. Lab. Code § 202....................................................................................1

Cal. Lab. Code § 203.................................................................................1, 12

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY APPROVAL OF SETTLEMENT
*Salonga, et al. v. Aegis Senior Communities LLC,* Case No. 22CV007450

Cal. Lab. Code § 204 ...................................................................................................... 1

Cal. Lab. Code § 210 ...................................................................................................... 1

Cal. Lab. Code § 225.5 ................................................................................................... 1

Cal. Lab. Code § 226 ...................................................................................................... 1

Cal. Lab. Code § 226.3 ................................................................................................... 1

Cal. Lab. Code § 226.7 ................................................................................................... 1

Cal. Lab. Code § 256 ...................................................................................................... 1

Cal. Lab. Code § 2800 .................................................................................................... 1

Cal. Lab. Code § 2802 .................................................................................................... 1

Cal. Lab. Code § 510 ...................................................................................................... 1

Cal. Lab. Code § 512 ...................................................................................................... 1

Cal. Lab. Code § 558 ...................................................................................................... 1

**Other Authorities**

*Eisenberg & Miller, Attorney Fees in Class Action Settlements: An Empirical Study, J. of Empirical*

*Legal Studies, Vol. 1, Issue 1, 27-78, March 2004* ..................................................... 14

Manual for Complex Litigation, § 21:311 (4th Ed. 2006) ............................................ 19

Manual for Complex Litigation, § 21:312 (4th Ed. 2006) ............................................ 19

*Newberg on Class Actions*, § 11:25 (4th Ed. 2002) ...................................................... 8

Newberg on Class Actions, § 8:21 (4th Ed. 2002) ......................................................... 19

**Rules**

Cal. Rules of Court, rule 3.766(d) ................................................................................ 19

Cal. Rules of Court, rule 3.769 ...................................................................................... 8

Cal. Rules of Court, rule 3.769(a) .................................................................................. 8

Fed. Rule Civ. Proc 23(e) ............................................................................................... 8

## I.  INTRODUCTION

Plaintiffs Andrea Martinez Salonga ("Salonga") and Daniela Melgoza ("Melgoza"), individually and on behalf of the putative class and collective members, the State of California, and Aggrieved Employees (collectively "Plaintiffs"), request that this Court take the first step in the settlement approval process and grant preliminary approval of their class, collective, and representative settlement with Defendant Aegis Senior Communities, LLC d/b/a Aegis Living ("Defendant").[1]

Through early intensive mediation and arm's-length negotiations by the Parties with the assistance of a respected wage and hour mediator, the Parties have resolved the claims of approximately 4,209 current and former non-exempt hourly employees for a total, non-reversionary Gross Settlement Amount of $3,000,000. This Settlement will resolve the claims based on Defendant's alleged violations of California and federal wage and hour laws for its failure to: include non-discretionary incentive bonuses in the regular rate of pay for sick wages and break premiums; correctly calculate gross wages earned; to pay for all time spent in COVID screenings; relinquish control over Class Members during meal and rest periods by requiring Class Members to monitor walkie-talkies at all times; pay all meal period premiums owed when Defendant's records showed late, short, or missed meal periods; and reimburse Class Members for the use their personal cell phones for business purposes. [2] Following significant investigation and informal discovery of the facts and law related to the allegations in Plaintiffs' four cases over the course of a year and a half, and a private mediation, the parties arrived at the proposed Settlement.

Plaintiffs believe the Settlement provides excellent benefits to the Class and Collective and an efficient outcome in the face of expanding litigation and risks. The Settlement easily falls within the range of reasonableness required for preliminary approval, far beyond a comparable 2018 settlement with Defendant for a fraction of the Settlement here, and the proposed Class satisfies all the criteria for class certifications under Cal. Code Civ. Proc. § 382. Accordingly, Plaintiffs

---

[1] Unless otherwise defined herein, capitalized terms have the meaning given in the Class and Collective Action Settlement Agreement and Release ("Settlement"), attached as **Exhibit A** to the Declaration of Carolyn H. Cottrell in Support of Plaintiff's Motion for Preliminary Approval of Settlement ("Cottrell Decl."), filed concurrently herewith.

[2] The applicable statutes follow: FLSA, 29 U.S.C. § 201 *et seq.,* Cal. Lab. Code §§ 201, 202, 203, 204, 210, 225.5, 226, 226.2, 226.3, 226.7, 256, 510, 512, 558, 1174, 1174.5 1182.12, 1194, 1194.2, 1197, 1197.1, 1198, 2800, and 2802, as well as alleged violations of Industrial Welfare Commission ("IWC") Wage Orders, and unlawful business practices in violation of Cal. Bus. & Prof. Code § 17200 *et seq.* (Cottrell Decl., ¶ 13.)

respectfully request that the Court preliminarily approve the settlement, provisionally certify the proposed Class and Collective for settlement purposes, authorize distribution of the proposed notice of Settlement, approve the proposed schedule to administer the Settlement, and set a Final Approval Hearing.

## II. BACKGROUND

### A. Factual and Procedural History

Defendant is a large national senior assisted living and memory care provider, operating nationwide in California, Washington, and Nevada. Plaintiff Salonga worked for Defendant from January 2021 to June 2021 as a wellness nurse at Defendant's Daly City, California facility. (Declaration of Andrea Salonga ["Salonga Decl."], ¶ 3.) Plaintiff Melgoza worked for Defendant from November 2021 to January 2022 as a caregiver at Defendant's Aptos, California facility. (Declaration of Daniela Melgoza ["Melgoza Decl."], ¶ 3.)

Together, Plaintiffs allege that Defendant: (1) failed to include non-discretionary incentive bonuses in the regular rate of pay for sick wages and break premiums; (2) failed to correctly calculate gross wages earned; (3) failed to pay for all time spent in COVID screenings; (4) failed to relinquish control over Class Members during meal and rest periods by requiring Class Members to monitor walkie-talkies at all times; (5) failed to pay all meal period premiums owed when Defendant's records showed late, short, or missed meal periods; and (6) required Class Members to use their personal cell phones for business purposes without reimbursement. (See, *supra,* n. 2.)

On November 24, 2021, Plaintiff Salonga filed a putative class action against Defendant in the Superior Court of California for the County of Alameda, Case No. 21CV003128, asserting wage and hour claims under the California Labor Code and the California Business & Professions Code. (Settlement, ¶ 2.1.) On January 26, 2022, pursuant to the Class Action Fairness Act, Defendant removed the lawsuit to the United States District Court for the Northern District of California, Case No. 3-22-cv-00525-LB. (*Id.*, ¶ 2.1.)  On February 23, 2022, Plaintiff Salonga filed a PAGA action against Defendant in this Court, asserting a single cause of action for civil penalties under PAGA. (*Id.*, ¶ 2.2.)[3]

On March 18, 2022, Melgoza filed a putative class and collective action against Defendant in the United States District Court for the Northern District of California, Case No. 3-22-cv-01756-LB, asserting wage and hour claims under the California Labor Code, the California Business &

---

[3] Plaintiff Salonga submitted her PAGA Notice to the California Labor and Workforce Development Agency ("LWDA") on November 24, 2021.

Professions Code, and the Fair Labor Standards Act ("FLSA"). (*Id.*, ¶ 2.3.) On May 5, 2022, Melgoza filed a PAGA action against Defendant, in San Francisco Superior Court, Case No. CGC-22-599517, asserting two causes of action for civil penalties under PAGA. (*Id.*, ¶ 2.4.)[4]

As part of the Settlement, the Parties agreed to consolidate the operative complaints in these four actions for settlement purposes only and to avoid duplication of settlement approval proceedings. (*Id.*, ¶ 2.9.) That consolidated complaint was filed in this Court pursuant to stipulated order on September 20, 2023. (First Amended Class and Collective Action and PAGA Complaint ["FAC"].)

**B. Discovery**

In anticipation of mediation, the Parties conducted extensive informal discovery. (Cottrell Decl., ¶¶ 14-15.) Defendant provided a sampling of approximately 10% of time, pay, and identifying records for all putative Class and Collective Members as defined in the complaints;[5] arbitration agreements; wage statements; time adjustment forms; employee handbooks for California and non-California employees, including addenda for employees in California, Nevada, and Washington; meal and rest break policies; job descriptions; and prior class action settlement documents in *Conlin v. Aegis Senior Communities, LLC*, N.D. Cal. Case No. 5:17-cv-05534-LHK (releasing claims for all persons who worked for Defendant as a non-exempt employee in California at any time between August 18, 2013 and February 25, 2018). (*Id.*) Class Counsel then conducted dozens of interviews with putative Class Members who worked in California, as well as putative Collective Members who worked in Washington and Nevada. (*Id.*)

From Plaintiffs' Counsel's investigations, Plaintiffs' Counsel determined and confirmed the following data points: (1) there are approximately 4,129 Class Members who worked 270,813 Workweeks during the Class Period; (2) there are approximately 1,525 Aggrieved Employees who worked 32,292 Pay Periods during the PAGA Period; (3) there are approximately 80 FLSA Collective Members who worked 4,000 Workweeks affected by the Kronos breach during the Collective Period; (4) the average time worked off-the-clock was three minutes per shift for Class

---

[4] On February 23, 2022, Plaintiff Melgoza submitted her PAGA Notice to the LWDA, and later submitted her PAGA complaint to the LWDA on May 10, 2022. (Cottrell Decl., ¶ 9.)

[5] A total of 4,129 putative Class Members and 5,122 putative Collective Members were originally sampled prior to the mediation; following mediation, however, the Parties agreed to settle only a small portion of the putative Collective to only cover an estimated 4,000 workweeks affected by the Kronos breach (as opposed to the estimated 241,716 total workweeks for the entire putative Collective, as defined by the Complaint. (*Id.*, ¶ 16, n.1.) The sampling provided to Plaintiffs' Counsel also included "true-up" pay records for reconciled wage payments due to the Kronos breach. (*Id.*)

Members; and (5) the average regular rate of pay was $17.18/hour for Class Members and $19.82/hour for Collective Members. (*Id.*, ¶ 16.) Based on this information and Defendant's data, Class Counsel's expert, Berger Consulting Group, performed a damages analysis. (*Id.*, ¶ 17.)

### C.  Mediation and Settlement

On March 28, 2023, the Parties attended a full-day, global mediation covering all four actions before Steve Rottman, Esq., a reputable employment mediator. (*Id.*, ¶ 18.) The Parties did not reach a settlement at the mediation but continued to engage in arms' length negotiations with the assistance of the mediator. (*Id.*) Subsequently on March 30, 2023, with the assistance of the mediator, the Parties reached a tentative settlement agreement. (*Id.*, ¶ 19.) The Parties thereafter spent months negotiating the specific terms of the Settlement, and have agreed to settle all pending litigation pursuant to the mediator's proposal and as set forth in the Agreement. (*Id.*) The Parties and their Counsel fully executed the Settlement on August 29, 2023. (*Id.*, ¶ 20.) Plaintiffs' Counsel intends to submit a copy of the Settlement to the LWDA contemporaneously with this Motion. (Settlement, ¶ 11.1; Cottrell Decl., ¶ 5.)

### III. TERMS OF THE SETTLEMENT

### A.  Basic Terms of the Settlement

The Settlement provides for a non-reversionary Gross Settlement Amount of $3,000,000, which includes any interest gained on the Gross Settlement Amount and any amounts paid pursuant to the Escalator Clause in the Settlement. (Settlement, ¶¶ 1.23, 7, 10.2.)  The Escalator Clause provides a *pro rata* adjustment of the Gross Settlement Amount by $10.55 per additional Workweek on any excess above 5%  in the event the estimated number of workweeks in the Class Period actually exceeds 272,108 by more than 5%. (*Id.*, ¶ 7.) Defendant will further pay its share of federal, state, and local taxes separately. (*Id.*, ¶ 1.23.)

For purposes of the Settlement, the Class includes Plaintiffs and all individuals employed by Defendant in non-exempt positions in the State of California at any time during the time period from May 30, 2017, to and including May 28, 2023. (*Id.*, ¶¶ 1.8, 1.10.) Such Class Members subsume the Aggrieved Employees, who were employed during the period from November 24, 2020, through May 28, 2023. (*Id.*, ¶¶ 1.4, 1.31.) The FLSA Collective Members include all individuals who were employed by Defendant in non-exempt positions anywhere in the United States at any time during the time period from November 14, 2021, to May 14, 2022. (*Id.*, ¶¶ 1.12, 1.13.)

Plaintiffs' Counsel will seek fees not to exceed 35% of the Gross Settlement Amount, or $1,050,000, and actual costs up to $35,000 (*Id.*, ¶¶ 1.5-1.6, 1.18.) The Settlement sets aside the actual

costs of settlement administration to Settlement Administrator, estimated not to exceed $58,000; $10,000 Service Awards to Plaintiff Salonga and Melgoza, each, for their service to the Class and Collective; and a PAGA Settlement Amount of $75,000, of which $18,750 (or 25%) will be distributed to Aggrieved Employees, and $56,250 (or 75%) will be paid to the LWDA. (*Id.*, ¶ 1.3, 1.32.)

### B. Scope of Releases

The releases contemplated by the proposed Settlement are dependent on whether the individual is a Participating Class Member, Opt-In Plaintiff, and/or Aggrieved Employee, and all such releases are effective as to the Released Parties, as of the Effective Date.[6] Participating Class Members will release all claims based on or arising from factual predicates alleged, or reasonably could have been alleged, in the Operative Complaint, during the Class Period.  (Settlement., ¶ 4.3.) Opt-In Plaintiffs will release all claims under the FLSA during the Collective Period, which are based on or arising from the factual predicates that were alleged, or reasonably could have been alleged, in the Operative Complaint. (*Id.*, ¶ 4.2.) Participating Class Members who are not Opt-In Plaintiffs and who cash their Settlement Award checks will also release the Released FLSA Claims against Released Parties. (*Id.*, ¶ 4.5.) Aggrieved Employees will release, on behalf of themselves and their representatives, claims for civil penalties under PAGA  that were alleged, or reasonably could have been alleged, in the Action based on the facts stated in the Operative Complaint and ascertained in the course of the Action, during the PAGA Period. (*Id.*, ¶ 4.4.) The Plaintiffs Salonga and Melgoza further agree to waive and relinquish the provisions, rights, and benefits, if any, of California Civil Code. Procedure 542 (*Id.*, ¶ 4.1.)

The scope of the Released Claims is proper under California class action law. "In a class action settlement, a clause providing for the release of claims may refer to all claims, both potential and actual, that may have been raised in the pending action with respect to the matter in controversy. A court may release not only those claims alleged in the complaint and before the court, but also claims which could have been alleged by reason of or in connection with any matter or fact set forth or referred to in the complaint." (*Amaro v. Anaheim Arena Mgmt., LLC* (2021) 69 Cal.App.5th 521, 537; see also *Uribe v. Crown Bldg. Maint. Co.* (2021) 70 Cal.App.5th 986, 1005; *Robinson v. Southern Counties Oil* (2020) 53 Cal.App.5th 476.)

---

[6] See also the Settlement, ¶¶ 1.17, 1.38, 4.2-4.4, for definitions of Effective Date, Released Parties, Released FLSA Claims, Released Class Claims, and Released PAGA Claims, respectively.

### C.  Allocations of Individual Settlement Awards

The estimated Net Settlement Amount available to approximately 4,129 Class Members and Aggrieved Employees, as well as approximately 80 Collective Members, is currently estimated to be $1,780,750. (See Settlement, ¶ 1.25; Cottrell Decl., ¶¶ 24-25.)[7] This provides an estimated average recovery of $423 per Participating Individual (i.e., Participating Class Members, Opt-In Plaintiffs, and Aggrieved Employees), assuming 100% participation in the Settlement. (Cottrell Decl., ¶ 26; see Settlement, ¶ 1.34.)

The Net Settlement Amount is to be divided among all Participating Individuals on a *pro-rata* basis. (Settlement, ¶ 10.3.5.3.) For each Workweek during the Class Period when a Participating Class Member was employed by Defendant, and for each Workweek during the Collective Period when a Collective Member was employed by Defendant , he or she shall be eligible to receive a *pro rata* portion of the Net Settlement Amount. (*Id.*, ¶ 10.3.5.5.) Each Workweek during which the individual was employed outside the State of California will be equal to one settlement share, and workweeks during which the individual was employed in California will be equal to three settlement shares to reflect the increased value of claims under California law. (*Id.*) The total number of settlement shares for all Participating Class Members and Opt-In Plaintiffs will be added together and the resulting sum will be divided into the Net Settlement Amount to reach a per share dollar figure. (*Id.*, ¶ 10.3.5.6.) That figure will then be multiplied by each individual's number of settlement shares to determine his or her *pro rata* portion of the Net Settlement Amount. (*Id.*)

Each Aggrieved Employee shall also receive a *pro rata* portion of the Net PAGA Amount based on his or her PAGA Pay Periods during which he or she was employed by Defendant in non-exempt positions in California during the PAGA Period. (*Id.*, ¶ 10.3.6.) The resulting Net PAGA Amount per Aggrieved Employee, if any, will be added to that Aggrieved Employee's Settlement Award. (*Id.*)

Any portion of each Settlement Award that is provided from the Net PAGA Amount shall be allocated as penalties. (*Id.*, ¶ 10.6.) For the remainder of each Settlement Award, 20% of each Settlement Award shall be allocated as wages, 75% of each Settlement Award shall be allocated as penalties, and 5% of each Settlement Award shall be allocated as expense reimbursements. (*Id.*)

---

[7] The estimated Net Settlement Amount means the Gross Settlement Amount less the following payments in the amounts approved by the Court: (a) the Service Awards; (b) the Fee Award; (c) Class Counsels' Costs Award; (d) Administration Costs; (e) the PAGA Settlement Amount; and (f) employers' share of any payroll taxes to be paid in connection with the Settlement. (Settlement, ¶ 1.25.)

Individual Settlement Payment checks will be valid for 180 days after issuance. (*Id.*, ¶ 10.13.) If, at the conclusion of the 180-day check cashing period, any funds remain from checks returned as undeliverable or that are not negotiated, those monies shall be tendered to the State of California Controller's Office, Unclaimed Property Fund, in the name of the Participating Individual until such time as he or she claims his or her property, as allowed by law, thereby leaving no "unpaid residue" subject to the requirements of California Code of Civil Procedure § 384(b). (*Id.*, ¶ 10.14.)

### D. Settlement Administration, Notice, and Requests for Exclusions and Objections

The Parties agreed to retain  Phoenix Settlement Administrators ("Phoenix") as the Settlement Administrator and determined that its bid for administration is fair. (*Id.*, ¶¶ 1.2, 6.1; Cottrell Decl., ¶ 27.) Phoenix is a willing, qualified, and experienced Settlement Administrator with operative procedures in place to protect the security of Class Data and adequate insurance in the event of a data breach, defalcation of funds, or other misfeasance. (Declaration of Jodey Lawrence ["Lawrence Decl."],  ¶¶ 5-16.)  Phoenix has no financial relationship with the Parties or their counsel. (Cottrell Decl., ¶ 28; Lawrence Decl., ¶ 4.)

Phoenix is responsible for preparing and distributing the Notice of Class Action Settlement and Notice of Collective Action Settlement (together, "Settlement Notice") in English, Spanish, Tagalog, and Mandarin, following receipt of the Class List from Defendant; skip-tracing current addresses prior to and following the mailing of the Settlement Notice; providing completed Opt-In Consent Forms to Class Counsel for filing; calculating individual settlement awards, all applicable payroll taxes, withholdings, and deductions; preparing and issuing all payments to Participating Individuals, the LWDA, Class Counsel, and applicable state and federal tax authorities; and preparing reports and certifications regarding the mailing of the Settlement Notice and distributions of the settlement awards. (See Settlement, Exs. B-C; *id.,* ¶¶ 1.7, 1.9, 1.11, 6.4-6.13, 10.1, 10.3, 10.7, 10.11-10.14.) Phoenix will also create a Settlement website and call center. (*Id.*, ¶ 6.5.1.) The Settlement Notice will provide information to Class Members who wish to object or exclude themselves from the Settlement, or dispute their estimated workweeks, as well as instructions on how to do so. (See Settlement, Exs. B-C, ¶ 1.39.)

### IV. THE COURT SHOULD PRELIMINARILY APPROVE THE SETTLEMENT

### A. Class Action Settlement Approval Procedure

 California law strongly favors settlements, particularly in the class action context. (*In re Cellphone Termination Fee Cases* (2009) 180 Cal.App.4th 1110, 1118 [noting that public policy favors "the compromise of complex class action litigation"); see also *Ferguson v. Lieff, Cabraser,*

*Heimann & Bernstein* (2003) 30 Cal.4th 1037, 1054.). Before a class action can settle, however, a court must approve the terms of the proposed settlement. (*Dunk v. Ford Motor Co.* (1996) 48 Cal.App.4th 1794, 180; Cal. Code Civ. Proc. § 1781(f); Cal. Rules of Court, Rule 3.769(a).)[8]  The Court's review and approval of a proposed class-action settlement involves a three-step process: (1) preliminary approval of the proposed settlement after submission of a written motion for preliminary approval, the proposed class action settlement, and the proposed Class Notice; (2) mailing of notice of the settlement to all affected Members of the Settlement Class; and (3) a final settlement approval hearing at which Members of the Settlement Class may be heard regarding the settlement, and at which evidence and argument concerning the fairness, adequacy, and reasonableness of the settlement is presented. (See Cal. Rules of Court, Rule 3.769.)

With this Motion, the Parties take the first step and ask the Court to grant preliminary approval. The Settlement proposed herein is based on extensive arm's-length negotiations that were guided by an experienced and respected mediator, as well as Plaintiff's Counsel's investigation and the evaluation of substantial informal discovery. The proposed Settlement provides substantial monetary recovery for the Class, and it satisfies all the required due process protections. Thus, the proposed Settlement is fair, reasonable, and adequate, and Plaintiff therefore request that the Court preliminarily approve the Settlement.

### B.  Preliminary Approval of the Class Portion of the Settlement is Appropriate

The decision to approve or reject a proposed settlement is committed to a court's broad discretion. (*Wershba v. Apple Computer, Inc.* (2001) 91 Cal.App.4th 224, 234-35.) To grant preliminary approval of a class action settlement, the court need find only that the settlement falls within the range of possible final approval, also described as "the range of reasonableness." (See, e.g.*, North County Contractor's Assn., Inc. v. Touchstone Ins. Svcs*. (1994) 27 Cal.App.4th 1085, 1089-90; see also *Newberg on Class Actions*, § 11:25.) To make this determination, courts must consider several relevant factors, including "the strength of [the] plaintiffs' case, the risk, expense, complexity and likely duration of further litigation, the risk of maintaining class action status through trial, the amount offered in settlement, the extent of discovery completed and the stage of the proceedings, [and] the experience and views of counsel." (*Dunk v. Ford Motor Co*. (1996) 48 Cal.App.4th 1794, 1801.) "The list of factors is not exclusive, and the court is free to engage in a

---

[8] (See California Civil Code § 1781(f); California Rules of Court 3.769; see also Federal Rule of Civil Procedure 23(e).) The California Supreme Court has authorized and urged California's trial courts to use Federal Rule of Civil Procedure Rule 23 and federal case law for guidance in considering class action issues. (*Green v. Obledo* (Cal. 1981) 29 Cal.3d 126, 145-46.)

balancing and weighing of the factors depending on the circumstances of each case." (*Wershba, supra*, 91 Cal.App.4th at p. 245.) Under the relevant factors, the Settlement warrants preliminary approval.

### 1. The Settlement Was Reached After Extensive Litigation, Discovery, and Analysis of the Class Claims

A presumption of fairness exists where, as here: (1) the settlement is reached through arm's-length bargaining; (2) investigation and discovery are sufficient to allow counsel and the court to act intelligently; (3) counsel is experienced in similar litigation; and (4) the percentage of objectors is small. (*Kullar, supra,* 168 Cal.App.4th at p. 1286.) Preliminary approval is warranted where the Court is provided sufficient information regarding the discovery process and the facts developed (see *id*. at pp. 129-31, so that the Court may form "an understanding of the amount that is in controversy and the realistic range of outcomes of the litigation." (*Clark v. Am. Residential Servs. LLC* (2009) 175 Cal.App.4th 785, 801.)

The Parties engaged in extensive arm's-length settlement negotiations and participated in a formal, full-day mediation session conducted by Steve Rottman, Esq., a well-respected and experienced mediator in wage and hour class actions. (Cottrell Decl., ¶¶ 18-21.) Only after the Parties and their counsel spent months negotiating, drafting, and finalizing the long-form Settlement, was the Settlement executed approximately 5 months later. (See *id.*) To facilitate settlement negotiations, Plaintiffs' Counsel investigated the applicable law and the facts in this case and extensively analyzed the potential damages and penalties that could be recovered following the exchange of hundreds of pages of documents and information with Defendant. (*Id.,* ¶ 14-21, 30-36, 38-45.) Plaintiffs' Counsel further interviewed dozens of putative Class Members to gather facts and identify potential witnesses. (*Id.,* ¶ 15.) Plaintiffs' Counsel used this information to perform a careful and extensive analysis of the effects of Defendant's compensation policies and practices on Class Members' pay. (*Id.,* ¶¶ 16, 30.)

The Settlement is based on this large volume of investigation, evidence, and analysis, which is more than sufficient to allow counsel and the Court to act intelligently. (*Kullar, supra*, 168 Cal.App.4th at p. 128.) Plaintiffs' Counsel are experienced and respected class action litigators. (Cottrell Decl., ¶¶ 6-8; Bekam Decl., ¶¶ 3-15.) Based on Plaintiffs' Counsel's knowledge and expertise in this area of law, Plaintiffs' Counsel believe this Settlement will provide an excellent benefit to the Class Members. (Cottrell Decl., ¶¶ 22-23, 29, 37, 45.) Plaintiffs' Counsel also believes the percentage of Class Members who will request exclusion from the Settlement will be small. (*Id.,*

¶ 23.) Accordingly, the *Kullar* factors are satisfied, and the Settlement is entitled to a presumption of fairness.

## 2. Strength of Plaintiffs' Case, Amount Offered in Settlement, and Litigation Risks

"The most important factor is the strength of the case for plaintiffs on the merits, balanced against the amount offered in settlement." (*Kullar, supra*, 168 Cal.App.4th at p. 130.) A preliminary review of the Settlement reveals the fairness of its terms. (Cottrell Decl., ¶ 22.) The Settlement provides an anticipated Net Settlement Amount of approximately $1,780,750 to approximately 4,129 Class Members and 80 Collective Members. (*Id.,* ¶¶ 24-25.) This provides an excellent, estimated average recovery of $423, assuming 100% participation in the Settlement. (*Id.,* ¶ 26.)

The Gross Settlement Amount of $3,000,000 represents approximately 27% of the $11,198,578 total estimated substantive exposure represented by the claims in this action. (*Id.,* ¶¶ 31-32.) For purposes of estimating these damages, Plaintiffs' Counsel's expert calculated the maximum potential exposure analysis of all Class, PAGA, and FLSA claims, which was subsequently revised to reflect various considerations. (*Id.,* ¶¶ 17, 30-32.) The estimation of the exposure was based on the following assumptions, which were based on Plaintiffs' Counsel substantial investigation: that Plaintiffs will fully prevail on all causes of action, can prove 3 minutes of off-the-clock work per Class Member and Collective Member, can prove that approximately 35% of rest breaks were noncompliant without corresponding premiums paid. (*Id.,* ¶¶ 33.)

This damages analysis further reflects the effect of the prior *Conlin v. Aegis Senior Living Communities LLC* settlement of $410,000. (See *id.,* ¶ 34.) In *Conlin*, the settlement was reached on behalf of 3,620 non-exempt employees who worked for Aegis in California between August 18, 2013 and February 25, 2018, for a total of $410,00, of which $102,500 was approved for reasonable attorneys' fees. (*Conlin v. Aegis Senior Living Communities LLC*, Case No. 17-CV-05534-LHK (N.D. Cal. Nov. 29, 2018), ECF Nos. 52 [final approval order], 32-3 [settlement].) The *Conlin* settlement represented over 100% of "unpaid wages," but an unknown percentage of total potential exposure, which would include statutory penalties. (*Id.,* ECF No. 42-1, at pp. 5-6.) By comparison, *Conlin* provided an average estimated recovery of $113 for Class Members.

The Settlement represents an excellent result. The Settlement and the recovery it represents, including the amount allocated as PAGA damages, is easily within the range of settlements case law establishes as reasonable. After all, "[i]t is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not *per se* render the settlement inadequate or unfair."

(*In Re Mego Fin. Corp. Sec. Litig.* (9th Cir. 2000) 213 F.3d 454, 459 [internal quotations and citations omitted].)   Indeed, courts routinely approve settlements that provide a fraction of the maximum potential recovery.[9]

It is equally well-settled that a proposed settlement is not to be measured against a hypothetical ideal result that might have been achieved. (See, e.g., *7-Eleven Owners for Fair Franchising v. Southland Corp.* (2000) 85 Cal.App.4th 1135, 1150.) "[I]t is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements. The proposed settlement is not to be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators." (*Ibid.* [quoting *Linney v. Cellular Alaska P'ship* (9th Cir. 1998) 151 F.3d 1234, 1242].) The excellent result here easily satisfies these standards.

### 3.  Litigation of this Action Not Only Would Delay Recovery, But Would Be Expensive, Time-Consuming, and Would Involve Substantial Risk

The amount offered in the Settlement is particularly reasonable in light of the risks, costs, and likely duration of further litigation, including the risk of not obtaining class certification and not surviving decertification. Absent this Settlement, it is estimated Plaintiffs' Counsel's fees and costs would far exceed $3,000,000 to pursue these claims on behalf of Class Members. (Cottrell

---

[9] (See, e.g., *Officers for Justice v. Civil Serv. Com.* (9th Cir. 1982) 688 F.2d 615, 628; *Viceral v. Mistras Grp., Inc.* (N.D. Cal. 2016) 2016 U.S. Dist. LEXIS 140759, at *7 [approving wage and hour settlement of approximately 8% of total verdict value]; *Hurtado v. Esperer Holdings* (Los Angeles Cty. 2021) 2021 Cal. Super. LEXIS 137529, *6 [noting that "typical PAGA settlement[s]" "include[e] those that provide for less than the one percent allocation to PAGA penalties"]; *Thames v. Cent. Transp. LLC* (Sac. Cty. 2021) 2021 Cal. Super. LEXIS 33424, *12 [approving PAGA allocation of $25,000.00 in $601,037.52 gross settlement]; *Balderas v. Massage Envy Franchising, LLP* (N.D. Cal. 2014) 2014 WL 3610945, at *5 [approving settlement totaling 8% of maximum recovery]; *In re Omnivision Techs. Inc.* (N.D. Cal. 2008) 559 F.Supp.2d 1036, 1042 [6-8% of estimated damages]; *In re Uber FCRA Litig.* (N.D. Cal. June 29, 2017) No. 14-cv-05200-EMC, 2017 U.S. Dist. LEXIS 101552, at *23- 24 [7.5% or less of total possible verdict]; *Cruz v. Sky Chefs, Inc.* (N.D. Cal. Dec. 19, 2014) No. 12-cv-02705-DMR, 2014 WL 7247065, at *5 [8.6% of maximum potential recovery].)
Additionally, the Settlement's amount to the PAGA component is fair to those affected. *Moniz v. Adecco U.S., Inc.* (2021) 72 Cal.App.5th 56 at 77. The $75,000 PAGA Payment represents 2.5% of the Gross Settlement Amount, well within PAGA settlements previously approved by California courts, and is a fair, reasonable, and adequate compromise for the Aggrieved Employees, who are encompassed by the Class and will also receive compensation as Class Members unless they request exclusion. (See, e.g., *Johnson v. Dispensaries* (Super. Ct. L.A. Cnty. Nov. 1, 2022) No. 21SMCV00156, 2022 Cal. Super. LEXIS 76537, at *4, 20 [approving PAGA allocation of $40,000, with $10,000 going to the Aggrieved Employees]; *Schiller v. David's Bridal, Inc.* (E.D. Cal. 2012) 2012 U.S. Dist. LEXIS 80776, at *35-36 [approving PAGA settlement of $7,500 or 0.14% of the total settlement.) Indeed, the LWDA has stated it "is not aware of any existing case law establishing a specific benchmark for PAGA settlements, either on their own terms or in relation to the recovery on other claims in the action." (*Ramirez v. Benito Valley Farms, LLC* (N.D. Cal. Aug. 25, 2017) No. 16-CV-04708-LHK, 2017 U.S. Dist. LEXIS 137272, at *3 [quoting from the LWDA response in *O'Connor v. Uber Techs. Inc.*, 201 F.Supp.3d 1110 (N.D. Cal. 2016)].)

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT
*Salonga, et al. v. Aegis Senior Communities LLC,* Case No. 22CV007450

Decl., ¶ 38.) Here, the certain benefits of the Settlement must be considered in conjunction with the risks of continuing litigation, which Class Counsel carefully assessed. Litigating the Class claims in this action would require substantial additional preparation and discovery, involving the depositions of Class Members and experts, presentation of witnesses at trial, and the analysis, preparation, and presentation of voluminous documentary evidence. (*Id.*) Such efforts would likely take many more months, if not years, and would necessitate expert witness testimony and significant additional litigation, including potential appellate litigation. (*Id.*)

Additionally, Plaintiff's derivative claims regarding waiting time penalties, accurate wage statements, and PAGA penalties rise and fall with Plaintiff's other wage payment claims. (*Id.*, ¶ 39.) For example, Plaintiff would recover nothing under Cal. Lab. Code § 203 if they were unable to prove the underlying claims or defeat a "good faith" dispute defense. *See* Cal. Code Regs. Tit. 8, § 13520. While Plaintiff believes that she would prevail on these issues and others, Plaintiff recognizes the risk that a fact finder may find for Defendants on one or more of these issues and may find damages to be significantly less than what Plaintiffs claim.

Furthermore, as it has maintained throughout settlement negotiations and mediation, Defendant, represented by experienced employment lawyers, believes that this case is not suitable for class treatment and that it fully complied with its wage obligations with respect to Plaintiff, the Class Members, and the Aggrieved Employees. (Settlement, ¶ 2.9.) Specifically, Defendant may argue that some or all of the off-the-clock work is *de minimis* and not compensable under the relevant wage and hour laws at issue. (Cottrell Decl., ¶ 41.) Defendant may also assert that it maintains compliant policies to compensate Class Members for all work during the Class Period. (*Id.*) With respect to Plaintiffs' meal and rest period claims, Defendant may assert that it maintains strong policies regarding meal and rest periods, provides Class Members with a "Time Adjustment Form" to report missed/waived meal breaks, and that it does not require Class Members to respond to or even carry communication devices during breaks. (*Id.*, ¶ 42; see also, *id.,* ¶ 39.)  With respect to Plaintiffs' expense reimbursement claim, Defendant may assert that Class Members were not required to use their cell phones to access their work email or wage statements. (*Id.*, ¶ 43.)

While Plaintiffs believe they would have prevailed on these issues and others, they also recognize the risk that a fact finder could have found for Defendant on one or more of these issues and/or found damages to be significantly less than what Plaintiffs claim. (*Id.*, ¶ 44.)  Given the broad scope and magnitude of risks, Plaintiffs' Counsel concluded that the Settlement here, which provides

a material percentage of the damages estimate, is a beneficial and just result for the Class and Collective. (*Id.*, ¶ 45.)

### 4.  The Proposed Individual Service Awards are Reasonable

Service awards "are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." *Cellphone Termination Fee Cases* (2010) 186 Cal.App.4th 1380, 1393–94.

Here, the Plaintiffs have substantially contributed their time and efforts over a period of a year and a half in pursuing the Class, FLSA, and PAGA claims, and Plaintiffs' roles were crucial in this case. As demonstrated in Plaintiffs' Declarations, Plaintiffs had numerous discussions with Class Counsel, worked with Class Counsel to review facts and answer questions, assisted Class Counsel in their mediation efforts, and remained apprised of the case since electing to become Class Representatives. (Salonga Decl., ¶¶ 4-6, 10-15; Melgoza Decl., ¶¶ 4-6, 10-15; Cottrell Decl., ¶¶ 46-49.) Moreover, Plaintiffs took the significant risk of coming forward to represent the interests of their fellow employees. (Salonga Decl., ¶¶ 7-8, 15; Melgoza Decl., ¶¶ 7-8, 15.) They stepped into this matter so that the claims could proceed, out of a sincere desire to see through the adjudication of Defendant's treatment of its employees. (Salonga Decl., ¶¶ 4, 9-10, 15; Melgoza Decl., ¶¶ 4, 9-10, 15.) As a result of their service, they subjected themselves to considerable risks with regards to having their names in the public forum. (Salonga Decl., ¶¶ 7-8, 15; Melgoza Decl., ¶ 7-8, 15.) Plaintiffs further have agreed to a broader release than those of the Class and the Collective. (Settlement, ¶ 4.1.) Plaintiffs' service awards of $10,000 each are reasonable considering the efforts they made and the risks they took in prosecuting this Action to obtain the Settlement.

### 5.  The Proposed Attorneys' Fees and Costs are Reasonable

Plaintiffs will seek reasonable attorneys' fees and costs from the Gross Settlement Amount. Under the terms of the Settlement, Class Counsel may seek fees not to exceed 35% of the Gross Settlement Amount, or $1,050,000, and actual costs up to $35,000. (Settlement, ¶¶ 1.5, 1.6, 1.18.) SWCK and Aegis have entered a fee-splitting agreement, which Plaintiffs approved in writing. (Cottrell Decl., ¶ 52.) Plaintiffs' Counsel's lodestar amount, which will be provided with the fee motion in advance of final approval, supports this request and will only increase with preparation and attendance at the preliminary and final approval hearings, further communications with Class Members, and Settlement administration and oversight. (*Id..*, ¶ 50; Bekam Decl., ¶ 17.)

In this case, there was no guarantee of compensation or reimbursement. (Cottrell Decl., ¶ 53; Bekam Decl., ¶ 16.) Rather, Class Counsel has undertaken all the risks of this litigation on a completely contingent fee basis. (Cottrell Decl., ¶ 53.) The inherent risk of proving liability and damages on a class-wide basis and Defendant's representation by skillful counsel confronted Plaintiffs' Counsel with the prospect of recovering nothing or close to nothing for their commitment to and investment in the case. (*Id.*) Nevertheless, Plaintiffs and Class Counsel have committed themselves to developing and pressing Plaintiffs' legal claims to enforce the employees' rights and maximize the Class and Collective recovery. (*Id.*)

This commitment and the risks involved are precisely the reasons for multipliers in contingency fee cases. (*Id.*, ¶ 54.) As Class and Collective Members will receive a significant payment if the Settlement is approved, Plaintiffs' Counsel seeks a reasonable fee award for their efforts and the risk they have assumed. (*Id.*) Attorneys who litigate on a wholly or partially contingent basis expect to receive significantly higher effective hourly rates in cases where compensation is contingent on success, particularly in hard-fought cases where, like in the case at bar, the result is uncertain. (*Id.*) This does not result in any windfall or undue bonus. (*Id.*)  In the legal marketplace, a lawyer who assumes a significant financial risk on behalf of a client rightfully expects that his or her compensation will be significantly greater than if no risk was involved (i.e., if the client paid the bill monthly), and that the greater the risk, the greater the "enhancement." (*Id.*) Adjusting court-awarded fees upward in contingent fee cases to reflect the risk of recovering no compensation whatsoever for hundreds of hours of labor simply makes those fee awards consistent with the legal marketplace, and in so doing, helps to ensure that meritorious cases will be brought to enforce important public interest policies and that clients who have meritorious claims will be better able to obtain qualified counsel. (*Id.*)

Plaintiffs' Counsel's fee request of 35% of the Gross Settlement Amount is well within the range customarily approved by California and Federal courts in comparable class and collective actions. (See, e.g., *Laffitte v. Robert Half Int'l Inc.* (2016) 1 Cal. 5th 480, 506 ["33 1/3 percent of the common fund is consistent with, and in the range of, awards in other class action lawsuits"].) *See also Chavez v. Netflix, Inc.* (2008) 162 Cal.App.4th 43, 66 n.11; Eisenberg & Miller, *Attorney Fees in Class Action Settlements: An Empirical Study*, J. OF EMPIRICAL LEGAL STUDIES, Vol. 1, Issue 1, 27-78, March 2004, at 35 [independent studies of class action litigation nationwide conclude that fees representing one-third of the total recovery is consistent with market rates]; *Ochoa v. Haralambos Beverage Co.* (Los Angeles Super. Ct., Feb. 1, 2007) No. BC319588 [approving 33.3%

fee award with no mention of lodestar crosscheck]; *Jones v. Alliance Imaging, Inc.* (Alameda Super. Ct., Nov. 27, 2006) No. RG05210418 [approving 33% fee award with no mention of lodestar crosscheck]; *Garcia v. Save Mart Supermarkets* (Stanislaus Super. Ct., Aug. 3, 2004) No. 312026 [approving 33% fee award with no mention of lodestar crosscheck]; *Terrell v. Ocean's 11 Casino, Inc.* (San Diego Super. Ct., Feb. 10, 2004) No. GIC795732 [approving 33% fee award with no mention of lodestar crosscheck]; *Vorise v. 24 Hour Fitness USA, Inc.*, (Contra Costa Super. Ct.) Case No. C 15-02051 [33.33% fee awarded on a PAGA case); *Garcia v. Pep Boys, Orange County Superior Court*, Case No. 30-2014-00720574-CU-OE-CJC (33.33% fee awarded on a PAGA-only case); *Perez v. Staffmark Investment, LLC*, (Riverside Super. Ct.) Case No. MCC1401137 [33.33% fee awarded on a $650,000.00 settlement of a PAGA only case].)

Further, reasonable litigation expenses are ordinarily included with an award of attorneys' fees pursuant to California wage and hour law. (See *Serrano v. Priest* (1977) 20 Cal.3d 25, 35; *Rider v. County of San Diego* (1992) 11 Cal.App.4th 1410, 1424.) Here, Class Counsel's expenses are reasonable, were necessary to the prosecution, and are customarily billed to fee-paying clients. (Cottrell Decl., ¶ 55; see also, Bekam Decl., ¶ 17.) Thus, the requested attorneys' fees and costs are reasonable compensation for the excellent recovery achieved and should be preliminarily approved.

## V.  THE COURT SHOULD CERTIFY THE PROPOSED CLASS FOR SETTLEMENT PURPOSES

This Court should certify the proposed Class pursuant to Cal. Code Civ. Proc. § 382 for purposes of the Settlement.[10]  California has a strong public policy in favor of broad enforcement of wage and hour laws for the benefit of workers and in favor of using the class action device. (*Sav-on Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 340.) The party seeking certification has the burden to establish the existence of both an ascertainable class and a well-defined community of interest among class members. (*Id.* at p. 326 [citations omitted].) The 'community of interest' requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." (*Id.*) The benefits and efficiencies of this proposed Settlement, when compared to continued litigation of this case on either a class basis or through hundreds if not thousands of individual suits, justifies certification of the proposed Class.

---

[10] For purposes of the Settlement only, the parties have stipulated that the requisites for establishing class certification pursuant to Cal. Code Civ. Proc. § 382 are met. (Settlement, ¶ 2.12.)

## A.  The Class is Sufficiently Ascertainable and Numerous

In determining whether a class is "ascertainable," courts "examine the class definition, the size of the class, and the means of identifying the class members." (*Reyes v. Bd. of Supervisors* (1987) 196 Cal.App.3d 1263, 1274-75.) Here, the parties have agreed to define the Class according to clear, objective criteria. (Settlement, ¶¶ 1.8, 1.10.) The Class Members are thus easily identifiable and can be easily located from Defendant's records. (See Cottrell Decl., ¶ 57.) Likewise, potential Class Members will easily be able to identify themselves as members of the Class based upon the parties' agreed-upon Class definition. Moreover, the Class consists of approximately 4,129 putative Class Members, making joinder impracticable. The putative Class is therefore both ascertainable and numerous.

## B.  The Class Members Share a Well-Defined Community of Interest

The "community of interest" requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." (*Sav-On*, *supra,* 34 Cal.4th at p. 326.) The requirement "does not mandate that class members have uniform or identical claims." (*Capitol People First v. Dep't of Developmental Servs.* (2007) 155 Cal.App.4th 676, 692 [italics removed].)

"[T]he focus in a certification dispute is on what type of questions – common or individual – are likely to arise in the action[.]" (*Sav-On*, *supra,* 34 Cal.4th at p. 427.) Predominance does not require that all questions of law and fact be uniform for all members of the class. (*Id*. at 338.) Here, Plaintiffs contend that Defendant's class-wide policies and procedures raise common issues of law and fact that are applicable to the claims of Plaintiffs and Class Members. (Cottrell Decl., ¶ 58.) At issue are Defendant's policies and procedures applied uniformly to Class Members, including Defendant's policies and procedures for compensating employees for off-the-clock work and overtime work, Defendant's policies and procedures for meal and rest periods, Defendant's policies and procedures for expense reimbursements, and Defendant's maintenance of working conditions resulting in employees spending unrecorded and uncompensated time working. (*Id.*, ¶¶ 59-60.)

Where, as in this case, uniform policies and procedures apply on a class-wide basis, "the legal question to be resolved is not an individual one. To the contrary, the common legal question remains the overall impact of [Defendant's] policies" on its employees. (*Jaimez v. Daiohs USA, Inc.* (2010) 181 Cal.App.4th 1286, 1299.) Plaintiff can rely on common proof (*e.g.*, Defendant's time and payroll

records) to show these common violations. The Court should therefore find that common questions predominate over any individualized differences among the Class Members in this case.

### C.  Typicality Is Satisfied

A representative plaintiff's claims are "typical" if they arise from the same event, practice, or course of conduct that gives rise to the claims of the other class members and if their claims are based on the same legal theory. (*Classen v. Weller* (1983) 145 Cal.App.3d 27, 46-47; *Linder v. Thrifty Oil Co* (2000) 23 Cal.4th 429, 435.) The typicality requirement is not onerous and does not require the claims to be identical. (*Classen, supra,* 145 Cal.App.3d at p. 46.)

Here, Plaintiffs contend that they, like other Class Members, were subject to Defendant's policies and procedures described above, and suffered damages from the alleged wage and hour violations that emanated as a result. (Cottrell Decl., ¶ 60.) Further, Plaintiffs assert that the Class Members were subjected to the same illegal practices and policies to which Plaintiffs were subjected and the Class claims are based on the same legal theory as Plaintiffs' individual claims. (*Id.*) Accordingly, Plaintiffs are members of the Class they seek to represent, and their claims are "typical" of those asserted by other Class Members.

### D.  Adequacy Is Satisfied

A plaintiff is an adequate class representative if his or her claims are not inconsistent with or antagonistic to the claims of the class members. (See *Johnson v. GlaxoSmithKline, Inc*. (2008) 166 Cal.App.4th 1497, 1509.) Here, Plaintiffs' interests are exactly in line with those of the Class, Plaintiffs have agreed to prosecute this case as Class Representatives with the interests of the Class in mind and understand their responsibilities, and there are no conflicts between Plaintiffs and the proposed Class. (See Salonga Decl., ¶¶ 3, 15; Melgoza Decl., ¶¶ 3, 15.) Furthermore, Plaintiffs are represented by Class Counsel with extensive experience in class action and employment litigation, including wage and hour class actions, and who do not have any conflict with the Class or the Settlement Administrator. (Cottrell Decl*.,* ¶¶ 6-8; Bekam Decl., ¶¶ 3-15.) For these reasons, Plaintiffs are adequate class representatives, and Schneider Wallace Cottrell Konecky LLP and Aegis Law Firm PC are appropriate Class Counsel.

## VI. THE COURT SHOULD CERTIFY THE PROPOSED FLSA COLLECTIVE FOR SETTLEMENT PURPOSES

This Court should certify the proposed Collective pursuant to 29 U.S.C. § 216(b) for purposes

of the Settlement.[11] Most courts in the Ninth Circuit first consider whether the named plaintiffs are "similarly situated" to the putative collective members, and then evaluate the settlement under the standard established by the Eleventh Circuit. (See *Lynn's Food Stores, Inc. v. United States* (11th Cir. 1982) 679 F.2d 1350, 1355.) This standard requires the settlement to constitute a "fair and reasonable resolution of a bona fide dispute over FLSA provisions." (*Otey v. CrowdFlower, Inc*. (N.D. Cal. 2015) 2015 WL 6091741 at *4.) "If a settlement in an employee FLSA suit does reflect a reasonable compromise over issues . . . that are actually in dispute," the court may "approve the settlement in order to promote the policy of encouraging settlement in litigation." (*Lynn's*, *supra,* 679 F.2d at p. 1354; *Otey*, *supra,* 2015 WL 6091741 at *4.)

Plaintiffs made substantial factual allegations showing collective members are similarly situated because they are subject to a common practice or policy in violation of the FLSA. (Cottrell Decl., ¶ 61.) Defendant maintains various common policies and practices as to what work it compensates and what work it does not compensate and applies these policies and practices to the Collective members. (*Id*., ¶ 59-61.) This is all that is needed to show that the Collective Members are similarly situated under the FLSA. (See 29 U.S.C. § 216(b).)[12] Therefore, the Court should find that Plaintiffs and the Collective Members are similarly situated, and that the Settlement is a "fair and reasonable resolution" for the same reasons discussed above.

## VII.    THE COURT SHOULD APPROVE THE SETTLEMENT NOTICE

"Adequate notice is critical to court approval of a class settlement." (*Hanlon v. Chrysler Corp*. (9th Cir. 1998) 150 F.3d 1011, 1025.) A class action settlement notice "is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." (*Churchill Village LLC v. General Electric* (9th Cir. 2004) 361 F.3d 566, 575.) All that is required is that the proposed notice be reasonably calculated to notify interested parties of the pendency of the action and their right to present their objections. (*Ryan v. Cal. Interscholastic Fed'n* (2001) 94 Cal.App.4th 1048, 1072.) Indeed, courts have approved class notices even when they provide only general information about

---

[11] For purposes of the Settlement only, the parties have stipulated that the requisites for establishing collective action certification under the FLSA pursuant to 29 USC § 216(b) are met. (Settlement, ¶ 2.12.)

[12] (*Lewis v. Wells Fargo & Co*. (N.D. Cal. 2009) 669 F.Supp.2d 1124, 1127 ["All that need be shown by the plaintiff is that some identifiable factual or legal nexus binds together the various claims of the class members in a way that hearing the claims together promotes judicial efficiency and comports with the broad remedial policies underlying the FLSA."].)

a settlement. (See, e.g., *Mendoza v. United States* (9th Cir. 1980)*, 623 F.2d 1338, 1351, disapproved on other grounds by *Evans v. Jeff D.* (1986) 475 U.S. 717, 725, n. 10.)

Here, the manner of providing the Settlement Notice easily satisfies these standards. The Settlement Notice will be mailed to each Class Member at his or her last-known address, following an updated review of the National Change of Address Registry by Phoenix. (Settlement, ¶¶ 6.4-6.5.) Any returned envelopes from this mailing with forwarding addresses will be utilized by Phoenix to forward the Notices to the individuals. (*Id.*) In addition, Phoenix will create a website for the Settlement, which will allow Class Members to view papers regarding the Settlement, and will also create a toll-free call center to field telephone inquiries from Class Members during the notice and settlement administration periods. (*Id.*, ¶ 6.5.1.)

The proposed Class Notice and Collective Notice are clear and straightforward, and provide information on the case, the meaning and nature of the proposed Settlement, its terms and provisions, and the rights of the Class and Collective Members to participate, opt out, and object. (See Settlement, Exs. B-C.) They describe the monetary awards that the Settlement will provide to Class and Collective Members, how the awards were calculated, and the releases. They also provide the date, time, and location of the Final Approval Hearing, and the identity and contact information for Class Counsel and all other information required by Cal. Rules of Court, Rule 3.766(d). The proposed Class Notice and Collective Notice fulfill the requirement of neutrality in class notices. (See *Newberg on Class Actions* at §§ 8:21 and 8:39, *Manual for Complex Litig.* at §§ 21:311 and 21:312.) Accordingly, the Settlement Notice complies with the standards of fairness, completeness, and neutrality required of a settlement notice authorized for dissemination by the Court.

## VIII.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant this Motion for Preliminary Approval and enter an order consistent with the [Proposed] Order submitted herewith.

Dated: November 3, 2023                    Respectfully Submitted,

Samuel A. Wong
Kashif Haque
Jessica L. Campbell
Fawn F. Bekam
**AEGIS LAW FIRM, PC**

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY APPROVAL OF SETTLEMENT
*Salonga, et al. v. Aegis Senior Communities LLC*, Case No. 22CV007450

1

2

3
_____

4
Carolyn H. Cottrell
David C. Leimbach

5
Michelle S. Lim
**SCHNEIDER WALLACE**

6
**COTTRELL KONECKY LLP**

7
*Attorneys for Plaintiffs, the Putative Collective,*

8
*the Putative Class, Aggrieved Employees, and on behalf of the State of California*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

30

31

32

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR
PRELIMINARY APPROVAL OF SETTLEMENT
*Salonga, et al. v. Aegis Senior Communities LLC,* Case No. 22CV007450